1  ANDERSON YEH PC
     Edward M. Anderson (STATE BAR NO. 198183)
2    Regina Yeh (STATE BAR NO. 266019)
   401 Wilshire Boulevard, 12th Floor
3  Santa Monica, California  90401
   Telephone: (310) 496-4270  Facsimile: (888) 744-0317
4  edward@andersonyehlaw.com
   regina@andersonyehlaw.com
5

6  Attorneys for Plaintiff
   ALCON ENTERTAINMENT, LLC
7

8              UNITED STATES DISTRICT COURT

9      CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

10

11  ALCON ENTERTAINMENT, LLC,          CASE NO.: 2:19-cv-00245
    a Delaware limited liability company,
12                                      **COMPLAINT FOR:**
            Plaintiff,
13                                          1) **BREACH OF CONTRACT;**
                                            2) **BREACH OF IMPLIED**
14          v.                                 **COVENANT OF GOOD FAITH**
                                               **AND FAIR DEALING;**
15                                          3) **PROMISSORY ESTOPPEL;**
                                            4) **BREACH OF DUTY TO**
16                                             **NEGOTIATE IN GOOD**
    AUTOMOBILES PEUGEOT SA, a               **FAITH;**
17  France societe anonyme; ISABEL          5) **FRAUD;**
    SALAS MENDEZ, an individual;            6) **REASONABLE VALUE OF**
18  and DOES 1-10, inclusive,                  **SERVICES; AND**
                                            7) **QUANTUM MERUIT**
19          Defendants.

20                                      **DEMAND FOR JURY TRIAL**

21

22

23

24

25

26

27

28

- 1 -
COMPLAINT

Plaintiff ALCON ENTERTAINMENT, LLC ("PLAINTIFF" or "ALCON"), hereby alleges as follows:

## JURISDICTION AND VENUE

### *Subject Matter Jurisdiction*

1.     The Court has subject matter diversity jurisdiction of the case or controversy herein pursuant to 28 U.S.C. § 1332 and on the grounds that this is a civil action where the matter in controversy exceeds the sum of $75,000 exclusive of interests and costs, and is between citizens of a State and citizens or subjects of a foreign state.

2.     PLAINTIFF Alcon Entertainment, LLC is a limited liability company organized under the laws of the State of Delaware and with its principal place of business in the State of California, at 10390 Santa Monica Blvd. #250, Los Angeles, California 90025.  For purposes of diversity jurisdiction, ALCON as a limited liability company is treated as having the citizenship of each of its members, and is further not treated as a citizen of its State of organization, unless one of its members is a citizen of that State.  *See, e.g., Johnson v. Columbia Properties Anchorage, LP,* 437 F.3d 894, 899 (9th Cir. 2006); *Siloam Springs Hotel, L.L.C. v. Century Sur. Co.*, 781 F.3d 1233, 1237-1238 (10th Cir. 2015).  ALCON's sole member is Alcon Media Group, LLC, whose members are Frederick W. Smith, Andrew Kosove and Broderick Johnson.  Smith is a citizen of the State of Tennessee.  Kosove and Johnson are citizens of the State of California.  Thus, none of ALCON'S members are citizens of any foreign state.  For purposes of diversity jurisdiction, ALCON is thus a citizen of the States of California and Tennessee, and not a citizen of any foreign state.

3.     Defendant AUTOMOBILES PEUGEOT SA ("PEUGEOT") is a French societe anonyme, which for purposes of diversity jurisdiction is best treated as the equivalent of a corporation organized under the laws of France and thus as a citizen or subject of France pursuant to 28 U.S.C. § 1332(c)(1).  *See, e.g., Bank*

1   *Brussells Lambert v. Chase Manhattan Bank, N.A.,* 1996 WL 609439 (S.D.N.Y.

2   1996); *Rolland v. Smithkline Beckman Corp.*, 1990 WL 69007 (E.D. Pa. 1990);

3   *White Pearl Inversiones S.A. (Uruguay) v. Cemusa, Inc.*, 647 F.3d 684 (7th Cir.

4   2011); *Macartney*, 253 F.2d 529 (9th Cir. 1958).  PEUGEOT does not have its

5   principal place of business within any State of the United States, and in any event

6   does not have its principal place of business in the States of California, Delaware,

7   or Tennessee, as PEUGEOT'S principal place of business is at 7 Rue Henri

8   Sainte-Claire Devi, Rueil Malmaison, 92500, France.

9        4.    Defendant ISABEL SALAS MENDEZ ("MENDEZ") is an individual

10   who at all times relevant to the subject matter of this Complaint was a citizen and

11   resident of France, for the purpose of diversity jurisdiction.

12       5.    To the extent supplemental jurisdiction is required with respect to any

13   claim for relief, the Court has supplemental jurisdiction pursuant to 28 U.S.C. §

14   1367 over all such claims.  All of PLAINTIFF'S claims for relief arise from a

15   common nucleus of operative facts, such that the claims form part of the same case

16   or controversy under Article III of the United States Constitution.

17                              *Personal Jurisdiction*

18       6.    California's personal jurisdictional long arm statute, Cal. Code Civ.

19   Pro. § 410.10, allows courts in the State to exercise personal jurisdiction over

20   parties to the full extent permissible under the United States Constitution, meaning

21   personal jurisdiction is permissible if it comports with due process.  The Court's

22   exercise of personal jurisdiction over each of the Defendants here comports with

23   due process, because each of the Defendants has minimum contacts with the State

24   of California such that maintenance of the suit does not offend traditional notions

25   of fair play and substantial justice.

26       7.    The Court has at least specific or limited personal jurisdiction over

27   PEUGEOT in that PEUGEOT directed its activities toward PLAINTIFF, who

28   PEUGEOT knew to be a citizen and resident of the State of California; PEUGEOT

1    purposefully availed itself of the rights, privileges and protections of doing

2    business in California, and PEUGEOT participated in directing false statements

3    and other intentionally tortious conduct toward PLAINTIFF and others, whom

4    PEUGEOT knew to be citizens and residents of the State of California.  PEUGEOT

5    knew that the harm caused by its intentionally tortious conduct would be felt by

6    PLAINTIFF and others in California.  PLAINTIFF'S claims arise out of

7    PEUGEOT'S acts of purposeful availment, and the exercise of personal jurisdiction

8    over PEUGEOT is reasonable and fair.

9        8.    Among other specific factors demonstrating the Court's specific

10   personal jurisdiction over PEUGEOT with respect to PLAINTIFF'S claims:

11            a. PEUGEOT signed contracts agreeing that the parties' communications

12               and negotiations regarding the motion picture *Blade Runner 2049* (the

13               "Picture" or "BR2049") would be governed by the laws of the State of

14               California, demonstrating PEUGEOT'S purposeful availment of the

15               benefits and privileges of conducting activities in California.

16            b. PEUGEOT has a history of extensive purposeful availment of doing

17               business in California, and PEUGEOT is actively in the process of re-

18               establishing continuous and systematic contacts with the California

19               market.  For several decades, from at least as early as the 1970s until

20               in or about 1991, PEUGEOT caused American corporate subsidiaries

21               of PEUGEOT to market and sell PEUGEOT-manufactured

22               automobiles in the United States and in California specifically.

23               PEUGEOT left the United States and California automotive markets

24               in or about 1991.  However, PLAINTIFF is informed and believes on

25               that basis alleges that by no later than about May 2016, PEUGEOT

26               was actively planning a return to selling PEUGEOT-manufactured

27               automobiles in the United States and California markets.  By on or

28               about July 19, 2018, PEUGEOT announced to United States press

- 4 -
COMPLAINT

1   publications that PEUGEOT was targeting four Canadian provinces

2   and 15 states for new PEUGEOT automobile sales, specifically

3   identifying California as one of the targeted states.

4   c.   PEUGEOT purposefully solicited, negotiated and agreed to a contract

5   and relationship between PLAINTIFF and PEUGEOT regarding

6   BR2049 produced by PLAINTIFF.  Substantial portions of pre-

7   production, production, editing, marketing, advertising and

8   distribution of the Picture would be and were done in California.

9   PUBLICIS thus knew that the subject of the contract would have

10   continuing and extensive involvement with California.

11   d.   PEUGEOT, through its agent and employee MENDEZ and other

12   representatives, made intentionally tortious false statements to

13   PLAINTIFF, including by sending emails to PLAINTIFF and

14   PLAINTIFF'S representatives that PEUGEOT knew would be

15   received in California.  Beyond emails, some of the intentionally

16   tortious and false statements or other statements creating liability were

17   made by MENDEZ and PEUGEOT'S other representatives to

18   PLAINTIFF's representatives in person, while all such persons were

19   physically present in California, and together in the same room at

20   PLAINTIFF'S Los Angeles offices, for the purpose of the transactions

21   that are the subject matter of this Complaint.

22   9.   The Court has at least specific or limited personal jurisdiction over

23   MENDEZ in that MENDEZ directed her activities toward PLAINTIFF, who

24   MENDEZ knew to be a citizen and resident of the State of California; MENDEZ

25   purposefully availed herself of the rights, privileges and protections of doing

26   business in California, and MENDEZ herself intentionally made and directed

27   tortiously false statements and conduct toward PLAINTIFF, whom MENDEZ

28   knew to be a citizen and resident of the State of California.  MENDEZ made at

least some of the intentionally tortiously false statements while MENDEZ was personally present in California, including at PLAINTIFF'S Los Angeles offices for the purpose of the transactions that are the subject matter of this Complaint, including MENDEZ'S own personal schemes.  MENDEZ knew that the harm from her tortious conduct would be felt by PLAINTIFF in California.  PLAINTIFF'S claims arise out of MENDEZ'S foregoing acts of purposeful availment, and the exercise of personal jurisdiction over MENDEZ is also reasonable and fair.

10.   Among other specific factors demonstrating the Court's specific personal jurisdiction over MENDEZ with respect to PLAINTIFF'S claims:

a.  MENDEZ signed contracts in both her individual and corporate capacities agreeing that the law governing the communications and negotiations between the parties would be and was the law of the State of California, demonstrating MENDEZ'S purposeful availment of the benefits and privileges of conducting activities in California

b.  MENDEZ personally traveled to California and attended meetings at PLAINTIFF'S offices in California for the purpose of negotiating and carrying out the contract and relationship between the parties regarding BR2049, and for the intentional purpose of defrauding PLAINTIFF or otherwise causing PLAINTIFF harm.

c.  During these meetings in Los Angeles, MENDEZ made intentionally false statements and/or misleading material omissions to PLAINTIFF'S representatives in person, for the intended purpose of defrauding PLAINTIFF regarding the BR2049 opportunity and PEUGEOT'S and MENDEZ'S intent and authority, and other material facts relevant to PLAINTIFF'S decision making.

d.  MENDEZ personally sent multiple emails to PLAINTIFF and PLAINTIFF'S representatives whom MENDEZ understood to be in California, for the intended purpose of transacting with PLAINTIFF

1   regarding BR2049, any resulting contract about which MENDEZ

2   knew and understood would require substantial performance in

3   California, and thus an ongoing relationship with California.  In the

4   course of these email communications, MENDEZ herself intentionally

5   and tortiously made false statements to PLAINTIFF and

6   PLAINTIFF'S representatives, for the purpose of defrauding

7   PLAINTIFF and/or causing PLAINTIFF detrimentally to change its

8   position in reliance on MENDEZ'S statements.

9                                    ***Venue***

10      11.   Venue is proper in this district pursuant to 28 U.S.C. § 1391(a)(1),

11   (b)(2), (b)(3), and (c)(3) and on the grounds that a substantial part of the events and

12   omissions giving rise to the claims herein occurred in this district, or a substantial

13   part of the property that is the subject of the action is situated here; there is no

14   district in which the action may otherwise be brought as provided in section 1391,

15   and the defendants are subject to the court's personal jurisdiction with respect to

16   the action; and each of the defendants is not resident in the United States and so

17   may be sued in any judicial district.

18                                    **PARTIES**

19                                    *Plaintiff*

20      12.   **Alcon Entertainment, LLC:** ALCON is a limited liability

21   company organized under the laws of the State of Delaware, with its principal

22   place of business located at 10390 Santa Monica Blvd, Suite 250, Los Angeles,

23   California 90025.

24      13.   ALCON is an independent motion picture and television production

25   studio.  Its film and television products are distributed worldwide.  ALCON has

26   produced more than thirty major motion pictures, including, among many others,

27   *The Blind Side* (which won the 2009 Academy Award for Best Actress), *Dolphin

28   Tale*, *Sisterhood of the Traveling Pants*, *Book of Eli*, *The Wicker Man (2006)*, *P.S. I

                                    - 7 -
                                    COMPLAINT

*Love You*, *My Dog Skip*, *Beautiful Creatures*, *Prisoners*, *Transcendence*, and *Point Break (2015)*.   ALCON also produces the critically acclaimed television series *The Expanse*.

14.     ALCON is also the assignee of all claims and potential claims that might be made by Columbia TriStar Marketing Group, Inc. ("CTMG") against any of the defendants to this Complaint with respect to BR2049.

### *Named Defendants*

15.     **Automobiles Peugeot SA:** PEUGEOT is a societe anonyme, organized under the laws of France, with its principal place of business at 7 Rue Henri Sainte-Claire Devi, Rueil Malmaison, 92500, France.  A French societe anonyme is legally equivalent to a corporation under the laws of the United States for purposes of diversity jurisdiction.

16.     PEUGEOT is one of the world's most venerated (but troubled) automotive brands.  PEUGEOT or its corporate predecessors-in-interest have been manufacturing and selling automobiles under its famous lion trademark since the late 19th Century.  By the mid- to late-twentieth century, PEUGEOT was a significant seller of automobiles in most major automotive markets around the world, including the United States and California specifically.

17.     PLAINTIFF is informed and believes and on that basis alleges that for several decades (from at least the early 1970s until about 1991), PEUGEOT or a corporate predecessor-in-interest of PEUGEOT owned and operated one or more United States subsidiaries, including Peugeot, Inc. (a corporation organized under the laws of the State of New York) and Peugeot Motors of America, Inc. (a corporation organized under the laws of Delaware), for the purpose of PEUGEOT marketing and selling automobiles throughout the United States, including in California.

18.     However, by the early 1990s, PEUGEOT'S North American sales had faltered.  PLAINTIFF is informed and believes and on that basis alleges that in or

about 1991, PEUGEOT directed and caused its American corporate subsidiaries to cease to sell automobiles in the United States, including California.  PLAINTIFF is informed and believes and on that basis alleges that from approximately 1991 to shortly before the present, PEUGEOT sold a sharply reduced number of automobiles in California or the United States, possibly none.

19.     For years or even decades, PEUGEOT experienced a series of financial and other business challenges, making a return to the lucrative North American automotive market beyond PEUGEOT'S practical reach.

20.     However, PLAINTIFF is informed and believes and on that basis alleges that by early 2016, PEUGEOT had turned a corner and was ready to engage in the active re-building of its brand around the world and in the United States and California in particular.

21.     PLAINTIFF is informed and believes and on that basis alleges that by no later than May 2016, PEUGEOT was actively considering a return to the California and United States automobile markets, and looking for ways to jump start and/or re-establish the PEUGEOT brand with a new generation of consumers worldwide, but also specifically with California and United States consumers. Indeed, in or about January 2018, PEUGEOT announced that it was establishing a new United States headquarters in Atlanta, Georgia.  By on or about July 19, 2018, PEUGEOT caused a new American corporate subsidiary (PSA Group North America) to announce to United States press publications that PEUGEOT had specifically targeted 15 states of the United States and four Canadian provinces for the imminent resumption of PEUGEOT automobile states in North America. PEUGEOT specifically identified California as one of the 15 states that PEUGEOT is now actively targeting.

22.     PLAINTIFF is informed and believes and on that basis alleges that PEUGEOT had begun to formulate its plans and intention to target the California market at least as early as January 2016, and had those plans in its mind when it

1  targeted PLAINTIFF on the subject matter of this Complaint.

2      23.   PLAINTIFF is informed and believes and on that basis alleges that

3  whether or not some of the current California-directed automobile sales efforts of

4  PEUGEOT are being carried out in part by American corporate subsidiaries,

5  PEUGEOT'S plans imminently to resume marketing and selling PEUGEOT-

6  manufactured automobiles in the California market are being actively planned and

7  directed by PEUGEOT itself; that they were so planned by PEUGEOT at all times

8  relevant to the subject matter of this Complaint; and are thus attributable to

9  PEUGEOT.

10     24.   **Isabel Salas Mendez:** MENDEZ is an individual who at all times

11 relevant to the subject matter of this Complaint was a citizen and resident of

12 France.  MENDEZ is a senior executive, officer and employee of PEUGEOT, with

13 actual authority, job duties and responsibilities in the areas of marketing and

14 communications management, including sponsorships, co-promotional

15 partnerships, and product placements.  MENDEZ generally had and has the actual

16 authority from and within PEUGEOT to communicate with parties like ALCON

17 for the purpose of binding PEUGEOT to product placement and co-promotional

18 contractual and other business relationships, including with respect to major motion

19 pictures (potentially subject to certain internal PEUGEOT approvals, some or all of

20 which MENDEZ may have concealed or affirmatively misrepresented to

21 PLAINTIFF or PLAINTIFF'S representatives).

22     25.   In the alternative, PLAINTIFF pleads that MENDEZ does not have

23 such actual authority, but that PEUGEOT and MENDEZ both engaged in conduct

24 such that, as to PLAINTIFF, MENDEZ had at least ostensible authority to bind

25 PEUGEOT to product placement and co-promotional contractual and other

26 business relationships, including with respect to major motion pictures.

27     26.   PLAINTIFF is informed and believes on that basis alleges that

28 MENDEZ also had either the actual or ostensible authority within PEUGEOT to

1 | designate agents, including PUBLICIS, to negotiate for and otherwise to bind
2 | PEUGEOT to product placement and co-promotional contracts and other business
3 | relationships and transactions, including regarding major motion pictures.

***Non-Party Persons or Entities of Interest***

5 | 27. **Publicis Groupe, S.A. and Publicis Media France, S.A.:** Non-
6 | party Publicis Groupe, S.A. ("PUBLICIS GROUPE") is a French societe anonyme,
7 | with its principal place of business at 133 avenue de Champs de Elysees, 75008
8 | Paris, France and/or at 30-34 rue de Chemin vert, 75011 Paris, France. Non-
9 | party Publicis Media France, S.A. ("PUBLICIS MEDIA FRANCE") is a
10 | French societe anonyme with its principal place of business at 17/19 rue Breguet –
11 | 30-34 rue de Chemin vert, 75011 Paris, France. Plaintiff is informed and
12 | believes and on that basis alleges that PUBLICIS MEDIA FRANCE is directly or
13 | indirectly wholly owned and controlled by PUBLICIS GROUPE. For purposes of
14 | this Complaint, the term "PUBLICIS" includes both PUBLICIS MEDIA
15 | FRANCE and PUBLICIS GROUPE.

16 | 28. PLAINTIFF is informed and believes and on that basis alleges that
17 | PUBLICIS (most specifically, PUBLICIS MEDIA FRANCE) is the successor-in-
18 | interest to The Casablanca Agency ("Casablanca"). As used in this Complaint, the
19 | defined terms "PUBLICIS MEDIA FRANCE" and "PUBLICIS" each includes
20 | Casablanca.

21 | 29. PLAINTIFF is informed and believes and on that basis alleges that
22 | "Publicis Media" is a division of PUBLICIS, not organized as formal separate
23 | legal entity, and with the principal place of business of Publicis Media also at
24 | the address or addresses stated for PUBLICIS. For purposes of this Complaint,
25 | the term "PUBLICIS" also includes Publicis Media.

26 | 30. PUBLICIS (certainly PUBLICIS GROUPE specifically) is a global
27 | advertising and public relations company, sometimes identified as the oldest
28 | communications company in the world, and unquestionably one of the largest.

PUBLICIS regularly represents PEUGEOT, other automotive clients, and a wide range of other businesses with respect to almost all types of marketing and advertising opportunities.  PUBLICIS regularly does business with Hollywood film and television studios regarding product placement and co-promotional opportunities in connection with major motion pictures and television products.  PUBLICIS is highly familiar with the customs and practices of product placement and co-promotional transactions in both the automotive industries worldwide, and in connection with major Hollywood motion picture and television projects.

31.    PUBLICIS'S knowledge of these business areas and their customs and practices was and is imputed to PUBLICIS'S principal, PEUGEOT.

### *Doe Defendants*

32.    The true names and capacities, whether individual, corporate, partnership, associate or otherwise, of Defendants sued herein as DOES 1 through 10, inclusive, are currently unknown to PLAINTIFF, who therefore sues said Defendants by such fictitious names.  PLAINTIFF is informed and believes, and on that basis alleges, that each of the Defendants designated herein as a DOE is legally responsible in some manner for the events and happenings referred to herein, and caused injury and damage proximately thereby to PLAINTIFF as hereinafter alleged.  PLAINTIFF will seek leave to amend this Complaint to show the true names and capacities of the Defendants designated herein as DOES when the same have been ascertained.  Whenever in this complaint reference is made to "Defendants," such allegation shall be deemed to mean the acts of Defendants acting individually, jointly, and/or severally.  PLAINTIFF is informed and believes and on that basis alleges that none of the DOES is a citizen or resident of the States of Delaware, Tennessee or California, for purposes of diversity jurisdiction.

33.    PLAINTIFF is informed and believes and on that basis alleges that DOES 1 through 5 are entities which PEUGEOT may contend are PEUGEOT-

1  controlled or PEUGEOT-affiliated entities which should be treated as the

2  contracting party or parties with PLAINTIFF, either in addition to or instead of

3  PEUGEOT, or otherwise as PEUGEOT-controlled or PEUGEOT-affiliated entities

4  on behalf of which MENDEZ, PUBLICIS and/or other agents or representatives

5  for defendants were interacting with PLAINTIFF and PLAINTIFF'S

6  representatives.

7      34.    PLAINTIFF is informed and believes and on that basis alleges that

8  DOES 6 through 10 are entities that may otherwise have liability for the conduct at

9  issue.

10                            ***Agency***

11     35.    Except as hereinafter specifically described, at all times relevant

12  hereto, PUBLICIS and DOES 1 through 10 were the agent or agents of

13  PEUGEOT.  Except as specifically alleged herein to the contrary, including on

14  certain alternative pleading theories, PUBLICIS and DOES 1 through 10 were

15  at all times acting with the scope of its or their agency and authority in

16  PUBLICIS'S dealings with PLAINTIFF, and with the permission, consent,

17  authorization, ratification, whether express or implied, of PEUGEOT, and/or

18  with PEUGEOT'S knowing acceptance of the benefits of the conduct  of

19  PUBLICIS.

20     36.    Except as hereinafter specifically described, at all times relevant

21  hereto, MENDEZ was an employee, officer and agent of PEUGEOT and

22  (except as specifically alleged herein to the contrary), MENDEZ was at all

23  times acting with the scope of her employment, agency and authority in

24  MENDEZ'S dealings with PLAINTIFF, and with the permission, consent,

25  authorization, ratification, whether express or implied, of PEUGEOT, and/or

26  with PEUGEOT'S knowing acceptance of the benefits of the improper conduct

27  of MENDEZ.

28  ///

1

*Aiding and Abetting*

2       37.     Except as herein specifically described, PLAINTIFF is informed and

3   believes and on that basis alleges that each of the Defendants aided and abetted the

4   tortious conduct of the other Defendants, in that each of the Defendants either

5   knew the other Defendants' conduct constituted a breach of duty to PLAINTIFF

6   and gave substantial assistance or encouragement to said Defendants to so act,

7   and/or gave substantial assistance to the other Defendants in accomplishing a

8   tortious result and said aiding and abetting Defendant's conduct constituted a

9   breach of duty to PLAINTIFF.  Thus, each of the Defendants is liable for the

10  tortious conduct of each of the other Defendants that they so aided and abetted, as

11  if said aiding and abetting Defendants had engaged in said conduct themselves.

12          **FACTS COMMON TO ALL CAUSES OF ACTION**

13                *1982: Blade Runner*

14      38.     In 1982, ALCON'S predecessors-in-interest in chain of title produced

15  and released the seminal motion picture *Blade Runner* (sometimes referred to

16  herein as the "Original Picture").  *Blade Runner* is widely recognized as one of the

17  most significant motion pictures ever produced.  It is regularly voted by critics,

18  fans and even scientists, as the Number 1 science fiction movie of all time (*see,*

19  *e.g.*, 2004 *Guardian* poll of 60 scientists), and regularly recognized as one of the

20  greatest movies of all time across all genres (*see, e.g.*, 2014 *Empire* magazine

21  ranking *Blade Runner* #11 on list of The 301 Greatest Movies of All Time).

22      39.     Among other well-known and highly regarded aspects of the Original

23  Picture are the exceptional quality of its production design elements, resulting from

24  the unique collaboration and chemistry among the creative giants that worked on

25  the Original Picture, including Ridley Scott and Syd Mead.  Indeed, Mead alone is

26  regarded as one of the world's greatest product and industrial designers and

27  concept artists, both for real-world works (including in the automotive industry),

28  and for his futuristic visions that have graced major cinema for decades.  *Blade*

*Runner* is often considered Mead's *magnum opus*.  It is among the most comprehensive, impactful and enduring cinematic production design works of all time.  For example, in 2007 the Visual Effects Society named *Blade Runner* the #2 Most Influential VFX Films of All Time (second only to *Star Wars* as #1).

40.     Among the Original Picture's most notable and resonant design elements were and are the flying cars, or "spinners," that feature prominently in its detailed and stunningly coherent futuristic world.  It is no exaggeration to say that the *Blade Runner* spinners are among the most famous and recognizable automobiles in the history of film.

41.     *Blade Runner* has been in continuous distribution worldwide through various distribution channels since 1982.  Even now, thirty-six years after its initial theatrical release, it remains a culturally relevant film with an active and appreciative audience.  It is a piece of permanent art that transcends ephemeral popular culture.  In 1993 it was selected for preservation in the United States National Film Registry by the Library of Congress as "culturally, historically, or aesthetically significant."

42.     The *Blade Runner* spinners themselves, including the real-world physical model versions used in filming the Original Picture, are also enduring pieces of art in their own right.  For example, one of the original *Blade Runner* spinners is on permanent exhibit at the Science Fiction Museum and Hall of Fame in Seattle, Washington.

43.     The *Blade Runner* property also holds a special place in film history with respect to product placements, marketing and advertising.  Among other themes, *Blade Runner* delved into the social and cultural effects of advanced consumerism and is notable for integrating real world brands such as Coca-Cola and Pan Am into the film's dystopian future vision.  As much or more than any other film, product placements are an integral part of the *Blade Runner* property and milieu.  This means that product placements are an artistically organic aspect

of the *Blade Runner* world.  Further, inclusion of a brand onscreen in a *Blade Runner* story can give a brand an almost mystical and timeless quality, and in any event clearly enhances the brand's legacy, for generations, if not forever.

44.    In 2016 and 2017, *Blade Runner* was also a rare property in that it had remained fallow for more than thirty years, with no additional pictures created: from 1982 until 2017, there were no *Blade Runner* sequels, prequels, television series, or any other motion picture or television extensions of the story.  Among other factors, the chain of title to the *Blade Runner* property became complex, tangled and divided, dissuading and obstructing the creation of further pictures.

### *2010 to 2016: Alcon Solves the Rights Tangle and Develops a Sequel*

45.    Beginning in or about 2010, ALCON took on the substantial challenge of identifying, negotiating for, and acquiring all rights necessary to develop and produce a sequel to the Original Picture.

46.    By in or about 2011, and as further enhanced by subsequent transactions, ALCON had acquired all relevant sequel rights to the Original Picture and all other rights relevant to the subject matter of this Complaint.  ALCON became and remains the ultimate rights holder for all rights relevant to develop, produce and exploit sequels to the Original Picture, including the right to contract for product placements and co-promotional opportunities for such sequels.

47.    ALCON invested massive resources in the development and production of the sequel Picture, BR2049.  The development and production of the Picture took more than half a decade, not least because ALCON painstakingly devoted itself to creating a work as striking and impactful as the Original Picture, particularly with respect to production design.

48.    Even in its development prior to production, the Picture represented a creative achievement that brought together and forward the work of the original visionaries including Mead and Scott (an Executive Producer on the Picture), channeled through the lens of one of the industry's most critically-acclaimed

contemporary directors, Denis Villeneuve (a native French speaker born and raised in Quebec).

### Early 2016: Sony Pictures Entertainment Inc.

49.     By no later than January 2016, ALCON entered into a co-production and distribution agreement and relationship with Columbia Pictures Industries, Inc. ("CPII"), a direct or indirect corporate subsidiary of Sony Pictures Entertainment Inc. (together herein, "Sony") regarding certain aspects of financing, production, distribution, promotion and marketing of BR2049, among other aspects.  Relevant here, as part of and related to that contractual and business relationship with Sony, executives of CTMG, Sony's and CPII'S product placement, co-promotion and marketing arm, were authorized to and did communicate with and negotiate with potential business partners on the BR2049 project, including with respect to product placement and co-promotional opportunities, including with both PEUGEOT and PUBLICIS.

50.     At least some of the parties' communications regarding BR2049 contemplated or referenced CTMG as a party to the product placement and co-promotion agreement that is partially the subject matter of this Complaint.  As referenced earlier, to the extent that CTMG is or was a party to any of the agreements discussed herein, or otherwise has or might have claims against any of the defendants with respect to BR2049, those claims have been assigned by CTMG to ALCON.

### Logistics of Film Production, Product Placement and Co-Promotions

51.     PLAINTIFF planned for and achieved a "day-and-date" global theatrical release of BR2049, meaning that the Picture was theatrically released for the first time in substantially all major theatrical markets around the world on the same day – October 6, 2017.

52.     The initial theatrical release of any major motion picture requires intensive logistical planning.  Strict adherence to schedules for months or even

years in advance is critical.  For a major motion picture intended for a global day-and-date release, as was true for BR2049, planning and scheduling rigor takes on even greater significance.  The rigor amplifies further the larger the marketing and promotional push planned for the Picture, and the larger the number of total screens on which the Picture is planned for exhibition.  For BR2049, all of these factors were near the highest end that occurs in the industry.  BR2049 was intended for release on several thousand screens around the world all on the same day: October 6, 2017 (over four thousand screens in the U.S. alone).  Once set, the October 6, 2017 day-and-date global release quickly became effectively immutable, such that all pre-production, production, post-production, promotion and marketing schedules associated with the Picture had to adhere strictly to timelines driven by the release date.

53.     Where a major motion picture with a global day-and-date release will be supported by a co-promotion with a brand partner who has a product placement in the film, the deal-making and preparation to perform must take place months or even years in advance.  The co-promotion itself must be planned and prepared at least several months before the initial theatrical release date.

54.     All business actors that transact and work in the product placement and co-promotional spaces involving major motion pictures all know and understand that these factors mean that business opportunities with respect to a major motion picture product placement or co-promotion, especially one with a planned global day-and-date release on thousands of screens around the world – like BR2049 – are exceptionally time sensitive.  PEUGEOT, PUBLICIS, MENDEZ and DOES 1 through 10 all knew that this was true for BR2049.

55.     For a major product placement and co-promotion integrated into the overall story – like branding the main character's vehicle with a co-promotional partner's logo and trade dress – the deals must be negotiated and closed on the key terms as much as a year or even longer before the release date, or the opportunity

will quickly become smaller and will be effectively lost altogether many months before the release date, if execution fails – or if a party reneges.

56.    Relevant to major motion picture brand partnering and what happened between the parties here, certain industry terms and realities are worth discussing for background.

57.    "Pre-production" refers to the time between the greenlighting of the picture (funding of production) and the commencement of "Principal Photography."  Pre-production includes a wide range of preparations for actual production, including the creation of concept art and physical props and models, including of things like vehicles that will appear onscreen in the picture.

58.    "Principal Photography" is the time during which the cameras are actually rolling to create the film or video footage capturing substantially all the scenes that will be used to create the final picture.  After Principal Photography is completed, it is possible to shoot additional scenes or footage (for example, to re-shoot a scene if the editing process reveals that additional footage is required), and it does sometimes happen.  However, shooting additional footage after the close of Principal Photography is exceedingly expensive, as at least some aspects of production that have been closed or shut down must be at least partially re-opened; actors might need to be brought back in from other places or projects, including potentially at higher cost; and similarly expensive factors of such a "do-over."

59.    If a motion picture, like BR2049, has a narrative where the main character spends much of the story traveling in and with a particular vehicle, any idea that the vehicle's fundamental look and design could be totally changed after the completion of Principal Photography is commercially unrealistic and would be enormously expensive, in addition to jeopardizing the intended release date.

60.    "Picture Lock" refers to the stage of post-production where the timing and sequence of all of the scenes in the picture have been set.  Many substantial changes to a motion picture occur after Picture Lock, including sound mixing,

color timing, and many forms of visual effects and visual editing.  However, after Picture Lock, to add a scene, change the order of scenes, or the number of seconds or minutes a scene runs, is not possible without starting over on many aspects of post-production of the picture.  In addition to being cost prohibitive, the time required also jeopardizes the release date.  Thus, after Picture Lock, changes can be made to, for example, how an image (like a brand logo) looks (indeed, logos can even be added after Picture Lock) in a scene or scenes, but scenes cannot be added or cut or modified as to the length of time the scene runs onscreen.

61.   "Picture Delivery" refers to when the final digital and film print versions of the film that will be shown in theaters around world are sent out to theaters.  Picture Delivery is the ultimate deadline for any changes to film – after Picture Delivery, no changes to the film as it will appear onscreen in theaters can be made at all.

62.   All professionals who work and transact in the product placement and co-promotional field in connection with motion pictures know these time sensitivities and restrictions.  The greater the role of the placement and co-promotion in connection with the film's story, the greater the stakes and time sensitivities.

### The BR2049 Spinner Product Placement and Co-Promotion Opportunity

63.   BR2049 presented an exceptionally rare and highly valuable automotive product placement and co-promotional opportunity.

64.   BR2049's protagonist is "K," whom by early 2016 had already been cast to be played by the highly charismatic star actor Ryan Gosling.  K is a blade runner, or hunter of rogue replicants (synthetic humans).  He is also a replicant himself.  BR2049 centers around K's Holy Grail-like quest to discover the truth about a human-replicant sexual union that produced a hybrid child against all known scientific possibility, and the truth of K's own origins and identity.

///

65.     K has two loyal companions in his journey – his lover, Joi, who is a hologram, and his vehicle, a spinner, evolved from the flying cars of the Original Picture.  K's quest takes him to far flung and forbidden places across BR2049's dystopian Southern California futurescape.  K's spinner accompanies and assists him almost everywhere K goes.  K's spinner has a semi-intelligence making it nearly sentient itself.  K's spinner responds to his voice commands, protects K, and assists K in his tasks beyond mere transportation, serving as sentry and scout in addition to flying steed.  More than just a car, the spinner is almost a character unto itself in the Picture, and one strongly associated with the charismatic Gosling.

66.     BR2049 thus presented a generational opportunity for an automotive product placement and co-promotional partnership.  For K's spinner to be branded as made by a real-world manufacturer would be artistically organic and creatively true to the Original Picture's legacy and themes, which weaved and morphed real-world brands into the *Blade Runner* alternate future history.  Making K's spinner a real-world brand thus served the art of the Picture, while also clearly being of extremely high value to an automotive brand.

67.     With even only several seconds of on-screen association of an automotive brand's logo and trade dress with K's spinner, an automotive brand could establish itself as almost another character in the Picture, closely and positively associated with a marketable movie star.  The brand would have a presence throughout the storyline of a major motion picture that would not only be seen by tens of millions of people around the world in its initial theatrical release alone, but had real prospects to be an enduring piece of human art that would remain relevant, viewed and revered for decades.  It was a rare opportunity for an automotive brand to enshrine itself in cinema and pop culture history.

68.     An automotive product placement on K's spinner in BR2049 could thus immediately globally lift, revitalize and even potentially cinematically immortalize a brand.

- 21 -

COMPLAINT

69.   BR2049 was subject to the following specific schedule:

   a.   Pre-production had commenced and was well under way by no later than January 2016.

   b.   By January 2016, production offices had been opened in Budapest, Hungary.

   c.   Principal Photography was scheduled to commence and actually commenced on July 11, 2016.

   d.   Principal Photography completed on November 22, 2016.

   e.   Picture Lock was targeted for June 8, 2017 (but did not actually occur as things played out until July 5, 2017).

   f.   Picture Delivery was planned for and actually occurred between September 25 and September 30, 2017.

   g.   October 6, 2017 was the planned and actually executed global day-and-date release of the Picture ("Release Date").

70.   Among other things, the above schedule meant that for BR2049, with respect to product placement and co-promotional opportunities, any product placement and co-promotion that was planned as an integral part of the story had to be completed by Picture Lock, meaning by June 8, 2017, as the schedule was originally planned.  As things actually occurred, Picture Lock on BR2049 was extended, such that a placement could have had some pre-Picture Lock changes through as late as July 5, 2017.  Visual enhancements or adjustments to a particular product placement within the film already integrated into the story could potentially occur even into late August 2017 or possibly even later, in an extreme emergency.  However, the closer in time any changes to (or reneging on) a product placement and co-promotional deal were to get to the above dates, the more and more remote any ability to mitigate a breach and/or substitute a placement and co-promotional partner would become.

///

71.     By as early as January 2016, ALCON was looking for automotive product placement and co-promotional partners.

72.     By no later than April 2016, the automotive product placement and co-promotional business community knew of the BR2049 opportunity.  ALCON had received interest from multiple global automotive brands, and was effectively running an auction.

73.     By about early May 2016, this practical auction was down to two highly interested bidders: a major global luxury automotive brand referred to herein as "Automotive Brand Z," and PEUGEOT.  Both bid richly.  However, PEUGEOT was intent on controlling the opportunity, and bid the most richly, so that it would.

### Peugeot Intentionally Puts in the Richest Bid to Take Control
### of the BR2049 Opportunity for Itself

74.     Product placement and co-promotional relationships between motion picture studios and brands can take different forms, along a spectrum of integration, relationship and value.

75.     At the simple end of the spectrum, in a pure product placement only, a brand might pay a studio a relatively limited single lump sum fee in exchange for the brand to appear onscreen in a single sequence in a motion picture or television episode.  In this simplest of product placement transactions, there may be no accompanying co-promotional marketing campaign and no agreement on any minimum dollar spend for one (indeed, in such circumstances, a co-promotional campaign, where the brand advertises both itself and the motion picture within a single ad or ad campaign, may not even be permitted by the studio, even for free).

76.     However, many product placement relationships are more involved and include a co-promotional element.  The brand appears in the film itself for typically no more than several seconds in a small number of sequences.  However, beyond this, in the lead up to the film's release and surrounding it, the brand and studio also work together on a co-promotional campaign.  In such a campaign, both

the brand and the film are marketed together in blended advertisements in a range of media, possibly including, without limitation, television spots, radio ads, and digital media advertising.

77.     Familiar examples of product placement and co-promotional executions include recent James Bond films where the Audi brand is prominently placed in the film itself.  Television advertisements for Audi that include footage of Daniel Craig as James Bond driving an Audi vehicle are telecast during prime television programming, such as a popular primetime television series or the telecast of a major sporting event, like a major college or professional football or basketball game.  In ALCON'S own recent history, with the 2015 remake of *Point Break*, Jeep vehicles were placed in the story of the film itself.  To support the release of the film and also to advertise brand, Jeep ran television and online video advertisements for Jeep that included footage from the film showing the stars of the film engaged in various daring outdoor activities, including with Jeep vehicles.  In both the Audi/James Bond and Jeep/*Point Break* examples, the television and other advertisements serve to promote both the automotive brand and the motion picture, in the same advertisement and overall co-promotional media campaign.

78.     For relationships involving both a product placement and a co-promotion, the pricing of the deal between the brand and the studio may be structured in two parts: a single product placement fee, which is cash paid directly from the brand (or the brand's representative) to the studio, and an agreed minimum "media spend."  The media spend is typically magnitudes larger than the product placement fee, and is not paid by the brand directly to the studio.  Rather, the media spend's dollar figure represents the guaranteed minimum dollar value of the paid media (television advertisements, radio advertisements, digital advertisements, and the like) that the brand commits to produce and put into the stream of commerce to market the film (and the brand at the same time).

///

79.     Although the media spend does not go directly to the studio, a guaranteed co-promotional media spend has high value to a film and once committed, the studio relies on it.  The marketing and promotional effort required to make a global audience aware of the day-and-date release of a major motion picture and give the release the best chance to succeed requires in the tens of millions of dollars, and can exceed a hundred million dollars.  That a brand has committed to a guaranteed co-promotional media spend thus bolsters the marketing and advertising of the film, increasing its chances for success, and also reduces the marketing and advertising burden that the studio otherwise must finance directly out of its own pocket.  The more marketing and advertising expenses that the studio has to pay for itself (versus through a co-promotional media spend by a brand), the greater the hurdle for the film to be a financial success, because the greater the amount of money the film must generate from audiences and licensees before it can overcome distribution expenses, and then production costs, to hopefully at some point become profitable.  Co-promotional media spends thus have high value to the studio, even though the media spend is not itself paid directly to the studio.

80.     Product placements and co-promotional media spends, and creativity in implementing them, have become even more valuable to both brands and studios as the world continues to move further into the Information Age.  Today's consumer audiences have many more choices of what, when, where and how they watch media than prior generations.  Born and raised in a saturated marketing and advertising environment, many modern consumers are also increasingly more sophisticated about and desensitized to overt marketing and advertising.  For example, a millennial consumer in the market for an automobile might never even see a television advertisement that runs on a broadcast television network, even if the advertisement runs extremely frequently, because the millennial consumer might very well never watch any broadcast network television at all, except possibly on a streaming service where the ads have been stripped out.  Even if the

millennial sees the traditional broadcast television ad, they are less likely to be as influenced by it than past generations, as they have grown up more constantly bombarded by commercial advertising.

81.     The best executed, most valuable and most effective product placement and co-promotional media spend experiences for brands, studios and consumers are those where the brand can organically be part of the story of the film or television episode itself, and where the co-promotional campaign also helps support, advance or enrich the film's story at the same time that it increases brand awareness with audiences.  For example, the co-promotional advertisements might be used to tell short "off screen" stories that might serve as a pre-amble to and pre-education of the audience about the film's story, even before the film's release.

82.     The best co-promotional campaigns might also include event marketing, where audiences have the opportunity to interact directly in an experiential way with the brand and the film's story or world – for example, a real-world physically immersive event at a fan convention or other venue (like an auto show), where audiences might get to see or even touch physical props from the film featuring the placed branding.

83.     The BR2049 K spinner placement opportunity was at the far high end of the spectrum in terms of what it offered, both in possibilities for the brand and the expectations for ALCON.  It was no mere single sequence placement.  Indeed, inevitably, any meaningful association of an automotive brand with K's spinner, even in a single sequence, would effectively place the brand indelibly into the entire story of the film and strongly associate the brand with Gosling, too, given the spinner's role in the BR2049 story.

84.     Moreover, especially given that more than thirty-five years had passed since the release of the Original Picture, the marketing and promotional plan for BR2049 already contemplated the pre-release generation and distribution of short-form video content, released through YouTube and other publicly accessible

platforms, and designed to "pre-tell" to the audience some of what had happened in the *Blade Runner* world between the time of the Original Picture and BR2049, which takes place thirty years later.  Thus, the opportunity was also especially primed for a brand to work with the studio to pre-establish to audiences that K's spinner was a particular automotive make, through the use of either short-form video content, or traditional advertising, or other hybrid marketing and storytelling methods, even before the film's release.

85.    The *Blade Runner* fan base is a fervent one, and it was desperately hungry in the months and even years prior to BR2049's release for any and all information about BR2049 and what surprises it might hold.  A release of even a single photograph of K's spinner as, for example, Peugeot-branded, in the months leading up to BR2049's release would almost certainly have been virally circulated and discussed on the Internet and elsewhere by hundreds of thousands or even millions of consumers, and in entertainment media magazines and programs, even without any paid media at all.

86.    Finally, like the Original Picture, physical props of K's spinner, including full-size physical versions of the vehicle, including with branding, would be made.  This presented the opportunity to have a physical vehicle that could actually travel and appear at experiential marketing events like auto shows and entertainment fan conventions (for decades), and that had the realistic prospect of permanent placement for ongoing public exhibition in venues like Seattle's Science Fiction Museum and Hall of Fame, as indeed happened for the Original Picture's life-size spinner model.

87.    Automotive Brand Z, PEUGEOT, and all other bidders understood that, given all of the above factors and the exceptionally high value of the opportunity, ALCON would never accept a deal for a product placement without a media spend.  A bid by an auto partner to pay ALCON only a product placement fee of only several hundred thousand dollars, without a commitment to a major

media spend, would never win the bid or even be seen as serious.  To have any chance of winning the opportunity, all bidders and their representatives knew that the bids and deal had to be for a product placement fee of at least several hundred thousand dollars coupled with a guaranteed media spend in at least the tens of millions of dollars.  In the alternative, although no bidders took this unusual route, if a bidder had wanted to bid on the placement only, without a guaranteed media spend commitment, then the product placement fee would have had to be magnitudes higher, and at a minimum several million dollars, and might have needed to approach or exceed $10 million, paid directly to ALCON.

88.    PLAINTIFF is informed and believes and on that basis alleges that MENDEZ, PEUGEOT and PUBLICIS were all well aware of these bidding realities.

89.    PLAINTIFF is informed and believes and on that basis alleges that the BR2049 opportunity also had a unique value to PEUGEOT relative to other automotive partners.  ALCON had communicated to the bid market that ALCON would accept, and potentially preferred, an automotive partner more interested in an international media spend than a domestic one, to best facilitate ALCON'S global release strategy.  The onscreen placement, though, would be the same in all theaters around the world, including in the U.S.  It was thus known in the bid market that on BR2049, a brand partner could get the benefit of an onscreen placement that would be seen in every major theatrical market around the world, including the United States and Canada domestic market, but where the media spend could be substantially or even entirely directed to international markets.

90.    This was a particularly good fit for PEUGEOT.  As noted in prior paragraphs, in early 2016 when the BR2049 opportunity was in play, PEUGEOT had been out of the United States auto market for about 35 years, but was eyeing a return.  PEUGEOT was not yet ready to begin running paid media advertisements to U.S. consumers, but it was very interested in re-introducing its brand to them.  A

major motion picture planned for release on thousands of U.S. movie screens and
that would almost certainly be seen by tens of millions of U.S. consumers
theatrically and in subsequent windows, but that could be effectively paid for with
international media spend dollars, meshed unusually well with PEUGEOT'S needs
and interests.

91.   To engage with ALCON on this opportunity, PEUGEOT employed at
least three different agencies: PUBLICIS, BETC and Branded Entertainment
Network ("BEN").   BETC is a French advertising agency founded in Paris in 1995
and is a globally acclaimed creative agency.   PLAINTIFF is informed and believes
and on that basis alleges that in the 2016 to 2017 time frame, BETC already had a
significant, continuous and systematic California presence, and actually opened a
physical office in Los Angeles on or about October 9, 2017.

92.   PUBLICIS'S representation of PEUGEOT regarding BR2049 was
handled with PUBLICIS'S Casablanca division or agency serving as the day-to-
day point for PEUGEOT, with Casablanca's personnel actively supported and
backed by the larger PUBLICIS organization, including the PUBLICIS legal team.

93.   BEN is a Los Angeles-based advertising agency.   BEN'S
communications with ALCON regarding the BR2049 opportunity on behalf of
PEUGEOT were handled primarily by Reiko Porter, at the time a BEN Manager,
who resides and works in the greater Los Angeles area.

94.   PLAINTIFF is informed and believes and on that basis alleges that
PEUGEOT, MENDEZ, PUBLICIS, BEN and/or BETC all knew that ALCON had
multiple competing bids for the opportunity, and that there was at least one other
competing bidder that was likely to win the bid unless PEUGEOT put in a rich bid.

95.   Automotive Brand Z's bid to ALCON for this opportunity was priced
as a several hundred thousand dollar product placement fee to be made directly to
the studio, and a guaranteed minimum media spend commitment of about $16
million.

96.     The automotive product placement and co-promotional world is relatively small, and while bids are confidential, PLAINTIFF is informed and believes and on that basis alleges that PEUGEOT, MENDEZ, PUBLICIS, BEN and/or BETC all knew or suspected that ALCON had a competing bid of at least this magnitude.  PEUGEOT thus knew that it had to beat at least these numbers to eliminate competing bidders and win the opportunity.  Indeed, PLAINTIFF is informed and believes and thereon alleges that PEUGEOT and MENDEZ believed that the Automotive Brand Z bid or other bids were even higher than they were.

97.     PLAINTIFF is informed and believes and thereon alleges that PEUGEOT and MENDEZ specifically and expressly directed and authorized PUBLICIS and/or BEN to make a large bid that would take out all other competing bidders – to make ALCON an offer that ALCON would be unable to refuse.

98.     By early May 2016, PEUGEOT had submitted at least one bid, but one that had clearly not won the bidding.  PEUGEOT'S bid had to be sweetened to win.

99.     As the number of bidders narrows and the remaining bidders become more and more likely to be the ultimate potential partner, more information about the project is often shared, and, for a closely guarded project like BR2049, on a confidential basis.

100.   By on or about May 18, 2016, Reiko Porter for BEN, in representation of PEUGEOT with respect to BR2049, had signed a confidentiality agreement with ALCON pursuant to which BEN agreed that it and its principals, including PEUGEOT, not only would treat all BR2049 information as confidential, but also that the parties' relationship and the communications about it would be governed by the laws of the State of California.  PLAINTIFF is informed and believes and on that basis alleges that this confidentiality agreement was signed by Porter while Porter was in California (where he works and resides), and was delivered to ALCON in California by Porter on behalf of BEN and PEUGEOT.  PLAINTIFF is

informed and believes and on that basis alleges that PEUGEOT and MENDEZ knew and understood the content of the confidentiality agreement and authorized Porter to execute it and/or later ratified his execution of it.  PLAINTIFF is thus informed and believes and thereon alleges that not only did PEUGEOT and MENDEZ expressly authorize BEN's bidding for PEUGEOT on the BR2049 opportunity, PEUGEOT and MENDEZ both knew and understood at the time of bidding that the deal and the parties' communications would be governed by California law.

101.   On May 19, 2016, at PEUGEOT'S and MENDEZ'S direction, and/or with PEUGEOT'S and MENDEZ'S approval and authority and/or subsequent ratification, Porter sent an email to Joshua Ravetch, ALCON'S product placement lead, specifically sweetening PEUGEOT'S prior bid by adding a massive guaranteed media spend.

102.   Ravetch, who received the email from Porter, works and resides in California, as Porter, BEN, PEUGEOT, MENDEZ, and PUBLICIS all knew.

103.   The May 19, 2016 Porter-to-Ravetch email, and related communications, relayed a proposal from PEUGEOT for a product placement and co-promotional deal where PEUGEOT would pay ALCON directly a product placement fee of $750,000, and commit to a guaranteed media spend of a minimum $20 million to $35 million, followed by, in bold letters, **"with potential to rise to $40 million."**  PEUGEOT and BEN also laid out a possible plan for specific media spends by territory.

104.   By its May 19, 2016 bid, PEUGEOT clearly specifically intended that it was the _promotional spend proposal_ (not any mere several hundred thousand dollar product placement fee) that should induce ALCON to deal with PEUGEOT rather than other bidders.  Indeed, after laying out the details of the up to $40 million co-promotion that PEUGEOT envisioned and dangled, Porter specifically wrote: "Peugeot is excited about the possibility of partnering on Blade Runner and

1   *that this new promotional insight* will be key to moving forward with

2   negotiations." (Emphasis added.)

3      105.  What Porter meant by this, and what all involved understood, was that

4   PEUGEOT knew that PEUGEOT'S previous offers had not been enough clearly to

5   win the bid for PEUGEOT over other competing bidders and PEUGEOT was

6   trying to sweeten its bid to eliminate the competition in a clear and decisive way.

7   Further, PEUGEOT was specifically proposing to do this by a specific bidding

8   lever: a large up to $40 million co-promotion media spend. **Thus, Porter was**

9   **specifically saying that PEUGEOT proposed the massive media spend in order**

10  **to win the bidding, as PEUGEOT and MENDEZ fully intended him to say**.

11     106.  The May 19, 2016 Porter-to-Ravetch email and related

12  communications also relayed that, with respect to the on-screen product placement

13  itself, PEUGEOT proposed two types of placements: 1) multiple scenes showing

14  PEUGEOT brand badging on K's spinner, and 2) a smaller number of scenes

15  where the PEUGEOT logo would appear onscreen as a feature of the BR2049

16  world, such as in a wall ad or skyscraper ad in the background (also sometimes

17  called by the parties a "holographic advertisement").

18     107.  From the May 19, 2016 communication forward (until approximately

19  a year later when PEUGEOT tried to fabricate justifications for breach),

20  PEUGEOT consistently communicated that, while PEUGEOT desired both types

21  of integrations, of the two types, the vehicle integrations were far more important

22  to PEUGEOT than the wall ad integrations.

23     108.  PLAINTIFF cannot be aware of what precisely was in PEUGEOT'S

24  and MENDEZ'S minds at the time, but based on how things played out,

25  PLAINTIFF alleges and pleads here alternative sets of facts with respect to

26  PEUGEOT'S and MENDEZ'S intent in causing Porter and BEN to ramp up

27  PEUGEOT'S bidding position radically in this way.

28  ///

109.   In one alternative, PLAINTIFF is informed and believes and on that basis alleges that PEUGEOT and MENDEZ fully intended to attempt to close and perform an agreement with ALCON on the above terms, but that circumstances, such as a change in PEUGEOT'S financial situation or otherwise, later caused PEUGEOT and MENDEZ to deny even the basic facts of the negotiations and the terms of the parties' soon-to-be-reached agreement.

110.   In a second alternative, PLAINTIFF is informed and believes and on that basis alleges that MENDEZ wanted personally as an executive to have her cake and eat it too: MENDEZ wanted to secure control of the BR2049 opportunity for PEUGEOT by eliminating other competing bidders with a larger bid specifically involving a large guaranteed media spend.  However, MENDEZ also did not want to risk her own internal corporate political capital by asking her superiors for the budget commitment necessary to fulfill the spend, until and unless MENDEZ felt the internal corporate tea leaves would lead to a "yes" from her superiors – she wanted to do the corporate equivalent of putting a very expensive present for her corporate superiors on reserve, without paying anything for it, until she knew the present would make her bosses happy.

111.   Therefore, MENDEZ intentionally caused and directed BEN to dangle the large media spend proposal, with MENDEZ specifically and secretly intending that it would never be fulfilled unless MENDEZ felt comfortable presenting it to her corporate superiors; if she never did, then MENDEZ would simply cause PEUGEOT to deny or throttle the deal through bad faith manipulations. PLAINTIFF is informed and believes that MENDEZ withheld her bad faith intentions from PUBLICIS and BEN, and that to the extent that these agencies were used as tools to carry out MENDEZ'S fraud, they did so without knowing they were doing so, at least initially.

112.   In a third alternative, PLAINTIFF is informed and believes and thereon alleges that the above fraudulent scheme was not MENDEZ'S alone within

1  PEUGEOT, but that MENDEZ'S superiors directed MENDEZ to execute it from

2  the outset (with PEUGEOT in that scenario putting a present for itself on hold

3  without any intention of paying for it later, unless PEUGEOT later decided it felt

4  like doing so, for its own expediencies, as the future developed).

5      113.   PEUGEOT and MENDEZ knew that the scheme was in bad faith and

6  a fraudulent one, and further knew that if in fact PEUGEOT entered into a deal

7  with ALCON on the dangled terms, and then PEUGEOT did not fulfill the deal in

8  bad faith, it would mean that ALCON would suffer an immense loss of opportunity

9  in the form of the other bidders, including Automotive Brand Z's good faith, $16

10  million-plus bid (which PLAINTIFF is informed and believes and thereon alleges

11  that PEUGEOT and MENDEZ believed to be even higher than it actually was).

12  PEUGEOT and MENDEZ intentionally went forward with the fraudulent scheme

13  anyway, even though they knew that the potential damage to ALCON would be

14  massive if they carried the scheme all the way to fruition and backed out of the deal

15  in bad faith.

16      114.   The May 19, 2016 Porter-to-Ravetch proposal from PEUGEOT, and

17  PEUGEOT'S related communications to ALCON at this time, soon had the

18  intended effect.

19      115.   ALCON expressed strong interest in PEUGEOT'S dangled up-to-$40

20  million media spend.  ALCON sent PEUGEOT additional confidential information

21  regarding the BR2049 opportunity that PEUGEOT had requested, so that

22  discussions could proceed in earnest.

23      116.   By on or about May 24, 2016, PEUGEOT had brought PUBLICIS

24  into the discussions (through Casablanca).  By on or about May 24, 2016, Mamou

25  Sissoko (at Casablanca, which is now PUBLICIS), in representation of PEUGEOT

26  with respect to BR2049, had signed a confidentiality agreement with ALCON

27  pursuant to which PUBLICIS agreed that it and its principals, including

28  PEUGEOT, not only would treat all BR2049 information as confidential, but also

that the parties' relationship and communications about it would be governed by
the laws of the State of California.  PLAINTIFF is informed and believes and on
that basis alleges that Sissoko works and resides in France, but knew that he was
delivering his signature on the confidentiality agreement to ALCON in California,
and did so, and PUBLICIS, PEUGEOT and MENDEZ knew and understood this as
well.

117.   PLAINTIFF is informed and believes and thereon alleges that
PEUGEOT and MENDEZ knew and understood the content of the confidentiality
agreement and authorized Sissoko to execute it and/or later ratified his execution of
it.  PLAINTIFF is thus informed and believes and thereon alleges that PEUGEOT,
MENDEZ and PUBLICIS all knew and understood that the business in which they
were engaging with ALCON, and the communications about it, would be governed
by California law.

### *Peugeot Binds Itself to Contractual and Other Duties to Alcon*

118.   Between May 19, 2016 and early July 2016, PEUGEOT and ALCON
(with CTMG executives), including through their respective representatives,
continued to discuss and negotiate about the BR2049 opportunity.

119.   On or about July 12, 2016, Herve Montron, a Casablanca (PUBLICIS)
executive, transmitted a two-page document entitled "Blade Runner II --
Agreement in Principle" from Paris, to ALCON and/or ALCON'S representatives
in California, on behalf of PEUGEOT.  The parties sometimes refer to this
document as the "July 12, 2016 Letter of Intent" or "July 12, 2016 LOI."

120.   PLAINTIFF is informed and believes and on that basis alleges that
PEUGEOT and MENDEZ expressly approved Montron's transmission of the July
12, 2016 LOI to ALCON and/or ALCON'S representatives, and/or ratified it.
Consistent with ALCON'S alternative pleading theories on MENDEZ'S and
PEUGEOT'S intent as articulated in prior paragraphs, ALCON pleads as one
factual alternative that MENDEZ, either with or without the knowledge of her

1   superiors within PEUGEOT, caused the July 12, 2016 LOI to be transmitted to

2   ALCON for the purpose of furthering her fraudulent and bad faith scheme to keep

3   control of the BR2049 opportunity, including her planned intention not to go

4   forward with the deal if MENDEZ and/or PEUGEOT chose not to do so for their

5   own undisclosed expediencies, either personal or corporate.

6       121.   The July 12, 2016 LOI and related contemporaneous communication

7   between the parties evidences and reflects that, by on or about July 12, 2016,

8   PEUGEOT and ALCON had agreed at a bare minimum to negotiate in good faith

9   for a binding contract that would include at least the following terms:

10           a.   PLAINTIFF and PEUGEOT would work in close collaboration to

11               integrate PEUGEOT badging and other trade dress into the design of

12               K's spinner.

13           b.   Once the K Spinner badging and feature designs were approved by

14               PEUGEOT, they would be locked and PEUGEOT would not be able to

15               change or disapprove them later.

16           c.   The finished BR2049 film would include at least several seconds of

17               footage in which PEUGEOT'S logo and badging would be clearly

18               visible to the audience, with PEUGEOT asking (but with the following

19               points still subject to discussion) that the visibility occur across three

20               (3) scenes of four (4) seconds each (for a PEUGEOT-requested total of

21               twelve (12) seconds), with 2 of the scenes being of K's spinner badging

22               and the third scene being the Peugeot logo in an external

23               advertisement/wall ad (sometimes called a "holographic

24               advertisement").

25           d.   The execution of the placement footage was subject to PEUGEOT'S

26               review and approval, which meant review and approval within industry

27               customary parameters, meaning *inter alia*, review was to be prompt,

28               and to PEUGEOT'S reasonable and good faith approval and

1    satisfaction, and within the creative and artistic parameters of the film,

2    and which review and approval was to be conducted by PEUGEOT

3    without unreasonable disruption of the film's schedule, including

4    Picture Lock, Film Delivery and Release Date.

5    e.   The Peugeot spinner badging would be associated with Ryan Gosling's

6    character, K.

7    f.   Ryan Gosling's character, K, would not be associated with any rival

8    automobile brand.

9    g.   The Peugeot brand would not be presented in a perjorative context.

10   h.   Including both pursuant to industry custom and practice and the parties'

11   express and implicit discussions, if upon review, PEUGEOT was not

12   reasonably and in good faith satisfied with a proposed execution of the

13   footage placement, then PEUGEOT was to engage with ALCON

14   reasonably and in good faith on changes or enhancements such that

15   PEUGEOT would be able to give its reasonable and good faith

16   approval, also again within the creative and artistic parameters of the

17   film.  Further, this process was to be conducted by PEUGEOT without

18   unreasonable disruption of the film's schedule, including Picture Lock,

19   Film Delivery and Release Date.

20   i.   If ALCON delivered a satisfactory placement under the above

21   parameters, then PEUGEOT would be obligated to pay $500,000

22   directly to ALCON as a product placement fee, and would also be

23   obligated to work with ALCON to plan, finance and execute a global

24   co-promotion media campaign (which could exclude the U.S.) to

25   support the October 6, 2017 day-and-date global theatrical release of

26   the Picture, with PEUGEOT obligated to deliver at least $30 million of

27   paid media.

28   ///

j.  If ALCON failed to deliver a satisfactory placement even after reasonable and good faith engagement between the parties to attempt to cure reasonable and good faith placement dissatisfactions of PEUGEOT, then the parties would negotiate in good faith about alternative terms that would be fair and reasonable to both sides.

k.  The parties would continue to work together and negotiate together in good faith on any additional terms, including without limitation the then still-to-be-agreed number of seconds of placement footage and their allocation across sequences.

122.  The July 12, 2016 LOI also included an attachment further detailing and reaffirming PEUGEOT'S proposal, intention and promise to a minimum co-promotion media spend of at least $30 million, and outlining specific elements of the potential co-promotion.

123.  ALCON moved forward to negotiate with PEUGEOT to the exclusion of other bidders, in reliance that all of the above communications from PEUGEOT were in good faith.  ALCON was unaware of undisclosed and bad faith intentions by MENDEZ and/or PEUGEOT to kill or deny any deal if it suited their own personal or corporate expediency, and that MENDEZ and/or PEUGEOT intended intentionally to stall or frustrate the triggering of any events that would cause them to be required to pay any meaningful money to ALCON or for any media spend, unless they decided for their own external reasons to do so.  ALCON was also unaware of any lack of ability of PEUGEOT itself to finance a media spend – there was no communication from PEUGEOT or PUBLICIS, for example, that a media spend would have to come from PEUGEOT'S retail dealers in local territories who were not under PEUGEOT'S control.  Unaware of MENDEZ'S and/or PEUGEOT'S bad faith and any such undisclosed highly material information, by no later than approximately July 12, 2016, ALCON had foregone the opportunity to enter into deals with other bidders, including without limitation the $16 million-

1    plus deal proposed by Automotive Brand Z (all exactly as MENDEZ and

2    PEUGEOT intended).

3       124.   At a bare minimum, in addition to other binding promises and

4    obligations, by the above communications and conduct, by no later than July 12,

5    2016, pursuant to the governing California law, PEUGEOT was under a duty to

6    negotiate in good faith with ALCON to close any more binding contractual

7    agreement that might have been necessary for the parties to have a fully binding

8    contractual agreement on a PEUGEOT product placement and minimum $30

9    million media spend on BR2049 with substantially the terms above.

10      125.   PLAINTIFF is informed and believes and on that basis alleges that,

11    under at least one alternative as to what was in PEUGEOT'S and MENDEZ'S

12    minds, over approximately the next year, PEUGEOT, primarily through MENDEZ,

13    was never negotiating in good faith with ALCON. Rather, PEUGEOT and

14    MENDEZ were intentionally leading ALCON further and further down a road

15    where it would be more and more difficult for ALCON ever to partner on the

16    BR2049 opportunity with any other automotive brand. PEUGEOT and MENDEZ

17    fraudulently and in bad faith withheld and concealed from ALCON what was

18    actually in PEUGEOT'S and MENDEZ'S minds: if at any point PEUGEOT or

19    MENDEZ decided for their own personal or corporate expediencies not to go

20    forward with the deal or any part of it, they would take the position that there never

21    was a binding contract of any kind and/or they would claim arbitrary dissatisfaction

22    with ALCON'S performance to avoid their own obligations, even if it was too late

23    for ALCON to recover from MENDEZ'S and/or PEUGEOT'S bad faith and fraud.

24            ***Alcon Performs and Proceeds in Good Faith***

25      126.   With the July 12, 2016 LOI in place, in or about the latter half of July

26    2016, PEUGEOT, PUBLICIS and ALCON all worked together to facilitate an in-

27    person visit by PEUGEOT and PUBLICIS to BR2049's production offices and sets

28    in Budapest, Hungary.

127.   On or about July 26, 2016, as an ALCON condition to the Budapest set visit, MENDEZ, in representation of PEUGEOT with respect to BR2049, and also binding herself as an individual, signed a confidentiality agreement with ALCON pursuant to which MENDEZ herself and PEUGEOT agreed and reaffirmed that both MENDEZ as an individual and PEUGEOT as a company, would treat all BR2049 information as confidential, and that the parties' relationship and communications about it would be governed by the laws of the State of California.  PLAINTIFF is thus informed and believes and thereon alleges that although MENDEZ was traveling to Budapest, MENDEZ again understood and had it reinforced to her that the business in which she was engaging with ALCON would be governed by California law, and that ALCON was a California entity.

128.   The PEUGEOT representatives attending the Budapest production visit included Yang Cai ("Cai"), one of PEUGEOT'S leading production designers. On or about July 26, 2016, as an ALCON condition to the Budapest set visit, Cai, in representation of PEUGEOT with respect to BR2049, signed a confidentiality agreement with ALCON pursuant to which Cai himself and PEUGEOT agreed and reaffirmed that both Cai as an individual, and PEUGEOT as a company, would treat all BR2049 information as confidential, and that the parties' relationship would be governed by the laws of the State of California.  PLAINTIFF is informed and believes and on that basis alleges that Cai signed and delivered the confidentiality agreement to ALCON at MENDEZ'S direction and/or with her knowledge, approval or subsequent ratification.  PLAINTIFF is thus informed and believes and thereon alleges that although Cai was traveling to Budapest, MENDEZ and PEUGEOT again understood and had it reinforced to them that the business in which they were engaging with ALCON would be governed by California law, and that ALCON was a California entity.

///

129.   On or about July 27 and July 28, 2016, MENDEZ, Cai and PUBLICIS'S Sissoko all traveled to Budapest and spent approximately a full day or more meeting with PEUGEOT'S production leads, including Director Denis Villenueve, Production Designer Dennis Gassner, Supervising Art Director Paul Inglis, Executive Producer Bill Carraro, and numerous others.  MENDEZ, Cai and Sissoko were all shown both physical and computer models of K's spinner itself, and were given intimate insights into the creative vision for not only K's spinner, but for the overall BR2049 film and its look, feel and tone.  MENDEZ, Cai (and possibly also Sissoko) also shared PEUGEOT'S creative and business needs and wish lists.

130.   It bears noting that for a major motion picture production to devote substantial resources during principal photography to a visit of this type is itself quite expensive for the studio.  Every day – indeed, every hour – of production time on a major motion picture is tracked, accounted for, and affects the budget of the Picture.  This is common knowledge in the industry, and PEUGEOT, PUBLICIS and MENDEZ all knew that ALCON was incurring substantial expense to work with PEUGEOT and PUBLICIS, including in performing and preparing to perform ALCON'S part of the deal.

131.   During and after the set visit, PEUGEOT, PUBLICIS, MENDEZ, Cai and Sissoko all consistently communicated their high level of enthusiasm for the project to ALCON and ALCON'S representatives, along with PEUGEOT'S commitment and desire to move forward.  At no time during the set visit did MENDEZ ever communicate anything to ALCON that PUBLICIS, or Sissoko specifically, were not authorized to act on PEUGEOT'S behalf with respect to the BR2049 deal.  Indeed, by her statements and conduct, MENDEZ and PEUGEOT instead reaffirmed that PUBLICIS and Sissoko specifically were expressly authorized agents for PEUGEOT, with full authority to communicate PEUGEOT'S positions and to bind PEUGEOT.

132.   Close in time to the above-referenced set visit (either shortly before or shortly after the visit or both), PEUGEOT designer Cai transmitted proposed designs of his own for the K spinner to ALCON.  PLAINTIFF is informed and believes and on that basis alleges that Cai did so with the knowledge of MENDEZ. Some of Cai's drawings for a re-design of the K spinner are attached to this Complaint as **Exhibit A** and incorporated herein by reference.

133.   ALCON and the production's creative team reviewed Cai's drawings in good faith.  Cai's first set of drawings and designs (Exhibit A) are high quality and interesting.  However, after due consideration, ALCON communicated to PEUGEOT, including with the knowledge and awareness of MENDEZ, that Cai's proposed wholesale re-design of K's spinner was farther than the production was going to go both creatively and from a cost standpoint.  ALCON communicated in late July 2016 or early August 2016 that Cai's proposed designs were thus rejected, and asked PEUGEOT to submit alternatives.

134.   PEUGEOT, MENDEZ and Cai all accepted that ALCON had considered Cai's proposed re-designs in good faith.  PEUGEOT and MENDEZ communicated to ALCON that the deal was still a go.  PEUGEOT, MENDEZ and Cai went back to the drawing board to come up with alternative design notes.

135.   In late July and/or early August 2016, Cai transmitted four pages of alternative design notes on K's spinner to ALCON, on behalf of PEUGEOT and, PLAINTIFF is informed and believes and on that basis alleges, with the knowledge and approval of MENDEZ.  A copy of this Cai second set of design notes are attached to this Complaint as **Exhibit B**.  The annotations on the design notes are Cai's, on behalf of PEUGEOT.

136.   By Cai's notes and in related communications between PEUGEOT'S representatives and ALCON'S representatives, PEUGEOT proposed and requested that the following design changes be made to K's spinner:

a.   The word logo "PEUGEOT" appear on the front grill.

b. The word logo "PEUGEOT" appear across the rear hood.

c. The word logo "PEUGEOT" appear (in subtle black lettering) on the dashboard directly ahead of the driver's seat.

d. The driver's display be two square screens (where the logo could appear in one or more sequences of the movie, on, for example, a start or re-start of the vehicle).

e. The modern chrome Peugeot roaring lion logo be placed on the center console rather than an alternative Peugeot "coat of arms" logo.

f. PEUGEOT'S trademark "three claws" brake lighting be added to the rear of the vehicle.

g. The vehicle's front headlighting and running lights track specific positioning as drawn by Cai.

137. In communications between their representatives, PEUGEOT and ALCON also discussed PEUGEOT'S desire to feature its current actual logos in the year 2049 onscreen world of BR2049, including on K's spinner, rather than a fictional futuristic version of the logo. PEUGEOT even provided a narrative explanation for the anachronism, consistent with the BR2049 story.

138. In these same and related communications in this late July and early August 2016 time frame, ALCON and PEUGEOT also discussed an idea by PEUGEOT to have a large holographic PEUGEOT logo emanate from the exterior of K's spinner (for example, on ignition of the vehicle or unlocking it). ALCON and PEUGEOT together discussed that it would be better to have an in-cockpit onscreen dashboard logo on startup, and PEUGEOT agreed.

139. By about the first week of August 2016, PEUGEOT and ALCON had agreed that **all** of Cai's proposed design changes in his second set of notes (Exhibit B) would be made to K's spinner. This included and required making the changes to the actual life-size physical versions of the spinner. The changes were not merely computer graphics image changes, for example – they involved actually

COMPLAINT

making physical changes to real-world vehicles or models thereof, including full life-size versions.  The cost of making PEUGEOT'S changes just to the physical versions of the models exceeded $50,000 – these were expensive changes to make and ALCON never would have made them, but for its understanding that the parties were working together on a product placement and co-promotion with a guaranteed media spend in the tens of millions of dollars.  PEUGEOT, MENDEZ and PUBLICIS all knew this.

140.   By about this same time, PEUGEOT and ALCON had further agreed to all of the following specific design and placement implementations:

a.   PEUGEOT'S current logos would be used (rather than futuristic versions of the logos), with PEUGEOT providing links to approved versions of the logo.

b.   ALCON demonstrated specific onscreen dashboard animations of the Peugeot logo.  PEUGEOT not only agreed to them, but affirmed that they were "great."

c.   ALCON demonstrated and PEUGEOT specifically approved the subtleness of the recessed black "Peugeot" dashboard lettering as valid and approved on-screen Peugeot vehicle badging.

141.   In or about early August 2016, ALCON'S and PEUGEOT'S representatives also discussed and agreed that ALCON only had to provide a total of ten (10) seconds of visibility branding footage.  They further agreed that both types of visibility footage (meaning both 1) vehicle branding visibility footage and 2) outdoor/wall ad Peugeot logos in the BR2049 world background but not on the vehicle) would count toward satisfaction of the ten (10) second agreed minimum. Further, PEUGEOT continuously made clear that of the two types of visibility footage, the vehicle branding visibility footage was more important than the outdoor/wall ad visibility footage and should take primacy.

///

COMPLAINT

142.   By in or about August 2016 (and no later than September 2016), ALCON and PEUGEOT, through representatives, also expressly discussed and agreed that while PEUGEOT had requested an ALCON promise that motion picture soundtrack rights would be granted for use in PEUGEOT co-promotional spots, ALCON was declining to make this a contractual promise or obligation (largely because the soundtrack would not be finalized until too close to the Picture's planned release for PEUGEOT'S request to be a contractual commitment from ALCON).   PEUGEOT agreed to give up the soundtrack ask as a term.

143.   In the course of all of the above communications and conduct, it was also reaffirmed and made clear to MENDEZ, PEUGEOT and PUBLICIS (and custom and practice in the industry also dictates) that while it was agreed that PEUGEOT had a right of review and approval of the specific implementation of the ten (10) seconds of branding visibility footage as it would actually appear on screen, PEUGEOT'S review and approval process was to be prompt, and subject to reasonableness and good faith by PEUGEOT.   PEUGEOT'S review and approval also had to be within the creative and artistic parameters of the film, which were in the control of ALCON and not PEUGEOT.   Furthermore, review and approval was to be conducted by PEUGEOT without unreasonable disruption of the film's schedule, including Picture Lock, Picture Delivery and Release Date, and also such that the co-promotion could be planned and executed.

144.   Including because the planning of a substantial near-worldwide co-promotion of the type the parties agreed to here requires several months of advance planning, all concerned clearly knew and understood that it was not expected, nor would it even be possible, for PEUGEOT to wait to conduct (or withhold) its review and approval of the visibility footage until and unless PEUGEOT could view the entire theater-ready release version of the film.   At no time during the parties' negotiations prior to reaching agreement did PEUGEOT ever request such an exceedingly unusual (and indeed, impossible) condition, nor would ALCON

have ever agreed to it, and ALCON did not do so (nor would any major motion picture company – the idea is nonsensical, as the co-promotion planning is for the purpose of supporting the release and thus must precede the film's release by several months).

145.   Further, by no later than about August 2016, PEUGEOT, MENDEZ and PUBLICIS all understood (including without limitation by custom and practice in the industry), if upon review, PEUGEOT was not reasonably and in good faith satisfied with a proposed execution of the footage placement, then PEUGEOT was to engage with ALCON reasonably and in good faith on changes or enhancements such that PEUGEOT would be able to give its reasonable and good faith approval, also again within the creative and artistic parameters of the film.  And this process, too, was to be conducted by PEUGEOT without unreasonable disruption of the film's schedule, including Picture Lock, Film Delivery and Release Date, and also such that the co-promotion could be planned and executed.

146.   By no later than early August 2016, with the knowledge and approval of PEUGEOT and MENDEZ, and in reliance that all of the above terms were agreed, ALCON proceeded to execute the above agreed specific implementations of the spinner design and to incorporate them into the film's production, including in principal photography.  For ALCON to so proceed required ALCON to commit and expend substantial financial resources, time resources and creative resources that had no other purpose except performing the placement for PEUGEOT.  From about August 2016 and forward, the PEUGEOT placement began to be incorporated into the BR2049 film in ways that would have been exceedingly expensive to undo or change.

147.   ALCON would never have incurred any of these expenses or actions if ALCON had known that PEUGEOT would ever take the position that the parties had no enforceable agreement of any kind, or that PEUGEOT and MENDEZ were secretly reserving a purported unilateral right to back out of any PEUGEOT

performances if they ever determined it to be personally or corporately expedient for them to do so, or that PEUGEOT had not firmly committed to at least a $30 million media spend upon a satisfactory placement, or that PEUGEOT had no budget of its own to make such a spend.

148.   PEUGEOT and MENDEZ knew all of this and that all such misrepresentations and omissions were highly material to ALCON'S decision making.  PLAINTIFF is informed and believes and on that basis alleges that at least under one alternative set of facts, PEUGEOT and MENDEZ knowingly, intentionally, fraudulently and in bad faith allowed ALCON to proceed to its detriment, with PEUGEOT and MENDEZ essentially secretly holding in their metaphorical pocket that they would claim that they had a "get out of jail free" card that they intended to play arbitrarily not to perform their obligations under the deal, if it was personally or corporately expedient for them to not to perform.

149.   PLAINTIFF is informed and believes and on that basis alleges that among other bad faith strategies, MENDEZ had a (mistaken) belief and intent that if she could stall or avoid putting any PEUGEOT signature on any written contract (including in bad faith), that PEUGEOT could walk away from the entire deal with no consequences at all.

### September 2016 to January 2017

150.   Product placement and media spend agreements do not need to be in formal signed contracts in order to be enforceable under California or United States law.  Indeed, it is relatively common in the industry for such agreements to be documented informally, and for major performances under such agreements to be undertaken based on emails only or even on close to a handshake basis, especially where the parties or their representatives (like PUBLICIS) are known and respected industry players.  Furthermore, even where the parties do negotiate a long form, as with many forms of industry contracts, it may or may not ever be fully signed.
///

151.   Here, although they did not necessarily need to do so, ALCON, with CTMG'S participation, assistance and representation, and PEUGEOT and PUBLICIS, all proceeded together to work on a longer, more formal written documentation of the parties' agreement.  As part of that process, the parties continued to negotiate additional terms and refinements to terms.

152.   CTMG executives sent an initial draft of a longer, more formal agreement to PUBLICIS on or about September 24, 2016, and the parties' respective representatives exchanged multiple drafts, comments and emails about it into early January 2017.

153.   In parallel during this same period (September 2016 to January 2017), ALCON and PEUGEOT continued to communicate together to effectuate the placement creatively, and to plan for the co-promotion.

154.   Between August 2016 and through December 2016, and afterward, creative personnel for ALCON and the BR2049 production remained in contact with PEUGEOT creatives, including regarding execution of the Cai design changes to K's spinner.  In particular, PLAINTIFF is informed and believes and on that basis alleges that Supervising Art Director Paul Inglis continued in this period to communicate from time to time with Cai regarding the spinner, how it looked and related issues.  ALCON and PEUGEOT communications during this approximate time frame (late 2016) also included another visit to the BR2049 set, at the request of PEUGEOT and BETC, for the express purpose of preparation for planning the co-promotion.  PLAINTIFF is informed and believes and on that basis alleges that MENDEZ was aware of the ongoing communications between Cai and/or other PEUGEOT representatives, including BETC, and the production; MENDEZ and PEUGEOT knew that ALCON was relying on the deal between the parties and that it was a go; and MENDEZ and PEUGEOT knew that ALCON had no awareness or suspicion that MENDEZ and/or PEUGEOT were fraudulently and in bad faith still planning to deny or pull out of the deal if it suited them.

155.   PLAINTIFF is also informed and believes and on that basis alleges that MENDEZ was also aware of and expressly authorized PUBLICIS to continue to negotiate refinements to the deal with ALCON, and knew that PUBLICIS was doing so.

156.   Among other communications, in an email exchange between PUBLICIS and CTMG executives on or about October 4 and 5, 2016 (and with principal photography well under way, with the Peugeot branding incorporated into K's spinner), the parties agreed on a mutually acceptable allocation of the agreed ten (10) seconds of branding visibility footage: six (6) seconds to spinner branding footage across no more than two (2) sequences, and four (4) seconds to the outdoor/wall ad (or "holographic advertisement").  However, it was clear at this time and at all times, that, subject to knowing what the allocation target was with enough time to meet the target without undue prejudice, ALCON was widely flexible as to how the agreed ten (10) seconds of visibility footage be allocated as between spinner and outdoor/wall ad sequences.

157.   Principal photography closed on November 22, 2016, with numerous scenes prominently featuring the now Peugeot-badged-and-branded K spinner, including with Gosling in and around it.  ALCON was thus fully ready, willing and able to include the placement in the finished Picture, and had every intention of doing so, and never had any intention not to do so.  Indeed, ALCON was prepared to go above and beyond any contractual minimum visibility timing targets, and generally to engage actively and cooperatively with PEUGEOT, to achieve PEUGEOT'S reasonable and good faith approval of the placement and thereby insure the media spend (and ALCON in fact did all of these things).

158.   PEUGEOT and MENDEZ continued to lead ALCON actively down the road that the co-promotion was agreed and that there were no obstacles to PEUGEOT financing it or otherwise fulfilling it when the time came.  PLAINTIFF is informed and believes and on that basis alleges, including due to PEUGEOT'S

1    and MENDEZ'S later express admissions and under one alternative set of facts,

2    that PEUGEOT'S and MENDEZ'S representations to ALCON about this were

3    false and in bad faith – in fact, there was no funding within PEUGEOT for any

4    media spend, whether or not the placement was satisfactory.  Worse, MENDEZ

5    had not yet even asked her corporate superiors for any, nor did she intend ever to

6    do so, unless she believed that it would favor her politically within PEUGEOT to

7    present BR2049 to her superiors as a possible deal.

8        159.   By no later than December 16, 2016, PEUGEOT had informed

9    ALCON that it had hired BETC to help plan and execute the co-promotion and its

10   $30 million media spend.  Indeed, on or about December 16, 2016, Vincent

11   Behaeghel, Marina Sokolowsky, Olivier Aumard and Henri Tripard, all affiliated

12   with BETC, all signed and delivered to ALCON confidentiality agreements

13   pursuant to which all of them agreed on behalf of themselves and BETC (and

14   PEUGEOT) to treat all BR2049 information as confidential and that the parties'

15   relationship and communications about BR2049 (in which BETC was serving as an

16   agent for PEUGEOT, specifically as to the co-promotion) would be governed by

17   the laws of the State of California.  PLAINTIFF is informed and believes and on

18   that basis alleges that BETC signed and delivered the confidentiality agreements to

19   ALCON at MENDEZ'S and PEUGEOT'S direction and/or with MENDEZ'S and

20   PEUGEOT'S knowledge, approval or subsequent ratification.

21       160.   By in or about early January 2017, ALCON, PUBLICIS, PEUGEOT,

22   MENDEZ, executives from CTMG, and BETC had all made plans to attend a

23   meeting at ALCON'S offices in Los Angeles, scheduled for January 24, 2017.  The

24   meeting's intended purpose was for ALCON to show the placement and other

25   creative materials to PEUGEOT, PUBLICIS and BETC, and otherwise take steps

26   so that work could commence in earnest on planning for and beginning to execute

27   the co-promotion – indeed, all parties understood the January 24, 2017 meeting to

28   be a "kickoff" meeting **for the co-promotion**.

161.   On or about January 10, 2017, CTMG executives transmitted a proposed execution version of the long-form written documentation of the placement and co-promotion agreement to PUBLICIS.  On or about January 18, 2017, PUBLICIS'S Sissoko emailed back to CTMG executives located in California that same version of the proposed long-form bearing Montron's signature for PUBLICIS, on behalf of PEUGEOT.  Sissoko actually or effectively represented and intended by his transmission of the signed draft (and Sissoko was saying "final") long form back to ALCON and CTMG, that ALCON and CTMG rely on the signed document as attached to Sissoko's email as fully authorized by PEUGEOT, and that PEUGEOT agreed to all terms and language in that particular writing.

162.   But, Sissoko copied no PEUGEOT executives on the transmission.

163.   ALCON and CTMG discussed the matter internally and decided for the sake of caution to ask for confirmation that the particular draft signed by PUBLICIS had indeed been shown to PEUGEOT and approved by it.  Thus, on or about January 23, 2017, ALCON and CTMG requested that PUBLICIS so confirm, preferably by having a PEUGEOT executive sign the particular draft directly that PUBLICIS was representing to be the PEUGEOT-approved final long form.

164.   PUBLICIS resisted in an email response on or about January 23, 2017.  PUBLICIS'S resistance to obtaining PEUGEOT'S direct signature did not raise flags to ALCON and CTMG as to whether the parties had any deal at all.  They unquestionably did: PEUGEOT had been directly involved in numerous communications and had used multiple agencies other than PUBLICIS to communicate about and affirm the deal.  However, PUBLICIS'S resistance to obtaining a PEUGEOT signature on a particular document did raise questions for ALCON and CTMG, not as to whether ALCON and PEUGEOT had a deal on the material terms, or whether PUBLICIS was PEUGEOT'S authorized agent, but

///

1 rather whether PEUGEOT had seen and fully approved the particular written draft
2 in question.

3      165.   That PEUGEOT was directly aware that parties had a deal for a
4 guaranteed co-promotion, and that PUBLICIS was representing PEUGEOT about
5 it as to the negotiation of terms, was beyond question.  For example, the January
6 24, 2017 BR2049-PEUGEOT co-promotional kickoff meeting took place at
7 ALCON'S offices in Los Angeles, attended in person by MENDEZ and Sissoko.
8 In the meeting, MENDEZ and Sissoko, by their statements and conduct, sitting
9 next to each other in person, clearly communicated and reaffirmed to ALCON and
10 CTMG that the deal was still on as to both the placement and co-promotion, and
11 that PUBLICIS continued to be PEUGEOT'S expressly authorized agent.
12 Moreover, BETC executives were also present at the same meeting, in person in
13 the presence of MENDEZ, and were there for the express purpose of representing
14 PEUGEOT with respect to execution of the agreed co-promotion (*i.e.*, PUBLICIS
15 had negotiated and was authorized to negotiate the terms of the co-promotion, but
16 BETC was actually to carry out the agreed co-promotion, or help PEUGEOT do
17 so).

18      166.   Further, during the January 24, 2017 meeting, ALCON distributed a
19 creative deck (PowerPoint or Keynote presentation) laying out visuals from the
20 film and story elements, and specifically including multiple images of K's spinner
21 tracked to show compliance with PEUGEOT-designer Yang Cai's requested and
22 agreed design modifications to the vehicle.  A copy of this January 24, 2017
23 Creative Deck is attached to this Complaint as **<u>Exhibit C</u>** and incorporated herein
24 by reference.

25 ///
26 ///
27 ///
28 ///

COMPLAINT

167.   During the January 24, 2017 meeting, MENDEZ, PEUGEOT and PUBLICIS, and BETC all saw and reviewed the deck.  All of them communicated PEUGEOT'S approval of the K spinner badging design execution, and commenced moving forward with discussion of the planned co-promotion, all in the January 24, 2017 meeting.

168.   Under at least one alternative set of facts regarding MENDEZ'S and PEUGEOT'S intent at this time, PLAINTIFF is informed and believes and on that basis alleges that at the January 24, 2017 meeting, MENDEZ and/or PEUGEOT knowingly and intentionally made false statements and/or omissions to ALCON for the intended purpose of continuing to keep the BR2049 opportunity moving forward so that MENDEZ could claim for it PEUGEOT if she decided to do so, but also secretly planning and intending that if it were personally or corporately expedient for her and/or PEUGEOT to do so, that PEUGEOT would deny any obligation and refuse to perform.  PLAINTIFF is informed and believes and on that basis alleges that MENDEZ and/or PEUGEOT made these false statements and/or omissions knowing that ALCON had changed and was continuing to change its position to its extreme detriment in reliance on them.

169.   Lingering for ALCON and CTMG, though, was what they believed to be the relatively limited issue of whether PEUGEOT and PUBLICIS were adequately communicating between themselves about the finality of the particular draft that Montron had signed and Sissoko had transmitted.

170.   Thus, in late January and early February 2017, ALCON and CTMG representatives continued to communicate with Sissoko about pinning down this seemingly limited issue.

171.   As a result, not long after MENDEZ'S Los Angeles visit, Sissoko and PUBLICIS suggested that the PEUGEOT signature issue could be clarified by PEUGEOT simply providing a signed confirmation of PUBLICIS'S authority to negotiate and sign BR2049 contracts on PEUGEOT'S behalf.  Accordingly,

PUBLICIS and PEUGEOT caused to be transmitted to ALCON and CTMG, in California, a document entitled "Delegation of Signature Authority."  The document was signed by MENDEZ for PEUGEOT, and expressly affirmed that "I, the undersigned Isabel Salas Mendez, as Peugeot Marketing and Communication Manager, authorize The Casablanca Agency – Herve Montron and/or Mamou Sissoko [*i.e.*, PUBLICIS, as that defined term is used in this Complaint], to sign any document related to the *Blade Runner 2049* project, on behalf of Peugeot.  [¶] For this purpose, those persons may sign for Peugeot on its behalf, any form of document required.  They may also require any necessary documents for Peugeot."  Indeed, MENDEZ signed and transmitted the "Delegation of Signature Authority" document ***twice***.

172.    The first version of the confirmation of PUBLICIS signature authority signed by MENDEZ was dated effective as of December 7, 2016.  The parties all considered their fundamental deal as having been made no later than August 2016.  Thus, ALCON and CTMG expressly requested that MENDEZ re-sign the effective date of the "Delegation of Signature Authority" to go back as early as August 16, 2016, and expressly because that was about the time that ALCON and PEUGEOT had reached agreement on material terms.

173.    MENDEZ complied with ALCON and CTMG'S request and executed the "Delegation of Signature Authority" a second time, with the August 16, 2016 effective date.  PUBLICIS and/or PEUGEOT caused it to be transmitted to ALCON and CTMG, and ALCON received it (in California, as understood and intended by PUBLICIS, PEUGEOT and MENDEZ) on or about February 8, 2017.

174.    As described in detail in subsequent paragraphs, despite MENDEZ'S clear signature (twice) on the "Delegation of Signature Authority" documents, MENDEZ and PEUGEOT ultimately denied in bad faith (under at least one factual alternative) that PUBLICIS had been authorized to negotiate on behalf of PEUGEOT or had exceeded its authority.  PEUGEOT and MENDEZ further

asserted that they had never become obligated to ALCON or Sony under any contractual or other duty of any kind with respect to any co-promotion and did not even know such discussions were even occurring (despite MENDEZ'S personal physical presence and participation in, for example, the January 24, 2017 co-promotion kickoff meeting).

175.   As described in further detail in subsequent sections of this Complaint, even though PEUGEOT had expressly induced ALCON to stop considering other bidders by specifically sweetening PEUGEOT'S own bid with an "up to $40 million co-promotion;" and even though MENDEZ had signed the signature delegation documents twice; and even though MENDEZ herself had personally communicated with both ALCON and CTMG and herself affirmed that the deal was for both a placement and a co-promotion; and even though MENDEZ herself personally attended and participated at ALCON'S Los Angeles offices in the co-promotion "kickoff" meeting; MENDEZ nonetheless ultimately flatly refused to have any PEUGEOT executive sign _any_ version of the multiple written drafts that the parties' exchanged of a more formal written agreement documenting the co-promotion; and (amazingly) MENDEZ even sent emails denying that she or PEUGEOT had ever agreed to any co-promotion; and further denied that PEUGEOT _had even ever discussed one_ with ALCON.

176.   The history of communications, including the negotiations and the drafting history, clearly show (including as things played out subsequently with additional PEUGEOT drafting and signature-withholding shenanigans described further below), that by no later than January 18, 2017, ALCON and PEUGEOT had reached a valid and enforceable agreement that included all of the following mutually agreed terms (which include some further refinements to and additions to the terms agreed in or about August 2016):

        a.   PLAINTIFF and PEUGEOT would work in close collaboration to integrate PEUGEOT badging and other trade dress into the design of

K's spinner.

b. Once the K Spinner badging and feature designs were approved by PEUGEOT, they would be locked and PEUGEOT would not be able to change or disapprove them later (and the badging and feature designs were actually approved by PEUGEOT no later than January 24, 2017).

c. The finished BR2049 film would include at least ten (10) seconds of footage in which PEUGEOT'S logo and badging would be clearly visible to the audience (although if ALCON for creative or other reasons did not include a PEUGEOT placement, then this was not necessarily a breach by ALCON, but the parties were expected and obligated to negotiate with each other in good faith about what to do in such event).

d. The at least ten (10) seconds of footage was to be apportioned across multiple sequences in the movie (with a clear record that PEUGEOT had it explained to them that a sequence or scene could include more than one camera shot – ALCON and CTMG expressly declined to be bound by measuring timing by single shots, but rather would only agree to "sequences" or "scenes", meaning aggregations of related shots).

e. The at least ten (10) seconds of footage was to be apportioned across two types of sequences: 1) badging on K's spinner, and 2) at least one sequence where the Peugeot logo would appear in the BR2049 world, such as in an outdoor advertisement in the background.

f. Of the two types of sequences, the K spinner badging sequences were more important to PEUGEOT, and the outdoor/wall ad sequences (or "holographic advertisements") were of secondary importance (including meaning that of the ten (10) seconds, more of the time would go to the K spinner badging sequences).

g. At least one mutually acceptable allocation of the ten (10) seconds was

about six (6) seconds of visibility footage in two spinner sequences and about (4) seconds to at least one outdoor/wall ad sequence. It was also clear that ALCON was widely flexible and ready, willing and able to perform a different allocation, as long as PEUGEOT communicated its desires clearly with enough time for ALCON to meet them without undue prejudice. Indeed, ALCON was prepared to over-perform on the visibility deliveries if it had to (and in fact, it did so).

h. The execution of the ten (10) seconds of placement footage was subject to PEUGEOT'S commercially reasonable and good faith review and approval, which was to be prompt, and within the creative and artistic parameters of the film, which were understood not to be in PEUGEOT'S purview. PEUGEOT'S review and approval was to be conducted by PEUGEOT without unreasonable disruption of the film's schedule, including Picture Lock, Film Delivery and Release Date, and also early enough such that the co-promotion could be planned and executed.

i. The Peugeot spinner badging would be associated with Ryan Gosling's character, K.

j. Ryan Gosling's character, K, would not be associated with any rival automobile brand.

k. The Peugeot brand would not be presented in a perjorative context. PEUGEOT acknowledged that it had reviewed the BR2049 script and knew, understood and agreed that the BR2049 involved one or more crashes of K's spinner, and that these crashes were agreed as not violative of any term of the parties' agreement.

l. If upon review, PEUGEOT was not reasonably and in good faith satisfied with a proposed execution of the footage placement, then PEUGEOT was to engage with ALCON reasonably and in good faith

on changes or enhancements such that PEUGEOT would be able to give its reasonable and good faith approval, also again within the creative and artistic parameters of the film, and which was to be conducted by PEUGEOT without unreasonable disruption of the film's schedule, including Picture Lock, Film Delivery and Release Date.

m. PEUGEOT expressly acknowledged that it had been provided with the opportunity to review the visual depictions of the placement items and had approved them.

n. If ALCON delivered satisfactory placement footage, then PEUGEOT was obligated to pay $500,000 directly to ALCON as a product placement fee, and was also obligated to work with ALCON to plan, finance and execute a global co-promotion media campaign (which could exclude the U.S.) to support the October 6, 2017 day-and-date global theatrical release of the Picture, with PEUGEOT obligated to deliver at least $30 million of paid media.

o. If ALCON failed to deliver satisfactory placement footage even after reasonable and good faith engagement between the parties to attempt to cure reasonable and good faith placement dissatisfactions of PEUGEOT, then the parties would negotiate in good faith about alternative terms that would be fair and reasonable to both sides.

p. Of the $500,000 placement fee, $400,000 was allocated to the spinner placements and $100,000 to the outdoor/wall ad placement.  The parties further agreed and intended that the purpose of setting forth an allocation was to provide a yardstick for potential reduction of the placement fee if an element of the placements was not satisfactory after good faith cooperative attempts to cure were exhausted.

q. The $500,000 placement fee was earned by ALCON and owed by PEUGEOT no later than upon ALCON'S written confirmation to

COMPLAINT

PEUGEOT that the placements would be in the final Picture – while the placement fee could be paid by PEUGEOT after release of the Picture, it was earned by ALCON and owed by PEUGEOT earlier, on ALCON'S confirmation that ALCON intended to perform the placement.

r. The agreed co-promotional period (the time during which the co-promotion would actually be licensed to run) would be from September 1, 2017 to November 30, 2017 (or sixty days after the initial theatrical release date of the Picture, if ALCON had to change the release date of the Picture for any reason).

s. The defined co-promotional territory was the entire world, excluding the United States and Canada and their related territories (but it was understood that PEUGEOT would nonetheless receive the branding and goodwill benefits of the U.S. and Canada release of BR2049, as the PEUGEOT placements would be and were in all versions of the film in all territories).

t. The agreed $30 million guaranteed minimum media spend was to be divided $27 million in Above-The-Line ("ATL") Spend and $3 million in Below-The-Line ("BTL") Spend (with it understood and agreed that the ATL and BTL definitions were the advertising industry standard definitions of these terms – very generally, ATL Spend refers to media that mass targets large audiences, like television and radio and many forms of Internet media; BTL Spend refers to media that more specifically targets a limited set of consumers, like flyers distributed from a particular retail store, or most forms of event marketing, like a fan convention or auto show).

u. ALCON had a review and approval right over the co-promotion's specific executions, on a case-by-case basis.

1       v.  The co-promotion was to include a dedicated presence on

2           PEUGEOT'S website (www.peugeot.fr).

3       w.  PEUGEOT was obligated to create, and the co-promotion was to

4           include, at least one thirty-second television spot, unless Gosling

5           refused to approve use of his likeness in the spot, in which case

6           PEUGEOT was relieved of the television spot obligation (but not of

7           the entire co-promotion).  (Gosling agreed in principal to potential use

8           of his likeness in a television spot for PEUGEOT, and PEUGEOT

9           never sought Gosling's review or approval of any proposed spot,

10          including because PEUGEOT never created one.)

11      x.  PEUGEOT was to create and produce Below-The-Line spend spots.

12      y.  PEUGEOT was to create and issue a press release to the media

13          regarding the co-promotion.

14                          ***February 2017 to May 2017***

15          177.  With these terms all clearly agreed, ALCON continued to move

16   forward with its performances, believing that the PUBLICIS-PEUGEOT signature

17   communication oddities were simply about whether the particular draft that

18   Sissoko had signed was indeed agreed by PEUGEOT as the final written

19   documentation of the deal.

20          178.  On or about February 11, 2017 and continuing through February 24,

21   2017, desiring to eliminate any uncertainty whatsoever as to whether a particular

22   draft long form had been agreed to or not by PEUGEOT, and with MENDEZ

23   clearly available to review and execute documents directly as the Delegation of

24   Signature Authority documents evidenced, ALCON and CTMG asked PUBLICIS

25   to have PEUGEOT executives directly execute the draft version of the long form

26   agreement.  PUBLICIS continued repeatedly to represent the document as

27   approved and agreed by PEUGEOT.  PUBLICIS in particular repeatedly

28   reaffirmed to ALCON, including through CTMG, that there was no problem with

the fundamental deal or PUBLICIS'S and PEUGEOT'S principal-agent relationship, but at most an issue about what level of review of specific drafts was appropriate internally as between PUBLICIS and PEUGEOT. However, after some back and forth, PUBLICIS agreed to obtain PEUGEOT'S direct signature, or at least to consider doing so.

179. The following PEUGEOT and PUBLICIS acrobatics then occurred between late February 2017 and early May 2017, as MENDEZ and/or PEUGEOT sought to continue to cling to their undisclosed intention to withdraw or deny the deal arbitrarily if it suited their personal and/or corporate expediencies. This involved PUBLICIS disclosing some embarrassing internal conduct not the fault of ALCON or CTMG.

180. Over a series of tortured communications in late February and into mid-May 2017, PUBLICIS and PEUGEOT eventually disclosed to ALCON and CTMG that (through no fault of ALCON or CTMG) a fee dispute had arisen between PUBLICIS and PEUGEOT regarding the BR2049 deal (apparently arising sometime in or about late 2016 or early 2017). PUBLICIS and PEUGEOT communicated, as ALCON and CTMG understood them (and as ALCON believes under at least one set of alternative facts pled here is actually true), that the fee dispute was resolved between PUBLICIS and PEUGEOT somewhere during the approximately February to March 2017 time frame.

181. However, there was at least a possibility that the existence of the dispute (or other factors not the fault of ALCON or CTMG) might have meant that PEUGEOT executives had not seen some of the long-form draft agreements in December 2016 and January 2017. Furthermore, the internal legal team of the larger PUBLICIS entity became involved and expressed regret that (through no fault of ALCON or CTMG), Montron had signed what he had represented to be the PEUGEOT- and PUBLICIS-approved version of the draft long-form agreement, but without running it by any PUBLICIS lawyers. The PUBLICIS internal legal

1  team thus desired an opportunity to review the document and potentially make

2  some limited comments, including in consultation with PEUGEOT -- PUBLICIS

3  legal wanted a limited Mulligan on the long form (not the fundamental deal).

4      182.   At no point prior to May 4, 2017 did PUBLICIS or PEUGEOT ever

5  communicate to ALCON or CTMG that PEUGEOT was denying the existence of a

6  deal, and one that included a placement and guaranteed $30 million co-promotion,

7  or that PEUGEOT was claiming an arbitrary unilateral right not to go forward with

8  the deal if it chose.  Furthermore, at no point prior to May 4, 2017 did PEUGEOT

9  ever communicate to ALCON or CTMG that PUBLICIS was negotiating for

10  PEUGEOT regarding BR2049 without PEUGEOT'S authorization.  Indeed, during

11  February 2017 and into May 2017, PUBLICIS and PEUGEOT both continued to

12  allow and encourage ALCON to continue to move forward with performance of the

13  placement and preparations for the co-promotion.  ALCON in fact did so, in full

14  and heavy reliance on the existence of agreement on all material terms, with the

15  only potential issue between about mid-February 2017 and up to May 4, 2017

16  being whether PUBLICIS and PEUGEOT should be allowed some limited

17  additional tinkering with specific language in the proposed long form.

18      183.   Having no need or desire to force any specific draft of the long form

19  agreement upon PEUGEOT if PUBLICIS and PEUGEOT wanted to make limited

20  additional comments on non-material terms, and where it seemed that there was at

21  least some possibility that PUBLICIS and PEUGEOT had had some limited

22  moment of disconnection around whether the final draft long form was fully final,

23  ALCON and CTMG agreed potentially to consider additional comments from

24  PUBLICIS and PEUGEOT, and to engage with PUBLICIS'S internal legal team

25  about what they might be.

26      184.   ALCON and CTMG marketing executives continued to communicate

27  with PEUGEOT about various specific co-promotional opportunities, including

28  opportunities that PEUGEOT could take advantage of it wanted to do so.  For

example, on or around March 30, 2017, ALCON and CTMG executives inquired about what PEUGEOT wanted to do about its branding in connection with consumer products models of K's spinner – whether PEUGEOT wanted to have its branding on them or not.  In these communications and similar such communications, continuing through at least March 30, 2017 and even afterward, PEUGEOT never communicated to ALCON that the deal was off or had never been made, or did not include a co-promotion.

185.   On or about April 13, 2017, almost three months after Montron's signature on the January 18, 2017 writing, PUBLICIS'S internal legal team emailed a proposed revised draft to ALCON and CTMG executives in California, with PUBLICIS'S and PEUGEOT'S requested additional comments.  PUBLICIS represented by its express statements and implied conduct that the April 13, 2017 draft had now with full certainty been reviewed directly by PEUGEOT and approved by PEUGEOT.

186.   PLAINTIFF is informed and believes and on that basis alleges that the April 13, 2017 draft from PUBLICIS'S internal legal team was in fact reviewed and approved by PEUGEOT, and specifically MENDEZ, prior to its transmission to ALCON and CTMG.

187.   ALCON and CTMG executives reviewed the April 13, 2017 draft and comments in good faith.  They were disconcerted and concerned by the nature of some of the comments and whether they were being made in good faith by PEUGEOT.  At least some of the requested changes appeared to be in bad faith and could not possibly be explained by any internal miscommunication between PUBLICIS and PEUGEOT or any lack of PUBLICIS internal legal review.  As one example, the April 13, 2017 draft asked to eliminate language acknowledging that PEUGEOT had reviewed and approved the K spinner badging design implementations, even though MENDEZ herself had personally reviewed and approved them while sitting in front of ALCON and CTMG executives, and while

sitting next to PUBLICIS'S Sissoko and BETC executives, in the January 24, 2017 meeting.  Any drafting miscommunication between PUBLICIS and PEUGEOT could not possibly justify not acknowledging MENDEZ'S and PEUGEOT'S communicated approvals, especially after ALCON had relied on them for another three months and the Release Date was three months closer.

188.   Moreover, comparison of the drafts made it clear that the parties had substantial agreement on all material terms, with the possible exception of PEUGEOT in bad faith attempting in the drafting to build in moving targets regarding what would or would not satisfy the placement conditions and fully obligate PEUGEOT to the make the placement payment and guaranteed media spend.  The attempt to undo acknowledgement of previously given approvals was one example.  As another example, although ALCON and CTMG did not understand that PEUGEOT was doing so in bad faith at the time, PEUGEOT appears in hindsight intentionally to have been creating a moving target with respect to exactly how PEUGEOT wanted the agreed ten (10) seconds of brand visibility footage apportioned across the spinner and outdoor/wall ad sequences, so that PEUGEOT could claim lack of compliance and a purported justification for non-performance, no matter what allocation ALCON actually delivered.

189.   For example, as detailed above, prior to the completion of principal photography, PEUGEOT had clearly communicated that an allocation of six (6) seconds across up to two (2) spinner sequences, and four (4) seconds to an outdoor/wall ad sequence or sequences was acceptable, and the parties mutually agreed to it, including in October 2016 emails.  However, in at least some subsequent drafts, PEUGEOT appeared to be requesting that all ten (10) seconds go to spinner sequences.  Then, in yet another radical change, as detailed further below, for the purpose of frustrating ALCON satisfying any timing allocation target, MENDEZ later appeared to state (falsely) in emails that PEUGEOT placed higher priority on the outdoor/wall ad sequences, over spinner badging, coupled

with statements that the numerous design changes that PEUGEOT had requested (including in the Cai drawings, Exhibit B) and that ALCON had irrevocably implemented as significant expense, were not important and of no value to PEUGEOT.

190.   As PEUGEOT well knew, and as ALCON'S conduct consistently clearly demonstrates, ALCON was widely flexible as to how PEUGEOT wanted the agreed ten (10) seconds allocated across spinner and outdoor/wall ad sequences, as long as ALCON knew the target reasonably with enough time to meet it.  ALCON would have agreed to any reasonable allocation, and even a change to allocation, as long as ALCON had enough time to implement it without undue cost, unfair benefit to PEUGEOT, or undue risk to the production and release date schedule.  Indeed, ALCON was prepared to (and actually did) over-perform on the allocation, including giving PEUGEOT substantially more than ten (10) seconds of visibility to avoid any disputes about ALCON'S performance of the placement.  Thus, to the extent that there was any uncertainty about the allocation of the agreed ten (10) seconds, it was entirely created by PEUGEOT, and ALCON is informed and believes and on that basis alleges that PEUGEOT intentionally did so for the purpose of claiming in bad faith that there was no deal or that ALCON had not performed based on some moving target technicality of the allocation terms.

191.   Thus, the negotiation and drafting history of the proposed long form agreement and its versions all show and confirm, as further affirmed by the parties' course of performance and conduct prior to PEUGEOT'S express reneging on the deal on May 4, 2017, that 1) there was in fact an agreement between ALCON and PEUGEOT on all material terms that ALCON seeks to enforce by this Complaint, and 2) that agreement on all terms as stated above was reached no later than January 18, 2017 (with many terms agreed well before that, as early as August 2016).

192.  In addition to concerns about the scope and substance of PEUGEOT'S additional comments transmitted April 13, 2017, ALCON and CTMG were also concerned about timing.  For much of the fall of 2016, PUBLICIS had communicated that PEUGEOT might claim difficulties in performing the co-promotion if the parties were not adequately synchronized about its specific execution by March or April 2017.  And now PEUGEOT had wasted almost three months, between January 18, 2017 and April 13, 2017, stalling on putting its own corporate signature on a long form that PEUGEOT and its agents had previously spent about five months negotiating with ALCON and CTMG.

193.  After considering the April 13, 2017 PUBLICIS-PEUGEOT draft and considering all of the circumstances, ALCON and CTMG communicated to PUBLICIS and PEUGEOT (through PUBLICIS'S internal legal team), that ALCON and CTMG preferred not to re-open the drafting discussions on the proposed long form to the extent that PUBLICIS and PEUGEOT appeared to be asking, and that the parties needed to move on to actual further execution of performances.

194.  ALCON and CTMG requested that PEUGEOT simply sign the January 18, 2017 Montron draft.  PEUGEOT never did, and indeed refused to put the signature of any PEUGEOT executive on any draft of the long form documentation.  PLAINTIFF is informed and believes and on that basis alleges that no version of a long form agreement ever came into existence bearing the signature of a PEUGEOT executive, because MENDEZ and/or PEUGEOT always intended to withhold any such signature out of a bad faith, fraudulent (and mistaken) view that if PEUGEOT avoided putting its signature on a long form, then PEUGEOT would be able to walk away from the deal at any time with no consequences to PEUGEOT, regardless of what MENDEZ and PEUGEOT had actually promised and represented, and how much it might cost ALCON for PEUGEOT to abandon the film.

### May 4, 2017: Peugeot Communicates Material Breach
### And Begins to Reveal Its Bad Faith

195.   By late April 2017 (and well before that), it was abundantly clear that ALCON intended to make the full placement in full compliance with the intent of the deal, and would work with PEUGEOT until PEUGEOT was reasonably and in good faith satisfied with the placement, even if that meant overperforming on the number of seconds of onscreen badging visibility.  Indeed, ALCON'S internal documents show that as of May 2017, ALCON was prepared and actually able to deliver as many as sixteen (16) seconds of branding visibility (where the parties had clearly agreed that ten (10) seconds were sufficient).

196.   On or about April 28, 2017, with just over five months remaining before the October 6, 2017 release of the Picture, and with PEUGEOT still yet to send its more detailed co-promotion plan, and still hemming and hawing about providing a long form signature, a CTMG executive simply telephoned MENDEZ directly and had a conversation with her.  He asked MENDEZ to deliver PEUGEOT'S more specific co-promotion plans and communicated that ALCON and CTMG were all anxious and looking forward to seeing them.

197.   Amazingly, MENDEZ asked the CTMG executive for any documentation he might have for any such deal.  The CTMG executive promptly emailed MENDEZ one or more documents, including the July 12, 2016 LOI and the Delegation of Signature Authority documents that MENDEZ had personally executed.

198.   MENDEZ responded essentially that she would get back to him.

199.   The CTMG executive followed up on or about May 3, 2017 with an email directly to MENDEZ, this time asking MENDEZ in writing (politely but firmly) to deliver PEUGEOT'S more specific co-promotion plans.  He communicated that ALCON and CTMG were all anxious and looking forward to seeing them.

1       200.   MENDEZ was cornered.

2       201.   With no further stalling on signatures available, with ALCON ready,

3   willing and able to meet all of its obligations, and with ALCON and CTMG asking

4   for PEUGEOT'S more specific co-promotion plans, MENDEZ simply went with

5   blatant falsehoods and bad faith denials to further stall and avoid any PEUGEOT

6   performances.  PLAINTIFF is informed and believes and on that basis alleges, that

7   MENDEZ did so to guard her own corporate career and internal political position

8   at PEUGEOT against her own exceedingly poor judgment in her bad faith dealings

9   on BR2049, and also knowing that for her to continue to conduct herself in this

10   manner would be to ALCON'S further extreme prejudice and detriment.

11       202.   On May 4, 2017, MENDEZ emailed back.

12       203.   In her May 4, 2017 email to CTMG, MENDEZ took the following

13   stunning positions and made the following admissions:

14           a.   <u>False Denial of July 12, 2016 LOI</u>. MENDEZ denied that she had ever

15               had any knowledge (prior to CTMG sending it to her directly on or

16               about April 28, 2017) that the July 12, 2016 LOI or the deal described

17               in it ever existed: "I was extremely surprised when I found out the

18               existence of this document, you called LOI, entitled 'Blade Runner II

19               – Agreement in principle' since It [sic] was the first time that I ever

20               saw this document."  By this false denial, and as clear from the rest of

21               her email, PLAINTIFF is informed and believes and on that basis

22               alleges that MENDEZ also implicitly meant that neither she nor

23               anyone else at PEUGEOT had ever authorized any agency even to

24               make a BR2049 <u>*bid*</u> that included a co-promotion proposal.  She so

25               communicated, even though by this point, MENDEZ herself had been

26               personally interacting from time to time with ALCON and CTMG

27               executives specifically about a placement <u>*AND*</u> co-promotion for

28               almost ten months.

b. <u>False Denial that Mendez or Peugeot Had Granted Negotiating and
Contracting Authority to Publicis</u>.  MENDEZ denied that the late
January 2017/early February 2017 Delegation of Signature Authority
that she had personally signed (twice), confirming PUBLICIS'S
authority to bind PEUGEOT, had given or confirmed any actual
authority by PUBLICIS to bind PEUGEOT to anything.  Even further,
<u>MENDEZ denied that PUBLICIS had any authority to make any
commitments for PEUGEOT on any subject</u>.  In an explanation
bearing no relationship at all to any language in the Delegation of
Signature Authority, MENDEZ falsely characterized the document as
only confirming that PEUGEOT was not working with any agencies
other than PUBLICIS on the product placement:  "The other document
that CASABLANCA [PUBLICIS] asked us to sign, giving them a
mandate to be our exclusive interlocutor for the Blade Runner 2
product placement project, was only to assure them that we only
worked with them on BLADE RUNNER product placement and not
with any others agencies.  **We never gave them the right to take any
commitment on our behalf, and never intended to do so through
this document**."  (Emphasis added.)  This explanation is especially
clearly false and in bad faith where everyone knew that PEUGEOT
was also working with BETC on BR2049, and not solely with
PUBLICIS.

c. <u>False Denial that MENDEZ or PEUGEOT had ever even discussed a
co-promotional aspect to the BR2049 Deal</u>.  "[T]he LOI doesn't
reflect at all our discussions with CASABLANCA [PUBLICIS].  For
us, we agreed only on a product placement for a certain amount that
obviously is much higher than the one written in the LOI."
PLAINTIFF is informed and believes and on that basis alleges that by

this last reference, MENDEZ meant that PEUGEOT had agreed to pay $700,000 to PUBLICIS for the placement, of which PUBLICIS would retain $200,000 as a fee and transmit the remaining $500,000 to ALCON [an arrangement to which ALCON and CTMG were entirely indifferent; that the placement fee paid directly to ALCON was to be $500,000 was agreed and not in dispute].  Again, MENDEZ'S statements represent an utterly false denial of MENDEZ or anyone at PEUGEOT even having any awareness of any co-promotional aspect of the deal, or that PUBLICIS was involved in the communications about it.  This was and is against all objective reality.  MENDEZ herself had been personally interacting from time to time with ALCON and CTMG executives specifically about a placement and co-promotion for almost ten months, **including MENDEZ interacting directly with PUBLICIS executives _about the co-promotion_ while representatives from ALCON, CTMG, PEUGEOT (beyond just MENDEZ), PUBLICIS and BETC were all physically together in the same room at ALCON'S Los Angeles offices**.

d.  <u>MENDEZ admitted that ALCON had performed to PEUGEOT'S satisfaction on the placement and that PUBLICIS had even partially paid PUBLICIS for it</u>.  "[W]e have already paid [to PUBLICIS] last year 40% of the full amount [of the placement fee].  We were waiting to see the proof of the placement during the release of the movie in theaters in order to pay the rest."  The clear implication of this admission by MENDEZ was that PEUGEOT was satisfied with ALCON'S performance on the placement (as PEUGEOT and MENDEZ herself had affirmed to ALCON numerous times, including at the January 24, 2017 co-promotion kickoff meeting in Los

Angeles).  That the placement would in fact be in the Picture was not
in any doubt – ALCON had been performing, and had repeatedly
affirmed to PEUGEOT that ALCON intended to continue to perform
and was ready, willing and able to do so, including across a relatively
wide spectrum of PEUGEOT'S additional specific implementation
input.  For example, as noted in previous paragraphs, ALCON
internally was prepared and ready, able, and willing, if necessary, to
go above and beyond the contract terms on seconds of visibility
footage (even as many as 16 seconds if necessary to avoid any time
counting disputes).  Moreover, as PEUGEOT and MENDEZ well
knew, ALCON was by this time deeply and for all commercially
practical purposes irrevocably committed to K's spinner appearing
throughout the entire film as a Peugeot.  This meant that PEUGEOT'S
satisfaction on the placement was not in any way an obstacle to
continuing to move forward with the co-promotion, on any reasonable
or good faith measure.  While ALCON was willing to wait until
release of the Picture actually to receive the $500,000 placement fee,
no motion picture can wait until after the release of the picture to plan
and execute a co-promotion – the purpose of the co-promotion is to
precede and support the release of the Picture.  Thus, the actual
payment timing of the placement fee and commencement of the co-
promotion were distinct issues with little bearing on each other, as all
professionals that work in the motion picture product placement and
co-promotion field, including MENDEZ, were and are well aware.
What MENDEZ clearly meant by her statement (as other portions of
her email make clear) was to suggest, nonsensically and in egregious
bad faith, that the parties should only begin to discuss a co-promotion
*after* the release of the picture had occurred – when the co-promotion

would be too late and have little or no value to ALCON.

e. <u>False Denial that PEUGEOT Had Won the Bidding Specifically by</u>
<u>Offering a Large Co-Promotion, and that MENDEZ had been</u>
<u>Involved in Doing So</u>.  "If I had known a year ago (at the beginning of
our discussions) that Sony [*sic*, ALCON] was expecting a minimum
investment on a promotion campaign to sign a deal, I would had [sic]
never agreed with it."  MENDEZ meant by this that PUBLICIS had
gone rogue and exceeded its authority by ever discussing PEUGEOT
proposals that included a co-promotion with a guaranteed media
spend.  This was again another nonsensical statement, and in many
ways was nonsensical regardless of what PUBLICIS'S authority
actually was or was not.  As detailed in prior paragraphs, PEUGEOT
had won the bidding a year earlier by voluntarily sweetening its own
bid to include an "up to $40 million" guaranteed media spend.  That
proposal had been initially communicated ***by BEN*** for PEUGEOT –
*not* PUBLICIS.  PUBLICIS had never been the initiator of
PEUGEOT'S discussions with ALCON about PEUGEOT'S clear and
intentionally enticing proposal for a large, guaranteed media spend.
Thus, to blame any lack of authority by PUBLICIS for PEUGEOT
purportedly not understanding that ***PEUGEOT*** had proposed the
guaranteed media spend and that it was part of the deal (and indeed
the only reason ALCON had been working with PEUGEOT for the
better part of a year rather than other automotive partners) was and is
against all objective reality, and clearly demonstrates MENDEZ'S and
PEUGEOT'S extreme bad faith.

f. <u>Admission and/or False Denial that No PEUGEOT Budget for a</u>
<u>Media Spend Ever Existed</u>: "I was very clear with Casablanca, I

CANNOT commit on any budget on Peugeot subsidiaries' behalves because they are free to manage their own media budgets." (All caps emphasis in original.)  PLAINTIFF is informed and believes and on that basis alleges that by this statement, MENDEZ meant that even when PEUGEOT made its sweetened, winning bid on or about May 19, 2016, PEUGEOT never actually had money available to put toward a media spend and in any event MENDEZ had never sought any within PEUGEOT.  Rather, MENDEZ and/or PEUGEOT had always had a secret intent, never disclosed to ALCON, that the most MENDEZ and PEUGEOT intended ever to do on a media spend was to wait until the Picture was released with the placement in it, and then if the Picture and placement were well received by audiences and PEUGEOT'S retail dealers around the world, only then PEUGEOT might put together a media campaign where the PEUGEOT brand rode off the established success of the Picture.  MENDEZ also meant that she was not even going to start the process within PEUGEOT that might be required for any co-promotion until the release of the Picture had actually occurred.  PLAINTIFF is informed and believes and on that basis alleges (under at least one factual alternative) that MENDEZ'S motivation and plan was in part to eliminate all personal and corporate political risk to herself of having committed PEUGEOT to a media campaign around a motion picture that might or might not be well received by audiences.  If the Picture was well-received, MENDEZ intended to claim it as her personal corporate victory and have PEUGEOT ride off it; if the Picture was not well-received, then PEUGEOT would only be out the 40% of the placement fee that had been paid to PUBLICIS and MENDEZ would blame others even for that.  All of this was fraudulent and egregious bad faith by MENDEZ

1     and PEUGEOT, and completely contrary to the fundamental substance

2     of all communications between ALCON and PEUGEOT, from the

3     time of PEUGEOT'S May 19, 2016 sweetened bid forward.  ALCON

4     would never have agreed to any such business relationship with

5     PEUGEOT on the terms that MENDEZ was now laying out (nor

6     would any major motion picture studio ever do so).

7        204.  Now only about five months away from the Picture's release date and

8 with ALCON completely unable for all commercially practical purposes to find an

9 alternative automotive partner, or even easily remove PEUGEOT'S branding from

10 the Picture, MENDEZ went on in her May 4, 2017 email to propose a complete re-

11 negotiation of terms, entirely in bad faith:

12     "What we would like today is to stick to our discussions with

13     CASABLANCA:

14     - first an agreement on the product placement,

15     - and then, if we are satisfied by this product placement, we will

16     review the possibility to work on a promotional campaign if the
creative campaign proposed by our ad agency is validated by

17     our CEO and no commitments on any budget or figures on any
of our subsidiaries' media campaign.

18

19     We are still very interested to work with you on this project as
long as the product placement is satisfying. There is no interest

20     for us to invest in a promotional campaign if the placement is
not satisfying. The decision to take part in the campaign has to

21     be made by our CEO.

22     In this regard, we need the proofs of the placement to be able to

23     judge if it is satisfying. We also need to know your terms and
conditions for the promotional campaign given that we cannot

24     commit on any budget regarding this campaign.

25     We are open to discussion and to receive your proposals to find

26     a solution.

27     Looking forward to continuing working with you

28     Best Regards,

COMPLAINT

Isabel"

205.   By the above, among other things, MENDEZ clearly declared on behalf of PEUGEOT that 1) PEUGEOT might not acknowledge its satisfaction with the placement until after the Picture's theatrical release, and was denying the parties even had a binding placement agreement yet, let alone a co-promotion agreement; and 2) regardless, and even if the placement were satisfactory (as ALCON'S placement performance clearly had been up to the time of MENDEZ'S May 4, 2017 email), PEUGEOT would _never_ itself fund a co-promotion media spend for BR2049.  MENDEZ thus clearly declared on behalf of PEUGEOT that PEUGEOT was _never_ going to perform the media spend as promised – a material term of PEUGEOT'S May 19, 2016 sweetened and winning bid; a material term of the July 12, 2016 LOI; a material term of the parties' placement and co-promotion agreement, and every refinement of it; and a material term of every single draft version of the proposed long form documentation of that agreement proposed by either side.

206.   Furthermore, with the parties about five months away from the Release Date, and with ALCON clearly performing on the placement and intending to continue to do so, PEUGEOT was under a duty to continue to move forward with preparations to execute the co-promotion.  This specifically meant, among other things, sending specific proposed plans to ALCON and CTMG for review and approval.  MENDEZ'S May 4, 2017 email also clearly declared that PEUGEOT refused to do so, and instead insisted that the obligations on that point be reversed and that ALCON and CTMG instead make the media spend plans for PEUGEOT to review and approve (and which plans PEUGEOT made clear it would not be paying for any part of itself, even if it approved them).  This refusal was itself a material breach.

///

207.   MENDEZ overall made clear by her May 4, 2017 email that from the point of PEUGEOT'S May 19, 2016 sweetened bid to ALCON and forward after that, PEUGEOT had at all times been negotiating in bad faith and fraudulently with respect to the media spend that was the single most material term of the entire deal. Worse, PEUGEOT was now proposing to renegotiate the deal to be radically more favorable to PEUGEOT, after PEUGEOT'S own bad faith had sharply reduced ALCON'S leverage.

208.   All of these communications by MENDEZ on behalf of PEUGEOT constituted actual and/or anticipatory material breaches of the parties' agreements and PEUGEOT'S negotiating duties toward ALCON and CTMG.  Thus, under clear California law, from MENDEZ'S May 4, 2017 email forward (if not earlier), ALCON (and CTMG) were relieved of making any further performances to PEUGEOT or making any further satisfaction of any conditions of PEUGEOT performances – and could still fully enforce the deal terms against PEUGEOT.

209.   As just one example, from the time of MENDEZ'S May 4, 2017 email forward, ALCON was no longer bound to perform, for instance, the allocation of the visibility footage down to any strict measure of seconds between spinner sequences and outdoor/wall ad sequences.  Indeed, although ALCON did so regardless, and in the utmost good faith, from MENDEZ'S May 4, 2017 email forward, ALCON was no longer bound to include _any_ PEUGEOT branding visibility sequences at all.  And, as long as ALCON did not act in bad faith or commercially unreasonably, ALCON could make no further performances to PEUGEOT whatsoever – including having no branding visibility footage at all in the Picture -- and could still fully enforce the agreement against PEUGEOT.

210.   Neither ALCON nor CTMG ever waived any of PEUGEOT'S actual and anticipatory breaches in MENDEZ'S May 4, 2017 email or any others.  And MENDEZ'S and PEUGEOT'S conduct was beyond egregious.

///

211.   However, ALCON and CTMG are highly professional and reputable companies.  They were also in a position where it was impossible for all commercially practical purposes to scrub PEUGEOT entirely from BR2049.  They had spent substantial resources on what was shaping up to be an excellent placement for everyone, and they wanted to try to see it through.  Indeed, PEUGEOT as a company inexplicably seemed to be shooting itself in its own foot, as there was already strong interest building by third parties who knew of the PEUGEOT branding to include it in various BR2049 promotional opportunities, which would have been at minimal or no cost to PEUGEOT.  For instance, close in time to MENDEZ'S May 4, 2017 email, on or about May 8, 2017, ALCON'S marketing team and CTMG presented PEUGEOT with the opportunity to include PEUGEOT branding in an immersive VR experience involving K's spinner that was highly attractive to consumers, but PEUGEOT simply did not act on it.

212.   Thus, ALCON and CTMG continued to perform reasonably and in good faith (but without waiver of PEUGEOT'S breaches) and further engaged with PEUGEOT to try to change its mind.

***Alcon and CTMG Go to Extraordinary Lengths to Attempt to Please Peugeot, Even After Peugeot's Egregious and Bad Faith Material Breaches***

213.   After MENDEZ'S May 4, 2017 email, ALCON and/or CTMG made clear to PEUGEOT in various communications that MENDEZ'S statements were inaccurate and deeply troubling, that there was indeed a binding agreement, including for a media spend, and that PEUGEOT was not performing it.

214.   Nonetheless, while reserving rights, rather than sue immediately or stop dealing with PEUGEOT, CTMG proposed a specific potential alternative accord.  On May 11, 2017, CTMG executives emailed MENDEZ and proposed that the parties explore the possibility of moving forward with a separate product placement agreement and separate media spend agreement, conditioned on at least the following (as further explained by telephonic communications between and

among CTMG, PUBLICIS, PEUGEOT and MENDEZ):

    a.  That MENDEZ confirm that PEUGEOT agreed that the terms of the placement were as follows:

        i.  That the Peugeot spinner branding would have at least ten (10) seconds of visibility footage across no more than two (2) scenes.

        ii.  That there additionally be a scene with a holographic advertisement with Peugeot branding or products in a background scene in the movie.

        iii.  That the placement fee be $500,000.

        iv.  That the placement fee be allocated $400,000 to the spinner scenes and $100,000 to the holographic advertisement.

        v.  That if the spinner visibility footage did not meet the ten (10) second minimum, that the $400,000 portion of the placement fee would be reduced by $40,000 per second under ten (10) seconds.

        vi.  Further, if the spinner visibility footage totaled less than ten (10) seconds, then in addition Peugeot would be relieved of its media spend obligations.

        vii.  Further, if Ryan Gosling did not approve use of his likeness in any footage for use in television advertisements for PEUGEOT, then PEUGEOT would also be relieved of television ad commitment obligations.

    b.  If MENDEZ confirmed that the above terms were agreed as to the placement, then ALCON and CTMG would provide rough proposed visibility footage to PEUGEOT for its review and approval as soon as possible;

    c.  If, upon review of such footage, including after a period for good faith

1    back and forth comments and efforts to cure any PEUGEOT good

2    faith and commercially reasonable dissatisfaction, PEUGEOT was

3    satisfied with the placement, then PEUGEOT would commit to a

4    minimum $30 million media spend.

5    215. The above placement terms were at least as favorable to PEUGEOT as

6    any language in either the January 18, 2017 draft long form signed by Montron, or

7    the April 13, 2017 revised draft long form proposed by PUBLICIS'S internal legal

8    team, even under a very generous-to-PEUGEOT interpretation of the drafts'

9    language.

10   216. On May 17, 2017, MENDEZ emailed back to CTMG, copying

11   PUBLICIS executives.  In her May 17 email, MENDEZ rejected the above

12   proposed accord on behalf of PEUGEOT, and instead proceeded to attempt to

13   renegotiate the deal almost entirely, using PEUGEOT'S by now extreme leverage.

14   217. In her May 17, 2017 email, MENDEZ again denied every having seen

15   or been aware of any draft of the long form agreement, or even that PUBLICIS had

16   been negotiating one for PEUGEOT, prior to CTMG'S May 3, 2017 transmission

17   of the January 18, 2017 draft signed by Montron directly to MENDEZ.

18   PLAINTIFF is informed and believes that this denial by MENDEZ was blatantly

19   false, and that at a bare minimum, by no later than April 2017, PUBLICIS'S

20   internal legal team had shared and discussed both the January 18, 2017 draft and

21   what became the April 13, 2017 draft with MENDEZ.  (As a second alternative,

22   because PEUGEOT asserts as much, and at least some of the facts are not known

23   or reasonably knowable by ALCON without discovery, PLAINTIFF reserves the

24   right to allege that PUBLICIS'S representations to ALCON and CTMG that such

25   had occurred were not accurate and either intentionally false or negligently made

26   by PUBLICIS.  ALCON similarly reserves that PUBLICIS, particularly

27   Casablanca, may have engaged in other conduct detrimental to PLAINTIFF,

28   possibly throughout the course of the parties' dealings, and for which PUBLICIS

1   might have its own liability; however, at present, although PEUGEOT contends

2   this, PEUGEOT has to date declined to deliver to ALCON any support for such

3   contentions, and ALCON'S understanding is that PUBLICIS denies PEUGEOT'S

4   contentions.  ALCON reserves all positions as to what may or may not have

5   occurred between PUBLICIS and PEUGEOT, including without limitation the

6   right to plead additional facts, including alternative facts, about such matters.)

7         218.   In her May 17, 2017 email, MENDEZ further denied again that

8   PUBLICIS had any authority to negotiate the placement terms that it negotiated in

9   the draft long forms or as proposed by CTMG'S May 11, 2017 potential accord, or

10   any authority to negotiate any media spend at all.

11         219.   MENDEZ then proposed the following specific renegotiated terms:

12        a.   That ALCON afford at least three (3) spinner branding visibility

13            scenes, running at least four (4) seconds each;

14        b.   That the spinner visibility scenes had to include at least three views of

15            the spinner, including all PEUGEOT branding on it ("FRONT, REAR

16            and INSIDE, the animated one on the inside board you showed us");

17        c.   That in addition to the above minimum twelve (12) seconds of spinner

18            branding visibility, that ALCON also still afford PEUGEOT an

19            additional holographic advertisement in a background scene;

20        d.   That the $500,000 placement fee be allocated $125,000 each to all

21            four (4) above visibility scenes;

22        e.   That if PEUGEOT approved the placement after review, that

23            PEUGEOT'S CEO would then consider approving a co-promotion

24            campaign;

25        f.   But that even if PEUGEOT'S CEO was fully satisfied with both the

26            placement and the planned co-promotion, PEUGEOT would still not

27            ever make any binding commitment to fund any co-promotion at all;

28        g.   At most, PEUGEOT would present the possibility of a co-promotion

campaign to its local dealerships by territory, and even as to that
PEUGEOT declined to agree even to propose any specific amount of
media spend to the local dealerships.

220.   Clearly knowing that MENDEZ'S May 17 email would be (and was)
shocking to CTMG, on May 18, 2017 Montron emailed the same group back
(copying MENDEZ), and attempted to smooth or "clarify" MENDEZ'S positions.
Montron attempted to clarify two points:

    a.   That ALCON and CTMG were fully committed to BR2049 featuring
        the PEUGEOT brand, and that it would be a high-value placement to
        PEUGEOT.

    b.   That MENDEZ and PEUGEOT meant that if PEUGEOT was satisfied
        with the placement, then "Peugeot is ready to launch a promotional
        campaign if Peugeot approves the product(/brand) placement."

221.   The same day, May 18, 2017, MENDEZ responded and corrected
Montron:

    a.   "We do want to continue the logo placement but we need to agree on
        terms" and

    b.   "We intend to push a co-promotional campaign **but we do not**
        **guarantee it all *even if the LOGO placement is confirmed*.**"
        (Emphasis added.)

222.   It was thus crystal clear that MENDEZ and PEUGEOT were
reaffirming their actual and/or anticipatory material breach of the agreement that
had been negotiated for over ten months, and further were rejecting even CTMG'S
proposed specific accord.

///
///
///
///

223.   Knowing her leverage was extreme at this point, MENDEZ thus proceeded to encourage CTMG to come to Paris and present in person to PEUGEOT'S CEO (so that maybe PEUGEOT would at least do something on the co-promotion campaign, if it felt like it after the CEO viewed rough cut visibility footage).

224.   Without waiving PEUGEOT'S breaches, but with little choice but to try their best to mitigate the situation, ALCON and CTMG worked together to prepare a presentation, including rough cut actual footage from the Picture as it stood in progress with Peugeot branding, for the express purpose of CTMG executives personally presenting it in Paris to PEUGEOT'S CEO.

225.   With the active participation and involvement of MENDEZ, and her clear knowledge and awareness of the purpose and intent of the trip, an exceptionally high-level team of CTMG executives, including a President-level promotions and marketing executive within the Sony organization, traveled in person to PEUGEOT'S Paris offices.  Again, the express purpose of the trip was to meet with PEUGEOT'S CEO.  PEUGEOT, including through MENDEZ, had agreed to and participated in the planning and finalization of the trip, and specifically that the meeting would be with the PEUGEOT CEO.

226.   Accordingly, on or about June 1, 2017 – the planned and agreed date for PEUGEOT and its CEO to receive the CTMG team -- the CTMG team arrived at PEUGEOT'S Paris offices (with some of them having traveled from California for the specific purpose of the meeting) with the presentation materials, including Picture footage.

227.   By this time, the originally planned Picture Lock deadline of June 8, 2017 was only seven (7) days away, and in any event was imminent.  The Release Date was just over four months away.  PEUGEOT was well aware of these deadlines and that timing was critical.

///

228.   MENDEZ met the CTMG team and informed them that PEUGEOT'S CEO was not in PEUGEOT'S offices that day and would not be meeting with the CTMG team or otherwise reviewing the presentation.  But, MENDEZ said that she and other executives who worked under MENDEZ would meet with CTMG, and if appropriate, communicate later themselves with the CEO about BR2049, without CTMG present.  This was stunning.  The CTMG trip was an extraordinary one, across continents, that had been planned with PEUGEOT (through MENDEZ) for the express purpose of CTMG meeting with and presenting directly to the CEO.

229.   Based on the circumstances and on facts and goings on that the CTMG team observed while at PEUGEOT'S offices, PLAINTIFF is informed and believes and on that basis alleges that MENDEZ'S statements that the PEUGEOT CEO was not in PEUGEOT'S Paris office and was unavailable for the meeting were false, and that in fact PEUGEOT'S CEO *was* physically at the offices that day, and could have met with CTMG.  PLAINTIFF is informed and believes and on that basis alleges that MENDEZ in fact still was withholding from her CEO substantially the entire BR2049 situation, and that MENDEZ had fraudulently and in bad faith induced CTMG into the June 1, 2017 Paris meeting knowing and intending from the outset that MENDEZ would never allow the CTMG team to meet with or present directly to PEUGEOT'S CEO.  In the alternative, PLAINTIFF is informed and believes and on that basis alleges that the PEUGEOT CEO was aware of the situation and himself participated and coordinated with MENDEZ in having CTMG travel halfway across the world for the meeting, and always intended to have MENDEZ take it in his stead (or to cancel or otherwise frustrate it).

230.   The CTMG team objected, but had little ability to compel the CEO to come out of his office, and proceeded in good faith as best they could.  At MENDEZ'S behest, the CTMG made their presentation to a group of more junior PEUGEOT executives led (and, PLAINTIFF is informed and believes and on that basis alleges, controlled) by MENDEZ.  This included showing rough cut footage

from the still-in-progress Picture that demonstrated proposed visibility footage sequences with PEUGEOT branding on the spinner and in at least one outdoor/wall ad.  The footage was all consistent at the very least with PEUGEOT'S inputs on placement requirements and desires up to that time, and completely or at the very least substantially true to the Cai design notes.

231.  CTMG'S team also expressly discussed with MENDEZ that although the agreement only called for ten (10) seconds of visibility footage, ALCON was prepared to deliver 12 (twelve) seconds, with no additional asks from PEUGEOT, except that PEUGEOT actually move forward with the deal as previously agreed (in fact, as already noted, ALCON was ready, able and willing if necessary to deliver as many as sixteen (16) seconds).  CTMG'S team also expressly explained that the footage presented could still be modified if PEUGEOT desired, especially with respect to visibility.  Indeed, ALCON was prepared to be and would have been highly flexible with and accommodating to PEUGEOT as to almost any commercially reasonable adjustments to the placement that PEUGEOT might have requested in good faith, both to satisfy PEUGEOT as a partner, and to get the media spend – but not if PEUGEOT refused to acknowledge that the media spend was guaranteed or refused to do it.

232.  During the June 1, 2017 meeting, while MENDEZ and her team made comments to the placement footage, they did not express any general dissatisfaction with the placement.  Indeed, instead, they expressed a generally positive reaction, with industry-ordinary requests and comments for enhanced visibility (for example, better lighting on logos in particular sequences, which were relatively easy things to address).

233.  Indeed, far from rejecting the placement or asking it to be redone, MENDEZ thanked the CTMG team and told them that she would make the presentation to her CEO promptly and get back to CTMG right away.  The MENDEZ-PEUGEOT team also said that they would provide some additional

1  PEUGEOT logo samples for possible insertion and/or substitution in the placement
2  (which ALCON was, in fact prepared and able to do if PEUGEOT had indeed
3  desired it).  Further, MENDEZ even promised that she would direct BETC
4  (PEUGEOT'S agency for planning and carrying out the co-promotion) to send over
5  a deck (PowerPoint or Keynote presentation) with a more specific and updated co-
6  promotion plan.

7       234.  CTMG returned to the United States optimistically, and both CTMG
8  and ALCON remained ready, willing, able and anxious to perform.

9       235.  On or about June 5, 2017, one of MENDEZ'S subordinates (Mylene
10 Poncet) emailed the promised additional logo samples to CTMG.  But nothing else.
11 No BETC deck came.

12      236.  On June 9, 2017, with more than a week having passed since the June
13 1, 2017 meeting and MENDEZ'S promises from it (and with the Picture now past
14 the originally planned Picture Lock), CTMG emailed MENDEZ again:

15          "We assume you have now shared the campaign ideas with
16          your CEO as promised and urgently need to know his reaction
            and feedback.

17          As mentioned in the meeting, we **urgently** need to share these
18          ideas internally next week in order to meet deadlines and would
            like to know when to expect the revised deck from BETC."
19          (Emphasis in original.)

20

21      237.  On June 9, 2017, PEUGEOT finally surfaced again and responded, in
22 an email from MENDEZ'S subordinate, Poncet.  MENDEZ is openly copied on
23 Poncet's June 9, 2017 email, and PLAINTIFF is informed and believes and on that
24 basis alleges that MENDEZ either substantially drafted or dictated the email herself
25 and had Poncet send it, or that MENDEZ reviewed it and approved it prior to
26 Poncet transmitting it, and indeed directed Poncet to send it.  In her June 9, 2017
27 email response, Poncet (for MENDEZ) declined to say that the placement met
28 PEUGEOT'S satisfaction and instead communicated that it did not, and directed

1  that ALCON re-do it.  Some of the Poncet comments related to such things as

2  lighting on a particular logo and requests that it be improved – which were both

3  ordinary kinds of comments in placement review generally, and which MENDEZ

4  had had explained to her were not a problem and could easily be done.  In the

5  industry, these would not be valid reasons to declare that a placement was

6  unsatisfactory.

7       238.   Other comments from Poncet (for MENDEZ) were even more clearly

8  in bad faith, and even directly contrary to prior approvals that PEUGEOT and

9  MENDEZ had already given ALCON and upon which ALCON had relied.  The

10  Poncet email even included comments that were undeniably objectively false and

11  ridiculous.  For example, by the Poncet email, MENDEZ purported to reject the

12  placement on the grounds that the spinner design did not incorporate the Cai design

13  notes, even though the spinner clearly incorporates them essentially exactly as

14  drawn by Cai, and MENDEZ had previously seen them and approved them

15  (including at the January 24, 2017 co-promotion kickoff meeting).  As another

16  example, stunningly, via the Poncet email, MENDEZ purported to reject the

17  placement on the grounds that the affiliation between Gosling's character K and the

18  Peugeot-branded spinner was not strong enough – even though it would be difficult

19  and potentially impossible to come up with a motion picture example where a

20  character is more strongly affiliated with a vehicle throughout the story of a Picture

21  than K with the spinner.

22       239.   Worst of all, at the same time that MENDEZ (via the Poncet email)

23  directed ALCON to re-do the placement, she doubled down on her May 4, 2017

24  denials that there had ever been any deal for a co-promotion, or even any

25  discussion of one.  She also expressly reaffirmed her most devastating revelation --

26  that all attempts to satisfy PEUGEOT on the placement were futile in any event,

27  because PEUGEOT had no intention of funding a co-promotion, and never did,

28  even if the placement were absolutely perfect: "Regarding, this potential

1   promotional campaign, **I need to reiterate our position that *even if the placement***

2   ***was satisfying* we cannot commit on the promotional campaign and/or any**

3   **figures regarding the campaign**." (Emphasis added.)

4       240. Further, the June 9, 2017 Poncet email also disclosed that MENDEZ

5   actually had not yet shown the placement presentation to her CEO or even, as

6   PLAINTIFF understands her communication, to *any* of her corporate superiors.

7   Rather, the statements of dissatisfaction on behalf of PEUGEOT with the

8   placement were entirely from MENDEZ herself (via Poncet), and not from the

9   CEO. Indeed, MENDEZ disclosed (via the Poncet email) that she would not even

10  be meeting with anyone above her in the PEUGEOT "hierarchy" about the BR2049

11  opportunity and issues until June 14, 2017.

12       241. Further, knowing that she had succeeded in destroying all ALCON

13  negotiating leverage with her repeated delays, bad faith negotiation tactics and

14  outright false statements over the course of now more than year, MENDEZ boldly

15  asked that CTMG send over one of its France-based executives to present (again)

16  to PEUGEOT on June 14.

17       242. CTMG's President-level executive who had personally attended the

18  extraordinary June 1, 2017 (non-CEO) meeting in Paris responded to MENDEZ

19  directly on June 14, 2017 regarding her subordinate's stunning June 9, 2017 email.

20  The CTMG executive pointed out to MENDEZ that her expression of overall

21  dissatisfaction with the placement was completely contrary to her comments in the

22  June 1, 2017 meeting. He also explained how many of MENDEZ'S June 9

23  complaints about the placement were completely untenable objectively. He

24  communicated that it appeared that PEUGEOT and MENDEZ were simply

25  stalling, and in the face of critical urgency on timing, if any co-promotion was ever

26  going to happen. He told MENDEZ that the matter would have to be turned over

27  to the lawyers at this point.

28  ///

243.   ALCON and CTMG conferred and decided to do their best to address things they reasonably could, including MENDEZ'S inexplicable denials that any co-promotion deal had ever even been under negotiation.  On or about June 16-19, 2017, ALCON and CTMG executives affixed signatures for ALCON and CTMG to the written long form version that had been signed and delivered by Montron on January 18, 2017, and prepared to send a fully executed copy of it to MENDEZ.

244.   Before they actually did, on June 19, 2017, MENDEZ finally responded to CTMG'S June 14, 2017 email, and repeated yet again all of her bad faith and false denials.  In her June 19, 2017 email MENDEZ did the following:

  a. Falsely denied again that PEUGEOT had ever given any negotiating or contracting authority to PUBLICIS at all, and falsely denied that the "Delegation of Signature Authority" documents that she had signed twice herself gave PUBLICIS any authority at all on anything.

  b. Falsely denied ever being aware of the July 12, 2016 LOI.

  c. Falsely denied that PEUGEOT had ever signed any contract, even though PUBLICIS had signed both the July 12, 2016 LOI and the January 18, 2017 draft of the proposed long form, both times expressly on PEUGEOT'S behalf.

  d. Reiterated that regardless of any solution that might be found as to the placement, PEUGEOT would never finance a co-promotion media spend itself, and that all PEUGEOT would ever pay would be the placement fee (even though PEUGEOT had won the bidding in May 2016 specifically by sweetening its bid with the co-promotion commitment, and even though the bid had been transmitted for PEUGEOT by BEN, not PUBLICIS).

  e. MENDEZ Repeated that even as to the placement, the CEO'S review and approval was required, and further revealed that (stunningly) MENDEZ had *again* delayed that -- MENDEZ had cancelled the June

- 88 -

1     14, 2017 meeting referenced in Poncet's June 9, 2017 email.

2     f.   Like Charles Schultz's Lucy teeing up the football for a placekick to

3     see if Charlie Brown would be gullible enough to let her pull it away

4     from him at the last moment yet again, MENDEZ asked CTMG to

5     send a team over again for her CEO to be afforded yet another chance

6     to review the placement footage.  At the same time and in the very

7     next sentence MENDEZ also made crystal clear that such an effort

8     would be futile regardless: "**I also reiterate our position that *even if***

9     ***the product placement is approved* it does not mean that there will**

10     **be a promotional campaign**."  (Emphasis added.)

11     245.  On June 20, 2017, a CTMG lawyer responded to MENDEZ via email.

12 CTMG'S June 20, 2017 lawyer email attached the January 18, 2017 version of the

13 long form as signed by Montron, and now with signatures affixed for ALCON and

14 CTMG, with a clear statement that although ALCON and CTMG were reserving

15 all rights, they both remained ready, willing and able to move forward with the

16 partnership, including if required in satisfaction of all terms as stated in the January

17 18, 2017 long form – if PEUGEOT would withdraw its reneging on the co-

18 promotion and commit to actually start doing it.  By this communication, ALCON

19 and CTMG both meant, and MENDEZ and PEUGEOT both clearly understood

20 and knew, that among other things, regardless of PEUGEOT'S egregious conduct

21 to this point, ALCON was still ready and willing to effect the placement in almost

22 any manner that PEUGEOT reasonably and in good faith desired that ALCON

23 could actually accomplish without jeopardizing the release date of the film or

24 unreasonably compromising the art of the film.  This included granting PEUGEOT

25 additional seconds of visibility beyond the ten (10) seconds that had been long

26 agreed, or even allocating all ten (10) seconds entirely to two spinner sequences if

27 that is what PEUGEOT actually wanted, or more visibility footage to outdoor/wall

28 ads – but all only if PEUGEOT would re-commit to and actually commence

1   moving forward with the co-promotion, as had been long agreed and relied on by

2   ALCON to its extreme detriment.

3        246.   The next day, June 21, 2017, MENDEZ responded.  MENDEZ denied

4   ever having seen the January 18, 2017 document signed by Montron, or any other

5   draft of the long form agreement.  Further, MENDEZ asserted essentially that she

6   was entirely unaware that PUBLICIS was even negotiating such a document on

7   PEUGEOT'S behalf.  PLAINTIFF is informed and believes and on that basis

8   alleges (under at least one factual alternative) that this was blatantly false on all

9   points.  Indeed, PLAINTIFF is informed and believes and on that basis alleges that,

10  at a bare minimum, in connection with the PUBLICIS-PEUGEOT fee dispute in

11  the first few months of 2017, PUBLICIS'S internal legal team had shown

12  MENDEZ the January 18, 2017 draft signed by Montron, and had sought and

13  received MENDEZ'S review and explicit approval of the proposed April 13, 2017

14  revised draft of the long form sent to ALCON by PUBLICIS'S internal legal team.

15  (Again, ALCON expressly reserves the right to allege alternative facts that

16  PEUGEOT'S contention that, essentially, PUBLICIS is lying about important

17  things or did, is instead what happened.  However, again, PEUGEOT has not

18  delivered to ALCON any support for any such contentions by PEUGEOT and

19  ALCON'S understanding is that PUBLICIS entirely or substantially denies them.)

20       247.   MENDEZ went on in her June 21, 2017 email to reject, on behalf of

21  PEUGEOT, ALCON'S and CTMG'S reserved rights offer to have all parties agree

22  to be bound by the January 18, 2017 long form signed by Montron, if PUBLICIS

23  would withdraw its breaches and re-affirm its promises to perform the co-

24  promotion and actually move it forward.  Instead, MENDEZ communicated yet

25  again clearly PEUGEOT'S utterly bad faith denial that PEUGEOT had any binding

26  obligations to ALCON whatsoever, and certainly refused to be bound by the terms

27  as stated in the January 18, 2017 draft long form (or any other terms).  MENDEZ

28  further made clear by her June 21, 2017 email, that if ALCON and CTMG would

1    not engage with PEUGEOT on renegotiated terms for a placement only, with no

2    binding PEUGEOT commitment to any co-promotion campaign, then PEUGEOT

3    was not interested in any further discussions.

4           ***Peugeot Receives the Benefit of the Placement without Any Co-Promotion***

5                  ***and Still Refuses to Pay Alcon Even a Single Penny***

6           248.   After MENDEZ'S and PEUGEOT'S June 21, 2017 abandonment of

7    the Picture and further discussions about it, ALCON and CTMG nonetheless

8    continued to act reasonably and in good faith, to say the least.

9           249.   In July 2017, a life-size real-world model of K's Peugeot-branded

10   spinner with all of Cai's design notes was the centerpiece of an immersive fan

11   marketing experience at San Diego Comic-Con.  Comic-Con is now one of the

12   entertainment industry's largest marketing events worldwide, patronized by

13   hundreds of thousands of fans that come from across the globe to attend it, and

14   covered by worldwide news outlets across all forms of media.  The BR2049

15   experience at 2017 Comic-Con, with its Peugeot spinner, was widely recognized as

16   one of the best executed and most popular event marketing showings at the

17   convention.

18          250.   In early August 2017, ALCON made a last attempt and demand on a

19   business basis for PEUGEOT to execute the co-promotion, which MENDEZ again

20   flatly rejected, with her same or similar bad faith denials.  By September 2017,

21   outside litigators for ALCON and PEUGEOT were exchanging correspondence.

22          251.   As the Picture's release neared and word began to spread that K's

23   spinner would be a Peugeot, multiple news outlets contacted ALCON wanting to

24   do stories focusing on Peugeot's role in BR2049.  However, these publicity

25   opportunities all passed by, with MENDEZ hunkered in her office in Paris,

26   blocking PEUGEOT's participation or even full corporate knowledge of the

27   situation, as MENDEZ guarded her own political corporate career at the expense of

28   so very many people and companies who worked on BR2049 and the placement.

1 Probably including to the detriment of PEUGEOT itself, who missed an immense

2 opportunity fully to leverage the placement.

3      252.   The Picture was finished, delivered and released theatrically (and

4 since on home entertainment, pay television and streaming services worldwide)

5 with the placement included.  Peugeot visibility branding sequences run at least

6 twelve (12) seconds.  They include both spinner badging sequences and a

7 prominent outdoor/wall ad Peugeot logo.  Even without the lighting and other

8 visual enhancements that would have been made to the visibility sequences had

9 PEUGEOT not bailed out of the process in bad faith, the placement still clearly

10 marks the spinner as a Peugeot and permanently enshrines PEUGEOT'S brand in

11 the Picture and its story.

12      253.   Indeed, the truth, far beyond counting seconds of logos, is that Cai's

13 design notes, intended to make the entire spinner sing with PEUGEOT'S trade

14 dress from almost every angle, are onscreen throughout the Picture.  The spinner

15 accompanies K through almost every aspect of his quest.  PEUGEOT'S triple-claw

16 brake lights blasting over a dystopian Southern California farmscape are almost the

17 first thing the audience sees in the entire film.  The film's first sequences feature

18 Gosling interacting with the vehicle and speaking to it, almost as a living

19 companion, with Gosling's face next to PEUGEOT'S logo multiple times.  The

20 visibility of the PEUGEOT logo in these sequences and others could have been

21 even higher had PEUGEOT not abandoned the process.  Gosling's close

22 connection to the spinner goes on throughout the film, all the way to the film's

23 final sequences when K finally lays back in the falling snow to rest, with his

24 spinner a few feet away.

25      254.   Attached hereto as **Exhibit D** and incorporated herein by reference are

26 photographic stills of scenes from the Picture incorporating PEUGEOT'S badging

27 and trade dress.

28 ///

255.   The placement and its ripple effects take PEUGEOT'S brand, logos and trade dress to consumers well past just the film as it appears on theater and streaming screens.  Some of the film's most prominent one sheets (marketing posters) feature Gosling next to the Peugeot spinner.  In fact, the very first one sheet released to a hungry audience, filled with anticipation for the long-dormant *Blade Runner* property, was Gosling standing in fog next to the spinner's red-lit triple-claw Peugeot-trademark brake lights, just as Cai marked them up.  **See Exhibit E** [One Sheet].

256.   Audiences and automotive industry publications around the world recognized and generally reacted overwhelmingly favorably to the placement, with pleasant surprise and appreciation to see that K's spinner was a Peugeot.  And in some markets, the placement was seen as a true milestone for PEUGEOT – especially the United States.

257.   Here in the U.S., some of the business communities most prominent watchers clearly took note of the placement.  And they recognized that by it, PEUGEOT had taken a first giant and positive step toward rebuilding its brand in the U.S. market, from which it had been absent for an entire generation.  For example, on October 6, 2017, the Picture's Release Date, *Bloomberg* published a two-page story on BR2049's treatment of brands and its deeper relevance to business history.  The Peugeot placement features prominently and overwhelmingly positively in the story.  The *Bloomberg* story effectively equates the long-hibernated Peugeot's brand stature with Coca-Cola, one of the world's most revered brands.  It is hard to imagine how much paid U.S. television, radio and print advertising might have been required for PEUGEOT to achieve such a branding magic trick – to go almost overnight in the U.S. market from almost no recognition to being equated to the revered Coca-Cola brand -- absent the BR2049 placement.

///

COMPLAINT

258.   PEUGEOT never executed any promotion and the Picture undoubtedly suffered for it.  The Picture had at least $30 million less in paid media to support the film's release than expected, not to mention lost publicity, short-form video pre-ambles never made or released to consumers to pre-tell the story of K's spinner as a PEUGEOT, and other ways to advance the film with consumers beyond even just paid media, that PEUGEOT should have been part of, and even led.  But that PEUGEOT wasn't and didn't.

259.   PEUGEOT'S bad faith failure to perform its co-promotional obligations almost certainly negatively affected the Picture's box office performance.  But even as the Picture actually performed, without the substantial marketing and promotion support that PEUGEOT was supposed to provide, BR2049 still grossed about $260 million in worldwide box office, meaning that in its initial theatrical release alone, it (and the PEUGEOT spinner, integral to the story from beginning to end) was seen by over thirty million people, each of whom were exposed to several _minutes_ of screen time of PEUGEOT trade dress and branding.

260.   The Picture also received extraordinarily positive audience response, with an 87% positive audience reaction on Rotten Tomatoes.

261.   The critical acclaim for the Picture was even greater.  Attached hereto as **Exhibit F** is a list of awards won by BR2049.  It is 16 pages long.

262.   Among numerous other awards, BR2049 was nominated for five Academy Awards, and it won two: Best Cinematography and Best Visual Effects – both notably arguably the highest recognition a film can receive as to the way the film (including the spinner) looks on the screen.

263.   IGN named BR2049 the Best Movie of the Year for 2017, the Golden Tomato Awards named it the Best Sci-Fi/Fantasy Movie of 2017, and the 2018 Saturn Awards named it the Best Science Fiction film.

///

COMPLAINT

264.   ALCON succeeded in making an enduring piece of art that will persist and be appreciated, actively viewed and culturally relevant for decades. PEUGEOT'S brand is permanently and positively a part of it, forever.

### *Aftermath*

265.   PEUGEOT has now had ample time to see the Picture's phenomenal quality, including the artistically deft, high quality execution of the placement and spinner, in exact match with Cai's design notes, and even in the face of PEUGEOT'S egregious behavior.

266.   PEUGEOT enjoyed and continues to enjoy accolades and positive publicity from its place in the Picture, and it will for years and years to come.

267.   In July 2018, PEUGEOT announced that it had opened a new office in Atlanta, Georgia and is ready to start marketing and selling cars again in the United States, after a being gone a generation.  PEUGEOT also announced that among the first 15 states it has its eye on is California.

268.   ALCON has spent approximately a year and a half communicating with PEUGEOT for it to make things right.

269.   PEUGEOT still refuses to pay ALCON even one penny toward the media spend, and has not paid ALCON anything at all, not even for the placement fee.

270.   ALCON thus now seeks relief from this Court.

271.   The earliest possible point in time on which ALCON was put on any notice that PEUGEOT and MENDEZ were engaged in the improper conduct alleged herein was no earlier than January 18, 2017.  ALCON did not discover and was not aware of and did not suspect, either actually or constructively, nor was ALCON put on any reasonable or actual inquiry notice, of any of the improper conduct alleged herein at any time prior to that January 18, 2017 date at the earliest, including because PEUGEOT and MENDEZ actively concealed their improper conduct with the intention of causing ALCON not to discover or suspect

it.  To the extent necessary, ALCON is thus entitled to the benefit of the discovery rule on statute of limitations and time bars for all claims as to which the discovery rule is applicable, and further, PEUGEOT and MENDEZ are legally and equitably estopped, and otherwise barred, to claim that any time bars were running at all any earlier than, at the very earliest, January 18, 2017.

## **FIRST CLAIM FOR RELIEF**

### *Breach of Contract against Automobiles Peugeot SA and Does 1 through 5*

272.  PLAINTIFF repeats, re-alleges and incorporates herein by reference each and every allegation set forth in all of the foregoing paragraphs, and each paragraph of this Complaint hereafter, as if set forth herein in full.

273.  To the extent any of the allegations or theories in this First Claim for Relief are inconsistent with other allegations or theories pled in this Complaint, they are pled in the alternative.

274.  PLAINTIFF and defendant PEUGEOT entered into a valid and enforceable partially written, partially oral contract which included at least the following material terms:

    a. PLAINTIFF and PEUGEOT would work in close collaboration to integrate PEUGEOT badging and other trade dress into the design of K's spinner.

    b. Once the K Spinner badging and feature designs were approved by PEUGEOT, they would be locked and PEUGEOT would not be able to change or disapprove them later (and the badging and feature designs were actually approved by PEUGEOT no later than January 24, 2017).

    c. The finished BR2049 film would include at least ten (10) seconds of footage in which PEUGEOT'S logo and badging would be clearly visible to the audience (although if ALCON for creative or other reasons did not include a PEUGEOT placement, then this was not

1    necessarily a breach by ALCON, but the parties were expected and

2    obligated to negotiate with each other in good faith about what to do in

3    such event).

4  d.  The at least ten (10) seconds of footage was to be apportioned across

5    multiple sequences in the movie (with a clear record that PEUGEOT

6    had it explained to them that a sequence or scene could include more

7    than one camera shot – ALCON and CTMG expressly declined to be

8    bound by measuring timing by single shots, but rather would only agree

9    to "sequences" or "scenes", meaning aggregations of related shots).

10  e.  The at least ten (10) seconds of footage was to be apportioned across

11    two types of sequences: 1) badging on K's spinner, and 2) at least one

12    sequence where the Peugeot logo would appear in the BR2049 world,

13    such as in an outdoor advertisement in the background.

14  f.  Of the two types of sequences, the K spinner badging sequences were

15    more important to PEUGEOT, and the outdoor/wall ad sequences (or

16    "holographic advertisements") were of secondary importance

17    (including meaning that of the ten (10) seconds, more of the time would

18    go to the K spinner badging sequences).

19  g.  At least one mutually acceptable allocation of the ten (10) seconds was

20    about six (6) second of visibility footage in two spinner sequences and

21    about (4) seconds to at least one outdoor/wall ad sequence.  It was also

22    clear that ALCON was widely flexible and ready, willing and able to

23    perform a different allocation, as long as PEUGEOT communicated its

24    desires clearly with enough time for ALCON to meet them without

25    undue prejudice.  Indeed, ALCON was prepared to over-perform on the

26    visibility deliveries if it had to (and in fact, it did so).

27  h.  The execution of the ten (10) seconds of placement footage was subject

28    to PEUGEOT'S commercially reasonable and good faith review and

approval, which was to be prompt, and within the creative and artistic parameters of the film, which were understood not to be in PEUGEOT'S purview.  PEUGEOT'S review and approval was to be conducted by PEUGEOT without unreasonable disruption of the film's schedule, including picture lock, film delivery and release date, and also early enough such that the co-promotion could be planned and executed.

i.  The Peugeot spinner badging would be associated with Ryan Gosling's character, K.

j.  Ryan Gosling's character, K, would not be associated with any rival automobile brand.

k.  The Peugeot brand would not be presented in a perjorative context. PEUGEOT acknowledged that it had reviewed the BR2049 script and knew, understood and agreed that the BR2049 involved one or more crashes of K's spinner, and that these crashes were agreed as not violative of any term of the parties' agreement.

l.  If upon review, PEUGEOT was not reasonably and in good faith satisfied with a proposed execution of the footage placement, then PEUGEOT was to engage with ALCON reasonably and in good faith on changes or enhancements such that PEUGEOT would be able to give its reasonable and good faith approval, also again within the creative and artistic parameters of the film, and which was to be conducted by PEUGEOT without unreasonable disruption of the film's schedule, including picture lock, film delivery and release date.

m. PEUGEOT expressly acknowledged that it had been provided with the opportunity to review the visual depictions of the placement items and had approved them.

n.  If ALCON delivered satisfactory placement footage, then PEUGEOT

COMPLAINT

was obligated to pay $500,000 directly to ALCON as a product placement fee, and was also obligated to work with ALCON to plan, finance and execute a global co-promotion media campaign (which could exclude the U.S.) to support the October 6, 2017 day-and-date global theatrical release of the Picture, with PEUGEOT obligated to deliver at least $30 million of paid media.  In this context, delivery of satisfactory placement footage meant that ALCON communicated intention to perform and deliver the footage – that the placement would in fact be in the Picture.  Planning of the co-promotion thus was to occur upon that communicated intent by ALCON.

o. If ALCON failed to deliver satisfactory placement footage even after reasonable and good faith engagement between the parties to attempt to cure reasonable and good faith placement dissatisfactions of PEUGEOT, then the parties would negotiate in good faith about alternative terms that would be fair and reasonable to both sides.

p. Of the $500,000 placement fee, $400,000 was allocated to the spinner placements and $100,000 to the outdoor/wall ad placement.  The parties further agreed and intended that the purpose of setting forth an allocation was to provide a yardstick for potential reduction of the placement fee if an element of the placements was not satisfactory after good faith cooperative attempts to cure were exhausted.

q. The $500,000 placement fee was earned by ALCON and owed by PEUGEOT no later than upon ALCON'S written confirmation to PEUGEOT that the placements would be in the final Picture – while the placement fee could be paid by PEUGEOT after release of the Picture, it was earned by ALCON and owed by PEUGEOT earlier, on ALCON'S confirmation that ALCON intended to perform the placement (which confirmation by ALCON was repeatedly given).

r.  The agreed co-promotional period (the time during which the co-promotion would actually be licensed to run) would be from September 1, 2017 to November 30, 2017 (or sixty days after the initial theatrical release date of the Picture, if ALCON had to change the release date of the Picture for any reason).

s.  The defined co-promotional territory was the entire world, excluding the United States and Canada and their related territories (but it was understood that PEUGEOT would nonetheless receive the branding and goodwill benefits of the U.S. and Canada release of BR2049, as the PEUGEOT placements would be and were in all versions of the film in all territories).

t.  The agreed $30 million guaranteed minimum media spend was to be divided $27 million in Above-The-Line ("ATL") Spend and $3 million in Below-The-Line ("BTL") Spend (with it understood and agreed that the ATL and BTL definitions were the advertising industry standard definitions of these terms – very generally, ATL Spend refers to media that mass targets large audiences, like television and radio and many forms of Internet media; BTL Spend refers to media that more specifically targets a limited set of consumers, like flyers distributed from a particular retail store, or most forms of event marketing, like a fan convention or auto show).

u.  ALCON had a review and approval right over the co-promotion's specific executions, on a case-by-case basis.

v.  The co-promotion was to include a dedicated presence on PEUGEOT'S website (www.peugeot.fr).

w.  PEUGEOT was obligated to create, and the co-promotion was to include, at least one thirty-second television spot, unless Gosling refused to approve use of his likeness in the spot, in which case

PEUGEOT was relieved of the television spot obligation (but not of the entire co-promotion).  (Gosling agreed in principal to potential use of his likeness in a television spot for PEUGEOT, and PEUGEOT never sought Gosling's review or approval of any proposed spot, including because PEUGEOT never created one.)

x.  PEUGEOT was to create and produce Below-The-Line spend spots.

y.  PEUGEOT was to create and issue a press release to the media regarding the co-promotion.

275.  PLAINTIFF completely or substantially performed all conditions, covenants and promises required on its part to be performed in accordance with the contract, except to the extent that such obligations have been excused or defendants prevented PLAINTIFF from performing them and/or made them impossible.  Any and all conditions precedent to the enforceability of PEUGEOT'S obligations that PLAINTIFF seeks to enforce herein have either been satisfied or waived or otherwise excused.

276.  PEUGEOT breached the contract in at least the following ways:

a.  PEUGEOT purported in bad faith to deny that it had given final approval over design and badging of K's spinner.

b.  PEUGEOT in bad faith attempted to make the allocation of the ten (10) seconds of visibility a moving target that ALCON could never hit, for the purpose of PEUGEOT holding on to a bad faith excuse for its own non-performance.

c.  PEUGEOT refused and failed to engage in good faith and commercially reasonable review of the visibility footage, for the purpose of PEUGEOT holding on to a bad faith excuse for its own performance.

d.  PEUGEOT purported to disapprove the placement even on issues where the placement followed PEUGEOT-created and PEUGEOT-

1    approved design elements (*e.g.*, the spinner's triple-claw brake lights,

2    and the subtlety of a recessed PEUGEOT black letter word logo on the

3    driver's side dashboard).

4       e.   PEUGEOT refused to conduct its reviews and approvals on a prompt

5    basis or at all.

6       f.   PEUGEOT refused to conduct its reviews and approvals on a

7    commercially reasonable and good faith basis.

8       g.   PEUGEOT denied in bad faith that it had ever made any co-promotion

9    commitment, and clearly communicated that it refused to finance any

10    co-promotion, even if the placement was fully satisfactory.

11       h.   PEUGEOT refused to make its necessary interim performances to

12    prepare to execute the co-promotion, including failing and refusing to

13    present ALCON and CTMG with co-promotion plans.

14       i.   PEUGEOT failed and refused to pay anything at all for the placement.

15       j.   PEUGEOT did not run any co-promotion during the agreed co-

16    promotional period or ever.

17       k.   PEUGEOT did not make media spend, including no ATL Spend and

18    no BTL Spend.

19       l.   PEUGEOT failed to include a dedicated BR2049 presence on

20    PEUGEOT'S website (www.peugeot.fr).

21       m.   PEUGEOT failed and refused to produce the TV spot.

22       n.   PEUGEOT failed and refused to produce Below-The-Line spend

23    spots.

24       o.   PEUGEOT failed and refused to issue a press release to the media

25    regarding the co-promotion.

26      277.   PEUGEOT'S breaches damaged PLAINTIFF.

27      278.   PEUGEOT is liable to PLAINTIFF in the amount of at least $30.5

28    million, exclusive of prejudgment interest, attorneys' fees, costs or other amounts.

279.   DOES 1 through 5 are named herein as entities which PEUGEOT may contend are PEUGEOT-controlled or PEUGEOT-affiliated entities which should be treated as the contracting party or parties with PLAINTIFF, either in addition to or instead of PEUGEOT.  To the extent DOES 1 through 5, or any of them, are a contracting party or the contracting party, all of the foregoing allegations are made as to said DOE defendant, and said DOE defendant is liable to PLAINTIFF for breach of contract for the reasons and on the ground set forth in this First Claim for Relief.

<u>**SECOND CLAIM FOR RELIEF**</u>

***Breach of Implied Covenant of Good Faith and Fair Dealing against Automobiles Peugeot SA and Does 1 through 5***

280.   PLAINTIFF repeats, re-alleges and incorporates herein by reference each and every allegation set forth in all of the foregoing paragraphs, and each paragraph of this Complaint hereafter, as if set forth herein in full.

281.   To the extent any of the allegations or theories in this Second Claim for Relief are inconsistent with other allegations or theories pled in this Complaint, they are pled in the alternative.

282.   PLAINTIFF and defendant PEUGEOT entered into a valid and enforceable partly oral, partly written contract which included at least the following terms:

    a.  PLAINTIFF and PEUGEOT would work in close collaboration to integrate PEUGEOT badging and other trade dress into the design of K's spinner.

    b.  Once the K Spinner badging and feature designs were approved by PEUGEOT, they would be locked and PEUGEOT would not be able to change or disapprove them later (and the badging and feature designs were actually approved by PEUGEOT no later than January 24, 2017).

    c.  The finished BR2049 film would include at least ten (10) seconds of

footage in which PEUGEOT'S logo and badging would be clearly
visible to the audience (although if ALCON for creative or other
reasons did not include a PEUGEOT placement, then this was not
necessarily a breach by ALCON, but the parties were expected and
obligated to negotiate with each other in good faith about what to do in
such event).

d.  The at least ten (10) seconds of footage was to be apportioned across
multiple sequences in the movie (with a clear record that PEUGEOT
had it explained to them that a sequence or scene could include more
than one camera shot – ALCON and CTMG expressly declined to be
bound by measuring timing by single shots, but rather would only agree
to "sequences" or "scenes", meaning related aggregations of shots).

e.  The at least ten (10) seconds of footage was to be apportioned across
two types of sequences: 1) badging on K's spinner, and 2) at least one
sequence where the Peugeot logo would appear in the BR2049 world,
such as in an outdoor advertisement in the background.

f.  Of the two types of sequences, the K spinner badging sequences were
more important to PEUGEOT, and the outdoor/wall ad sequences (or
"holographic advertisements") were of secondary importance
(including meaning that of the ten (10) seconds, more of the time would
go to the K spinner badging sequences).

g.  At least one mutually acceptable allocation of the ten (10) seconds was
about six (6) second of visibility footage in two spinner sequences and
about (4) seconds to at least one outdoor/wall ad sequence.  It was also
clear that ALCON was widely flexible and ready, willing and able to
perform a different allocation, as long as PEUGEOT communicated its
desires clearly with enough time for ALCON to meet them without
undue prejudice.  Indeed, ALCON was prepared to over-perform on the

1    visibility deliveries if it had to (and in fact, it did so).

2    h.  The execution of the ten (10) seconds of placement footage was subject

3    to PEUGEOT'S commercially reasonable and good faith review and

4    approval, which was to be prompt, and within the creative and artistic

5    parameters of the film, which were understood not to be in

6    PEUGEOT'S purview.  PEUGEOT'S review and approval was to be

7    conducted by PEUGEOT without unreasonable disruption of the film's

8    schedule, including picture lock, film delivery and release date, and

9    also early enough such that the co-promotion could be planned and

10   executed.

11   i.  The Peugeot spinner badging would be associated with Ryan Gosling's

12   character, K.

13   j.  Ryan Gosling's character, K, would not be associated with any rival

14   automobile brand.

15   k.  The Peugeot brand would not be presented in a perjorative context.

16   PEUGEOT acknowledged that it had reviewed the BR2049 script and

17   knew, understood and agreed that the BR2049 involved one or more

18   crashes of K's spinner, and that these crashes were agreed as not

19   violative of any term of the parties' agreement.

20   l.   upon review, PEUGEOT was not reasonably and in good faith

21   satisfied with a proposed execution of the footage placement, then

22   PEUGEOT was to engage with ALCON reasonably and in good faith

23   on changes or enhancements such that PEUGEOT would be able to

24   give its reasonable and good faith approval, also again within the

25   creative and artistic parameters of the film, and which was to be

26   conducted by PEUGEOT without unreasonable disruption of the film's

27   schedule, including picture lock, film delivery and release date.

28   m. PEUGEOT expressly acknowledged that it had been provided with the

- 105 -
COMPLAINT

1   opportunity to review the visual depictions of the placement items and
2   had approved them.

3   n. If ALCON delivered satisfactory placement footage, then PEUGEOT
4   was obligated to pay $500,000 directly to ALCON as a product
5   placement fee, and was also obligated to work with ALCON to plan,
6   finance and execute a global co-promotion media campaign (which
7   could exclude the U.S.) to support the October 6, 2017 day-and-date
8   global theatrical release of the Picture, with PEUGEOT obligated to
9   deliver at least $30 million of paid media. In this context, delivery of
10  satisfactory placement footage meant that ALCON communicated
11  intention to perform and deliver the footage – that the placement would
12  in fact be in the Picture. Planning of the co-promotion thus was to
13  occur upon that communicated intent by ALCON.

14  o. If ALCON failed to deliver satisfactory placement footage even after
15  reasonable and good faith engagement between the parties to attempt to
16  cure reasonable and good faith placement dissatisfactions of
17  PEUGEOT, then the parties would negotiate in good faith about
18  alternative terms that would be fair and reasonable to both sides.

19  p. Of the $500,000 placement fee, $400,000 was allocated to the spinner
20  placements and $100,000 to the outdoor/wall ad placement. The
21  parties further agreed and intended that the purpose of setting forth an
22  allocation was to provide a yardstick for potential reduction of the
23  placement fee if an element of the placements was not satisfactory after
24  good faith cooperative attempts to cure were exhausted.

25  q. The $500,000 placement fee was earned by ALCON and owed by
26  PEUGEOT no later than upon ALCON'S written confirmation to
27  PEUGEOT that the placements would be in the final Picture – while
28  the placement fee could be paid by PEUGEOT after release of the

1         Picture, it was earned by ALCON and owed by PEUGEOT earlier, on

2         ALCON'S confirmation that ALCON intended to perform the

3         placement (which confirmation by ALCON was repeatedly given).

4    r.  The agreed co-promotional period (the time during which the co-

5         promotion would actually be licensed to run) would be from

6         September 1, 2017 to November 30, 2017 (or sixty days after the

7         initial theatrical release date of the Picture, if ALCON had to change

8         the release date of the Picture for any reason).

9    s.  The defined co-promotional territory was the entire world, excluding

10       the United States and Canada and their related territories (but it was

11       understood that PEUGEOT would nonetheless receive the branding

12       and goodwill benefits of the U.S. and Canada release of BR2049, as

13       the PEUGEOT placements would be and were in all versions of the

14       film in all territories).

15    t.  The agreed $30 million guaranteed minimum media spend was to be

16       divided $27 million in Above-The-Line ("ATL") Spend and $3

17       million in Below-The-Line ("BTL") Spend (with it understood and

18       agreed that the ATL and BTL definitions were the advertising industry

19       standard definitions of these terms – very generally, ATL Spend refers

20       to media that mass targets large audiences, like television and radio

21       and many forms of Internet media; BTL Spend refers to media that

22       more specifically targets a limited set of consumers, like flyers

23       distributed from a particular retail store, or most forms of event

24       marketing, like a fan convention or auto show).

25    u.  ALCON had a review and approval right over the co-promotion's

26       specific executions, on a case-by-case basis.

27    v.  The co-promotion was to include a dedicated presence on

28       PEUGEOT'S website (www.peugeot.fr).

w. PEUGEOT was obligated to create, and the co-promotion was to include, at least one thirty-second television spot, unless Gosling refused to approve use of his likeness in the spot, in which case PEUGEOT was relieved of the television spot obligation (but not of the entire co-promotion). (Gosling agreed in principal to potential use of his likeness in a television spot for PEUGEOT, and PEUGEOT never sought Gosling's review or approval of any proposed spot, including because PEUGEOT never created one.)

x. PEUGEOT was to create and produce Below-The-Line spend spots.

y. PEUGEOT was to create and issue a press release to the media regarding the co-promotion.

283. PLAINTIFF completely or substantially performed all conditions, covenants and promises required on its part to be performed in accordance with the contract, except to the extent that such obligations have been excused or defendants prevented PLAINTIFF from performing them and/or made them impossible. Any and all conditions precedent to the enforceability of PEUGEOT'S obligations that PLAINTIFF seeks to enforce herein have either been satisfied or waived or otherwise excused.

284. Like all contracts under the relevant governing law, which is the law of the State of California, the contract between PLAINTIFF and PEUGEOT referenced herein contained an implied covenant of good faith and fair dealing, imposing on each party to the contract the duty to refrain from doing anything which would render performance of the contract impossible, by an act of his or her or its own, and also the duty to do everything that the contract presupposes that each party will do to accomplish its purpose.

285. PEUGEOT breached the contract's implied covenant of good faith and fair dealing in at least the following ways:

a. PEUGEOT manipulated the negotiation and signature process of long

form drafting and withheld its signature on all long form drafts in bad faith, for the purpose of attempting to create a bad faith excuse not to perform any obligation or condition.

b. PEUGEOT purported in bad faith to deny that it had given final approval over design and badging of K's spinner.

c. PEUGEOT in bad faith attempted to make the allocation of the ten (10) seconds of visibility a moving target that ALCON could never hit, for the purpose of PEUGEOT holding on to a bad faith excuse for its own non-performance.

d. PEUGEOT refused and failed to engage in good faith and commercially reasonable review of the visibility footage, for the purpose of PEUGEOT holding on to a bad faith excuse for its own non-performance.

e. PEUGEOT purported to disapprove the placement even on issues where the placement followed PEUGEOT-created and PEUGEOT-approved design elements (*e.g.*, the spinner's triple-claw brake lights, and the subtlety of a recessed PEUGEOT black letter word logo on the driver's side dashboard).

f. PEUGEOT refused to conduct its reviews and approvals on a prompt basis or at all.

g. PEUGEOT refused to conduct its reviews and approvals on a commercially reasonable and good faith basis.

h. PEUGEOT denied in bad faith that it had ever made any co-promotion commitment, and clearly communicated that it refused to finance and co-promotion, even if the placement was fully satisfactory.

i. PEUGEOT refused to make its necessary interim performances to prepare to execute the co-promotion, including failing and refusing to present ALCON and CTMG with co-promotion plans.

j.  PEUGEOT failed and refused to pay anything at all for the placement.

k.  PEUGEOT did not run any co-promotion during the agreed co-promotional period or ever.

l.  PEUGEOT did not make media spend, including no ATL Spend and no BTL Spend.

m.  PEUGEOT failed to include a dedicated BR2049 presence on PEUGEOT'S website (www.peugeot.fr).

n.  PEUGEOT failed and refused to produce the TV spot.

o.  PEUGEOT failed and refused to produce Below-The-Line spend spots.

p.  PEUGEOT failed and refused to issue a press release to the media regarding the co-promotion.

q.  PEUGEOT manipulated review and approval communications and processes in bad faith, including in ways that caused ALCON and CTMG to incur wasted expenses, including for at least one wasted trip by the CTMG team to Paris, and the preparations for it.

286.  PEUGEOT'S breaches damaged PLAINTIFF.

287.  PEUGEOT is liable to PLAINTIFF in the amount of at least $30.5 million, exclusive of prejudgment interest, attorneys' fees, costs or other amounts.

288.  DOES 1 through 5 are named herein as entities which PEUGEOT may contend are PEUGEOT-controlled or PEUGEOT-affiliated entities which should be treated as the contracting party or parties with PLAINTIFF, either in addition to or instead of PEUGEOT.  To the extent DOES 1 through 5, or any of them, are a contracting party or the contracting party, all of the foregoing allegations are made as to said DOE defendant, and said DOE defendant is liable to PLAINTIFF for breach of the implied covenant of good faith and fair dealing for the reasons and on the ground set forth in this Second Claim for Relief.

///

## THIRD CLAIM FOR RELIEF

***Promissory Estoppel against Automobiles Peugeot SA and Does 1 through 5***

289.   PLAINTIFF repeats, re-alleges and incorporates herein by reference each and every allegation set forth in all of the foregoing paragraphs, and each paragraph of this Complaint hereafter, as if set forth herein in full.

290.   To the extent any of the allegations or theories in this Third Claim for Relief are inconsistent with other allegations or theories pled in this Complaint, they are pled in the alternative.

291.   PEUGEOT made clear and unambiguous promises to PLAINTIFF as follows:

    a. Including by both the May 19, 2016 sweetened bid and the July 12, 2016 LOI, PEUGEOT promised at a minimum to negotiate in good faith with PLAINTIFF for a product placement and co-promotion agreement that would include a guaranteed media spend of at minimum $20 million and that could be "up to $40 million."

    b. Subsequently, from August 2016 through and until at least January 18, 2017, PEUGEOT made the following promises:

    c. PLAINTIFF and PEUGEOT would work in close collaboration to integrate PEUGEOT badging and other trade dress into the design of K's spinner.

    d. Once the K Spinner badging and feature designs were approved by PEUGEOT, they would be locked and PEUGEOT would not be able to change or disapprove them later (and the badging and feature designs were actually approved by PEUGEOT no later than January 24, 2017).

    e. The finished BR2049 film would include at least ten (10) seconds of footage in which PEUGEOT'S logo and badging would be clearly visible to the audience (although if ALCON for creative or other reasons did not include a PEUGEOT placement, then this was not

necessarily a breach by ALCON, but the parties were expected and obligated to negotiate with each other in good faith about what to do in such event).

f.  The at least ten (10) seconds of footage was to be apportioned across multiple sequences in the movie (with a clear record that PEUGEOT had it explained to them that a sequence or scene could include more than one camera shot – ALCON and CTMG expressly declined to be bound by measuring timing by single shots, but rather would only agree to "sequences" or "scenes", meaning aggregations of related shots).

g.  The at least ten (10) seconds of footage was to be apportioned across two types of sequences: 1) badging on K's spinner, and 2) at least one sequence where the Peugeot logo would appear in the BR2049 world, such as in an outdoor advertisement in the background.

h.  Of the two types of sequences, the K spinner badging sequences were more important to PEUGEOT, and the outdoor/wall ad sequences (or "holographic advertisements") were of secondary importance (including meaning that of the ten (10) seconds, more of the time would go to the K spinner badging sequences).

i.  At least one mutually acceptable allocation of the ten (10) seconds was about six (6) seconds of visibility footage in two spinner sequences and about (4) seconds to at least one outdoor/wall ad sequence.  It was also clear that ALCON was widely flexible and ready, willing and able to perform a different allocation, as long as PEUGEOT communicated its desires clearly with enough time for ALCON to meet them without undue prejudice.  Indeed, ALCON was prepared to over-perform on the visibility deliveries if it had to (and in fact, it did so).

j.  The execution of the ten (10) seconds of placement footage was subject to PEUGEOT'S commercially reasonable and good faith review and

approval, which was to be prompt, and within the creative and artistic parameters of the film, which were understood not to be in PEUGEOT'S purview.  PEUGEOT'S review and approval was to be conducted by PEUGEOT without unreasonable disruption of the film's schedule, including picture lock, film delivery and release date, and also early enough such that the co-promotion could be planned and executed.

k.  The Peugeot spinner badging would be associated with Ryan Gosling's character, K.

l.  Ryan Gosling's character, K, would not be associated with any rival automobile brand.

m.  The Peugeot brand would not be presented in a perjorative context. PEUGEOT acknowledged that it had reviewed the BR2049 script and knew, understood and agreed that the BR2049 involved one or more crashes of K's spinner, and that these crashes were agreed as not violative of any term of the parties' agreement.

n.   upon review, PEUGEOT was not reasonably and in good faith satisfied with a proposed execution of the footage placement, then PEUGEOT was to engage with ALCON reasonably and in good faith on changes or enhancements such that PEUGEOT would be able to give its reasonable and good faith approval, also again within the creative and artistic parameters of the film, and which was to be conducted by PEUGEOT without unreasonable disruption of the film's schedule, including picture lock, film delivery and release date.

o.  PEUGEOT expressly acknowledged that it had been provided with the opportunity to review the visual depictions of the placement items and had approved them.

p.  If ALCON delivered satisfactory placement footage, then PEUGEOT

1    was obligated to pay $500,000 directly to ALCON as a product

2    placement fee, and was also obligated to work with ALCON to plan,

3    finance and execute a global co-promotion media campaign (which

4    could exclude the U.S.) to support the October 6, 2017 day-and-date

5    global theatrical release of the Picture, with PEUGEOT obligated to

6    deliver at least $30 million of paid media.

7    q.   If ALCON failed to deliver satisfactory placement footage even after

8         reasonable and good faith engagement between the parties to attempt to

9         cure reasonable and good faith placement dissatisfactions of

10        PEUGEOT, then the parties would negotiate in good faith about

11        alternative terms that would be fair and reasonable to both sides.

12   r.   Of the $500,000 placement fee, $400,000 was allocated to the spinner

13        placements and $100,000 to the outdoor/wall ad placement.  The

14        parties further agreed and intended that the purpose of setting forth an

15        allocation was to provide a yardstick for potential reduction of the

16        placement fee if an element of the placements was not satisfactory after

17        good faith cooperative attempts to cure were exhausted.

18   s.   The $500,000 placement fee was earned by ALCON and owed by

19        PEUGEOT no later than upon ALCON'S written confirmation to

20        PEUGEOT that the placements would be in the final Picture – while

21        the placement fee could be paid by PEUGEOT after release of the

22        Picture, it was earned by ALCON and owed by PEUGEOT earlier, on

23        ALCON'S confirmation that ALCON intended to perform the

24        placement (which confirmation by ALCON was repeatedly given).

25   t.   The agreed co-promotional period (the time during which the co-

26        promotion would actually be licensed to run) would be from

27        September 1, 2017 to November 30, 2017 (or sixty days after the

28        initial theatrical release date of the Picture, if ALCON had to change

the release date of the Picture for any reason).

u. The defined co-promotional territory was the entire world, excluding the United States and Canada and their related territories (but it was understood that PEUGEOT would nonetheless receive the branding and goodwill benefits of the U.S. and Canada release of BR2049, as the PEUGEOT placements would be and were in all versions of the film in all territories).

v. The agreed $30 million guaranteed minimum media spend was to be divided $27 million in Above-The-Line ("ATL") Spend and $3 million in Below-The-Line ("BTL") Spend (with it understood and agreed that the ATL and BTL definitions were the advertising industry standard definitions of these terms – very generally, ATL Spend refers to media that mass targets large audiences, like television and radio and many forms of Internet media; BTL Spend refers to media that more specifically targets a limited set of consumers, like flyers distributed from a particular retail store, or most forms of event marketing, like a fan convention or auto show).

w. ALCON had a review and approval right over the co-promotion's specific executions, on a case-by-case basis.

x. The co-promotion was to include a dedicated presence on PEUGEOT'S website (www.peugeot.fr).

y. PEUGEOT was obligated to create, and the co-promotion was to include, at least one thirty-second television spot, unless Gosling refused to approve use of his likeness in the spot, in which case PEUGEOT was relieved of the television spot obligation (but not of the entire co-promotion).  (Gosling agreed in principal to potential use of his likeness in a television spot for PEUGEOT, and PEUGEOT never sought Gosling's review or approval of any proposed spot,

1    including because PEUGEOT never created one.)

2      z. PEUGEOT was to create and produce Below-The-Line spend spots.

3      aa. PEUGEOT was to create and issue a press release to the media

4          regarding the co-promotion.

5    292.   PLAINTIFF completely or substantially performed all conditions,

6 covenants and promises required on its part to be performed in accordance with the

7 contract, except to the extent that such obligations have been excused or defendants

8 prevented PLAINTIFF from performing them and/or made them impossible, and all

9 conditions precedent to PEUGEOT'S obligations that PLAINTIFF seeks to enforce

10 herein have either been satisfied, excused or waived.

11    293.   Within the last two years, PEUGEOT materially breached its promises

12 to PLAINTIFF in at least the following ways:

13      a. PEUGEOT did not negotiate in good faith with ALCON, including

14          intentionally misleading ALCON for almost a year that PEUGEOT was

15          committed to and able to perform a media spend of initially at least $20

16          million, later moving up to an agreed $30 million, when PEUGEOT

17          never intended to commit to any media spend at all, and was unable to

18          do so.

19      b. PEUGEOT manipulated the negotiation and signature process of long

20          form drafting and withheld its signature on all long form drafts in bad

21          faith, for the purpose of attempting to create a bad faith excuse not to

22          perform any obligation or condition.

23      c. PEUGEOT purported in bad faith to deny that it had given final

24          approval over design and badging of K's spinner.

25      d. PEUGEOT in bad faith attempted to make the allocation of the ten (10)

26          seconds of visibility a moving target that ALCON could never hit, for

27          the purpose of PEUGEOT holding on to a bad faith excuse for its own

28          non-performance.

e. PEUGEOT refused and failed to engage in good faith and commercially reasonable review of the visibility footage, for the purpose of PEUGEOT holding on to a bad faith excuse for its own performance.

f. PEUGEOT purported to disapprove the placement even on issues where the placement followed PEUGEOT-created and PEUGEOT-approved design elements (*e.g.*, the spinner's triple-claw brake lights, and the subtlety of a recessed PEUGEOT black letter word logo on the driver's side dashboard).

g. PEUGEOT refused to conduct its reviews and approvals on a prompt basis or at all.

h. PEUGEOT refused to conduct its reviews and approvals on a commercially reasonable and good faith basis.

i. PEUGEOT denied in bad faith that it had ever made any co-promotion commitment, and clearly communicated that it refused to finance any co-promotion, even if the placement was fully satisfactory.

j. PEUGEOT refused to make its necessary interim performances to prepare to execute the co-promotion, including failing and refusing to present ALCON and CTMG with co-promotion plans.

k. PEUGEOT failed and refused to pay anything at all for the placement.

l. PEUGEOT did not run any co-promotion during the agreed co-promotional period or ever.

m. PEUGEOT did not make any media spend, including no ATL Spend and no BTL Spend.

n. PEUGEOT failed to include a dedicated BR2049 presence on PEUGEOT'S website (www.peugeot.fr).

o. PEUGEOT failed and refused to produce the TV spot.

p. PEUGEOT failed and refused to produce Below-The-Line spend

1      spots.

2          q.   PEUGEOT failed and refused to issue a press release to the media

3               regarding the co-promotion.

4          r.   PEUGEOT manipulated review and approval communications and

5               processes in bad faith, including in ways that caused ALCON and

6               CTMG to incur wasted expenses, including for at least one wasted trip

7               by the CTMG team to Paris, and the preparations for it.

8      294.   PLAINTIFF actually relied on PEUGEOT'S promises in changing its

9   position to its detriment, including by:

10         a.   Foregoing other placement and co-promotion bids, including the

11              Automotive Brand Z bid, which was for at least a $16-plus million

12              media spend.

13         b.   Incurring substantial production expenditures to prepare to perform the

14              placement, including without limitation design changes to K's spinner,

15              and the value of at least one production day in bringing PEUGEOT

16              executives to Budapest, Hungary to move forward with negotiations

17              and to prepare to perform a placement and co-promotion deal.

18         c.   Planning an entire marketing and promotion strategy to support the

19              October 6, 2017 day-and-date release of the Picture that relied and

20              depended on a PEUGEOT $30 million or more media spend in a co-

21              promotion.

22         d.   Creating marketing materials, including one sheets, that featured the

23              spinner with PEUGEOT badging and/or trade dress.

24     295.   PLAINTIFF'S reliance on the all of the above promises from

25   PEUGEOT was reasonable and foreseeable, and indeed PEUGEOT made the

26   promises to PLAINTIFF for the intended purpose of causing PLAINTIFF to rely on

27   the promises substantially in the manner that PLAINTIFF did.

28

296.   PLAINTIFF'S reliance on PEUGEOT'S promises caused PLAINTIFF substantial detriment, including without limitation in the form of losing the value of the $16+ million bid from Automotive Brand Z, and in incurring all of the expenses and lost opportunities set forth immediately above.  Had PLAINTIFF not acted in reliance on PEUGEOT'S promises, PLAINTIFF would have entered into a placement and co-promotion deal with Automotive Brand Z or another bidder; would not have incurred expenses to prepare to perform with PEUGEOT; and would not have planned a global market and promotion strategy for release of the Picture that depended on and relied on a $30 million co-promotion media spend by PEUGEOT.  By relying on PEUGEOT'S promises, PLAINTIFF incurred these costs and suffered these lost opportunities irrevocably.

297.   If PLAINTIFF had known that PEUGEOT would not perform its promises to PLAINTIFF, especially that PEUGEOT never intended to commit to a guaranteed media spend co-promotion under any circumstances and was unable to do so, PLAINTIFF would not have agreed even to negotiate with PEUGEOT at all, would not have foregone the Automotive Brand Z $16+ million bid or other bids, and would not have taken any of the further steps that ALCON in fact took in reliance on PEUGEOT'S promises.

298.   Under these circumstances, injustice can only be avoided by enforcement of PEUGEOT'S promises to PLAINTIFF.

299.   As a result of PEUGEOT'S conduct, PEUGEOT is liable to PLAINTIFF for general damages, special damages, prejudgment interest, costs of suit, and such other relief as may be just.

### FOURTH CLAIM FOR RELIEF

*Breach of Duty to Negotiate in Good Faith*

*against Automobiles Peugeot SA and Does 1 through 10*

300.   PLAINTIFF repeats, re-alleges and incorporates herein by reference each and every allegation set forth in all of the foregoing paragraphs, and each

paragraph of this Complaint hereafter, as if set forth herein in full.

301.   To the extent any of the allegations or theories in this Fourth Claim for Relief are inconsistent with other allegations or theories pled in this Complaint, they are pled in the alternative.

302.   By no later than July 12, 2016, PEUGEOT had engaged in communications and conduct with ALCON such that PEUGEOT at a minimum was under a duty to negotiate in good faith with ALCON to come to a binding agreement (to the extent that they had not already done so or did not otherwise do so) pursuant to which ALCON would provide PEUGEOT product placements in BR2049 and in exchange for which PEUGEOT would pay at least on the order of $500,000 to ALCON directly and would also guarantee a co-promotional media campaign with a minimum guaranteed paid media value of $30 million.

303.   PEUGEOT breached the above duty to negotiate in good faith with ALCON, including as follows:

    a. PEUGEOT never intended ever to commit any guaranteed media co-promotion spend and indeed was unable to do so, and never revealed that to ALCON until at earliest May 4, 2017, by which time ALCON had drastically changed its position to its detriment.

    b. PEUGEOT at all times harbored a secret intention to stall and frustrate signature of a PEUGEOT executive on any form of contractual obligation (other than confidentiality agreements), for the intentional and bad faith purpose of controlling the BR2049 opportunity while also claiming it had incurred no obligations itself.

    c. Intentionally attempting in bad faith to build in and/or assert satisfaction targets that it would be impossible for ALCON to hit, no matter what ALCON did, for PEUGEOT'S intentional purpose of attempting to maintain bad faith excuses not to perform.

    d. Intentionally and falsely denying the existence and scope of authority

1    of its designated agents for negotiation.

2        e.  Falsely and in bad faith leading ALCON and CTMG to believe that if

3            PEUGEOT'S CEO were provided an opportunity to review materials,

4            that PEUGEOT might perform at least some parts of the deal, when in

5            fact PEUGEOT (and MENDEZ specifically) had no intention of

6            allowing the CEO to interact directly with ALCON or CTMG, and the

7            CEO ploy was just a further stall.

8        304.  As a result of PEUGEOT'S breach of duty, ALCON suffered

9    damages, including at a minimum the value of the $16 million-plus deal for a

10   BR2049 product placement and co-promotion that was being offered to ALCON by

11   Automotive Brand Z, prior to PEUGEOT'S promises and representations that it

12   would negotiate in good faith with ALCON on the terms set forth above.  ALCON

13   also lost the value of the costs and expenses it incurred in performing and preparing

14   to perform the actual and/or to-be-negotiated deal with PEUGEOT, including

15   modifications to K's spinner and the value of at least one lost production day on the

16   set.  ALCON also lost at least about three months of time in or about the late

17   January to early May 2017 period by PEUGEOT in bad faith concealing the

18   differences from the represented situation to the actual situation from ALCON, to

19   ALCON'S prejudice and detriment.  Had this time not been wasted, ALCON and

20   CTMG might have been able to use it better to plan a marketing and promotion

21   strategy for the Picture's release that was less dependent on a media spend from

22   PEUGEOT.  ALCON and CTMG also lost the expenses incurred in CTMG'S

23   wasted June 1, 2017 trip to Paris for PEUGEOT'S bad-faith non-meeting with its

24   CEO.

25       305.  PEUGEOT is thus liable to ALCON for general and/or special

26   damages in an amount to be proven at trial, but at least $16-plus million.

27   ///

28   ///

# FIFTH CLAIM FOR RELIEF

### *Fraud against Automobiles Peugeot SA,*
### *Isabel Salas Mendez and Does 1 through 10*

306.   PLAINTIFF repeats, re-alleges and incorporates herein by reference each and every allegation set forth in all of the foregoing paragraphs, and each paragraph of this Complaint hereafter, as if set forth herein in full.

307.   To the extent any of the allegations or theories in this Fifth Claim for Relief are inconsistent with other allegations or theories pled in this Complaint, they are pled in the alternative.

308.   Within the last three years, PEUGEOT and MENDEZ made affirmative misrepresentations to PLAINTIFF, and/or suppressed and concealed facts from PLAINTIFF which they had a duty to disclose to PLAINTIFF under all the circumstances, and/or made promises without any intention of performing them, at least as follows.

309.   PLAINTIFF is informed and believes and on that basis alleges that MENDEZ caused PEUGEOT to make all of the following misrepresentations or material omissions to ALCON or intended to be received by ALCON, either by MENDEZ making them herself or by MENDEZ causing others to make them at her direction:

a.   MENDEZ and/or PEUGEOT caused BEN and Porter to communicate the May 19, 2016 sweetened bid to ALCON, the purpose and intention of which was to lead ALCON falsely to believe that if ALCON gave up other bid opportunities and dealt only with PEUGEOT, that PEUGEOT was ready, willing and able in good faith to offer and negotiate with ALCON for a placement and co-promotion agreement on BR2049 that would include PEUGEOT committing to a minimum $20 million media spend, and "up to $40 million."  In fact, MENDEZ and/or PEUGEOT knew that there was no such commitment by PEUGEOT

1    for any media spend and indeed never would be.

2       b.  MENDEZ and/or PEUGEOT caused PUBLICIS (through Casablanca's

3          Montron) to communicate the July 12, 2016 LOI to ALCON, the

4          purpose and intention of which was to lead ALCON falsely to believe

5          that if ALCON continued to move forward to negotiate a more binding

6          agreement with PEUGEOT, rather than deal with other bidders, that

7          PEUGEOT would negotiate in good faith with ALCON for a more

8          binding agreement that would include a promotional campaign with a

9          PEUGEOT-financed media spend of at least $30 million.  In fact,

10         MENDEZ and/or PEUGEOT knew that there was no such commitment

11         by PEUGEOT for any media spend and indeed never would be.

12      c.  During and at around the time of the late July 2016 visit to the

13         Budapest production offices and set of BR2049, MENDEZ herself

14         and/or others on behalf of PEUGEOT made multiple statements and

15         engaged in conduct, the intended and actual effect of which was to

16         communicate to ALCON that if ALCON made design changes to the K

17         spinner to make it a Peugeot and otherwise took steps to effect Peugeot

18         product placement in the Picture, then PEUGEOT promised to commit

19         to, plan and finance a co-promotion with a minimum $30 million media

20         spend (or at a bare minimum to continue to negotiate in good faith for a

21         binding agreement to such a commitment).  In fact, MENDEZ and/or

22         PEUGEOT knew that there was no such commitment by PEUGEOT

23         for any media spend and indeed never would be.

24      d.  From August 2016 and until May 4, 2017, MENDEZ and/or

25         PEUGEOT intentionally caused PEUGEOT or its representatives to

26         make the promises set forth in the First through Third Claims for

27         Relief, even though MENDEZ and/or PEUGEOT knew at the time of

28         making the promises that the promises were false and that MENDEZ

1    had no intention of allowing PEUGEOT to perform them and/or

2    PEUGEOT had no intention of performing them, at least as any

3    committed contractual obligation, but rather at most only intended to

4    perform them if they felt like it later – and PEUGEOT never intended

5    to perform the media spend and co-promotion promises at all, under

6    any circumstances.

7    e.   On or about January 24, 2017, MENDEZ herself was at the Los

8      Angeles offices of ALCON for the purpose of participating in the

9      kickoff meeting for the co-promotion.  During and around the time of

10      that meeting, by her statements and conduct, MENDEZ intentionally

11      and falsely communicated to ALCON that there was a binding

12      agreement between ALCON and PEUGEOT that included a co-

13      promotion media spend to be financed by PEUGEOT and potentially

14      executed by BETC (representatives for whom also attended the

15      meeting).  MENDEZ further by her statements and conduct falsely

16      communicated that PEUGEOT was to that point satisfied with the

17      placement as presented by ALCON, and indeed MENDEZ expressly

18      approved the creative deck with Cai's K spinner design modifications

19      as executed by production.  MENDEZ further intentionally and falsely

20      omitted during all of her communication and conduct at this meeting

21      that in fact PEUGEOT had no budget of its own for any media spend

22      and MENDEZ had not taken any steps within the PEUGEOT

23      organization to prepare to fund a media spend, and that in fact there

24      would never be any such media spend by PEUGEOT, regardless of

25      satisfaction of the placement condition.  At the January 24, 2017

26      meeting and surrounding it, MENDEZ also directly and falsely

27      communicated herself that she would cause BETC to send an updated

28      and/or more specific co-promotion plan to ALCON and CTMG, so the

co-promotion could continue to move forward. In fact, MENDEZ never intended to cause BETC to send any such plans. The purpose of these false statements and omissions by MENDEZ at this time was to allow MENDEZ in bad faith to continue to keep control of the BR2049 opportunity both entirely for PEUGEOT versus any other auto partners, and to keep control of it herself within the PEUGEOT corporate organization, for her own expediencies. MENDEZ intended to do so for as long as possible until she either chose to abandon the deal, or had so much leverage due to time pressure to force ALCON to re-negotiate.

f. In or about May 2017, MENDEZ personally via email (and/or via emails from her subordinates) made false statements and omissions to CTMG executives to the effect that if CTMG put together placement demonstration materials and traveled to PEUGEOT'S Paris offices to show them, that MENDEZ would arrange and had arranged for PEUGEOT'S CEO to view them. In fact, this was false, and MENDEZ had never so arranged with the CEO, and/or the CEO was himself aware of and a party to the false representations, causing the wasted trip and the expenses of it.

310. The above misrepresentations, acts of suppression and concealment, and/or false promises were material to PLAINTIFF, essential to the analysis undertaken by PLAINTIFF, and PLAINTIFF would not have acted as it did had PEUGEOT and MENDEZ not made the above statements or engaged in the acts of suppression and concealment and/or false promises.

311. PEUGEOT and MENDEZ knew at the time that they made the affirmative misrepresentations and false promises that they were false, and knew at the time that they suppressed or concealed the material facts the effect such suppression or concealment would have.

///

- 125 -

COMPLAINT

312.   PEUGEOT and MENDEZ made the affirmative representations, false promises, and acts of suppression and concealment of material facts with the intent and for the purpose of causing PLAINTIFF to change its position to its detriment.

313.   PLAINTIFF actually and justifiably relied on the affirmative misrepresentations, false promises and the facts as they stood given the suppression and concealment of other material facts in changing its position to its detriment, including at a minimum the lost value of the $16 million-plus deal for a BR2049 product placement and co-promotion that was being offered to ALCON by Automotive Brand Z, prior to PEUGEOT'S promises and representations that they would negotiate in good faith with ALCON on the terms set forth above.  ALCON also lost the value of the costs and expenses it incurred in performing and preparing to perform the actual and/or to-be-negotiated deal with PEUGEOT, including modifications to K's spinner and the value of at least one lost production day on the set.  ALCON also lost at least about three months of time in or about the late January to early May 2017 period by PEUGEOT in bad faith concealing the differences in the represented situation from the actual situation from ALCON, to ALCON'S prejudice and detriment.  Had this time not been wasted, ALCON and CTMG might have been able to use it better to plan a marketing and promotion strategy for the Picture's release that was less dependent on a media spend from PEUGEOT.  ALCON and CTMG also lost the expenses incurred in CTMG'S wasted June 1, 2017 trip to Paris for PEUGEOT'S bad-faith non-meeting with its CEO.

314.   PLAINTIFF'S reliance on the affirmative misrepresentations, false promises and the facts as they stood given the suppression and concealment of other material facts was a proximate cause of actual damage to PLAINTIFF.

315.   PLAINTIFF actually relied on defendants' promises and representations in changing its position to its detriment, including by giving up the Automotive Brand Z $16 million-plus bid and/or the opportunity to do business with

1   other automotive partners who were acting in good faith.  ALCON also lost the

2   value of the costs and expenses it incurred in performing and preparing to perform

3   the actual and/or to-be-negotiated deal with PEUGEOT, including modifications to

4   K's spinner and the value of at least one lost production day on the set.  ALCON

5   also lost at least about three months of time in or about the late January to early May

6   2017 period by both PEUGEOT and PUBLICIS in bad faith concealing the

7   differences between the represented situation and the actual situation from ALCON,

8   to ALCON'S prejudice and detriment.  Had this time not been wasted, ALCON and

9   CTMG might have been able to use it better to plan a marketing and promotion

10  strategy for the Picture's release that was less dependent on a media spend from

11  PEUGEOT.  ALCON and CTMG also lost the expenses incurred in CTMG'S

12  wasted June 1, 2017 trip to Paris for PEUGEOT'S bad-faith non-meeting with its

13  CEO.

14        316.   PLAINTIFF'S reliance on the all of the above promises,

15  representations, and facts as they were understood in light of defendants' material

16  omissions was reasonable and foreseeable, and indeed defendants made the false

17  representations, false promises and material omissions for the intended purpose of

18  causing PLAINTIFF to rely on them substantially in the manner that PLAINTIFF

19  did.

20        317.   Had PLAINTIFF not acted in reliance on defendants'

21  misrepresentations, false promises, and facts as they were understood in light of

22  defendants' material omissions, PLAINTIFF would not have incurred the detriments

23  above.  By relying on defendants' misrepresentations, false promises, and facts as

24  they were understood in light of defendants' material omissions, PLAINTIFF

25  suffered those costs, expenses and lost opportunities irrevocably.

26        318.   PEUGEOT and MENDEZ are thus liable to PLAINTIFF for general

27  damages and special damages, as well as costs and other relief, all in amounts to be

28  proven at trial, but not less than $30.5 million.

1     319.   Defendants, and each of them, did the things herein alleged
2  maliciously, knowingly, willfully and with the deliberate intention of injuring and
3  oppressing PLAINTIFF and with conscious and reckless disregard of
4  PLAINTIFF'S rights.  Defendants' conduct was fraudulent, malicious and
5  oppressive and, by reason thereof, PLAINTIFF is entitled to exemplary and
6  punitive damages in an amount according to proof at trial.

7                          **SIXTH CLAIM FOR RELIEF**
8                     ***Reasonable Value of Services against***
9                  ***Automobiles Peugeot, SA and Does 1 through 5***

10     320.   PLAINTIFF repeats, re-alleges and incorporates herein by reference
11  each and every allegation set forth in all of the foregoing paragraphs, and each
12  paragraph of this Complaint hereafter, as if set forth herein in full.

13     321.   To the extent any of the allegations or theories in this Sixth Claim for
14  Relief are inconsistent with other allegations or theories pled in this Complaint,
15  they are pled in the alternative.

16     322.   PLAINTIFF provided valuable services to PEUGEOT at
17  PEUGEOT'S request and/or with PEUGEOT'S knowledge, and PEUGEOT
18  accepted or otherwise received the benefit of said services.

19     323.   The value of the placement that PEUGEOT actually received in the
20  Picture, if valued solely as a placement, is at least $10 million paid directly by
21  PEUGEOT to ALCON.

22     324.   The value of the services provided by PLAINTIFF to PEUGEOT was
23  agreed between PLAINTIFF to PEUGEOT, and/or reasonably known and
24  determinable including by custom and practice in the industry, and PEUGEOT
25  knew and understood that the services were valuable, or should have known.

26     325.   PEUGEOT knew and understood that PLAINTIFF expected
27  compensation for rendition of the services.

28     326.   PLAINTIFF has demanded that PEUGEOT compensate PLAINTIFF

1 for the value of the services and PLAINTIFF has refused to pay PLAINTIFF

2 anything at all for them.

### SEVENTH CLAIM FOR RELIEF

#### *Quantum Meruit against*

#### *Automobiles Peugeot, SA and Does 1 through 10*

6     327.  PLAINTIFF repeats, re-alleges and incorporates herein by reference

7 each and every allegation set forth in all of the foregoing paragraphs, and each

8 paragraph of this Complaint hereafter, as if set forth herein in full.

9     328.  To the extent any of the allegations or theories in this Seventh Claim

10 for Relief are inconsistent with other allegations or theories pled in this Complaint,

11 they are pled in the alternative.

12     329.  PEUGEOT received a benefit provided by PLAINTIFF to

13 PLAINTIFF'S detriment. The value of the placement that PEUGEOT actually

14 received in the Picture, if valued solely as a placement, is at least $10 million paid

15 directly by PEUGEOT to ALCON.

16     330.  Under the facts and circumstances here, it would be unjust for

17 PEUGEOT to retain the benefit or its value, at PLAINTIFF'S expense.

18     331.  PLAINTIFF is thus entitled to damages and/or restitution from

19 PEUGEOT.

### **Prayer for Relief**

21     WHEREFORE, PLAINTIFF prays judgment be entered in its favor and

22 against Defendants, and each of them, as follows:

23

24     <u>On the First Claim for Relief for Breach of Contract</u>:

25     1.    For general damages in an amount to be proved at trial, but at least

26 $30.5 million.

27     2.    For such other general damages as may be shown by proof at trial.

28     3.    For special damages.

4.      For prejudgment interest at the legal rate from at least October 6, 2017.

5.      For PLAINTIFF'S costs of suit.

6.      For such further relief as the Court deems just and proper.

On the Second Claim for Relief for Breach of Implied Covenant of Good Faith and Fair Dealing:

7.      For general damages in an amount to be proved at trial, but at least $30 million.

8.      For such other general damages as may be shown by proof at trial.

9.      For special damages.

10.     For prejudgment interest at the legal rate from at least October 6, 2017.

11.     For PLAINTIFF'S costs of suit.

12.     For such further relief as the Court deems just and proper.

On the Third Claim for Relief for Promissory Estoppel:

13.     For general damages according to proof at trial.

14.     For prejudgment interest at the legal rate from at least October 6, 2017.

15.     For PLAINTIFF'S costs of suit.

16.     For such further relief as the Court deems just and proper.

On the Fourth Claim for Relief for Breach of Duty to Negotiate in Good Faith:

17.     For general and/or special damages in an amount to be proved at trial, but at least $16 million.

18.     For prejudgment interest at the legal rate from at least October 6, 2017.

19.     For PLAINTIFF'S costs of suit.

20.     For such further relief as the Court deems just and proper.

COMPLAINT

On the Fifth Claim for Relief for Fraud:

21.   For general damages according to proof at trial.

22.   For punitive damages.

23.   For prejudgment interest at the legal rate from at least October 6, 2017.

24.   For PLAINTIFF'S costs of suit.

25.   For such further relief as the Court deems just and proper.


On the Sixth Claim for Relief for Reasonable Value of Services:

26.   For general damages according to proof at trial.

27.   For prejudgment interest at the legal rate from at least October 6, 2017.

28.   For PLAINTIFF'S costs of suit.

29.   For such further relief as the Court deems just and proper.


On the Seventh Claim for Relief for Quantum Meruit:

30.   For general damages and/or restitution damages according to proof at trial.

31.   For prejudgment interest at the legal rate from at least October 6, 2017.

32.   For PLAINTIFF'S costs of suit.

33.   For such further relief as the Court deems just and proper.


DATED: January 10, 2019        ANDERSON YEH PC
                               Edward M. Anderson
                               Regina Yeh

                               _____
                               Attorneys for Plaintiff
                               ALCON ENTERTAINMENT, LLC

1

## __DEMAND FOR JURY TRIAL__

2      Pursuant to Fed. R. Civ. P. 38, on its claims against defendants

3 AUTOMOBILES PEUGEOT SA, ISABEL SALAS MENDEZ  and DOES 1

4 through 10, Plaintiff ALCON ENTERTAINMENT, LLC hereby demands a trial by

5 jury of all matters triable to a jury.

6

7 DATED: January 10, 2019         ANDERSON YEH PC

8                               Edward M. Anderson

9                               Regina Yeh

10

                              Attorneys for Plaintiff

11                               ALCON ENTERTAINMENT, LLC

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28