**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

|  |  |
|---|---|
| ALCON ENTERTAINMENT, LLC,<br><br>Plaintiff,<br><br>v.<br><br>AUTOMOBILES PEUGEOT SA, et al.,<br><br>Defendants. | Case No.: CV 19-00245-CJC(AFMx)<br><br><br>ORDER DENYING DEFENDANTS AUTOMOBILES PEUGEOT SA AND ISABEL SALAS MENDEZ'S MOTION TO DISMISS [Dkt. 22] AND DENYING DEFENDANT PUBLICIS MEDIA FRANCE SA'S MOTION TO DISMISS [Dkt. 56] |

## I.  INTRODUCTION

Plaintiff Alcon Entertainment, LLC ("Alcon") brings this diversity action against Defendants Automobiles Peugeot SA ("Peugeot"), Peugeot executive Isabel Salas Mendez ("Mendez"), and Publicis Media France SA ("Publicis").  (Dkt. 8 [First

Amended Complaint, hereinafter "FAC"].)[1]  This dispute arises out of an alleged breach of a product placement and co-promotional agreement for Alcon's film *Blade Runner 2049* ("*BR 2049*").  (*Id.*)  Alcon's operative First Amended Complaint ("FAC") is 159 pages long and asserts nine causes of action for (1) breach of contract, (2) breach of implied covenant of good faith and fair dealing, (3) promissory estoppel, (4) breach of duty to negotiate in good faith, (5) fraud, (6) reasonable value of services, (7) quantum meruit, (8) fraud [against Publicis only], and (9) negligent misrepresentation.  (*Id.*)  Before the Court is Peugeot and Mendez's (collectively, "Peugeot Defendants") motion to dismiss for lack of personal jurisdiction and, in the alternative, to dismiss under the doctrine of *forum non conveniens*, (Dkt. 22 [Peugeot Defendants' Motion to Dismiss, hereinafter "Peugeot Mot."]), and Publicis's motion to dismiss for lack of personal jurisdiction, (Dkt. 56 [Publicis's Motion to Dismiss, hereinafter "Publicis Mot."]).

For the following reasons, both motions are **DENIED**.[2]

## II.  BACKGROUND

### A.     Parties

Peugeot is a carmaker incorporated in France as a "société anonyme," a legal entity similar to a corporation, with its principal place of business in Rueil-Malmaison, France.  (FAC ¶ 36.)  Mendez is a resident of France, a French citizen, and a senior marketing executive for Peugeot responsible for sponsorships, co-promotional partnerships, and product placements.  (*Id.* ¶ 45.)  Publicis, a French société anonyme with its principal

---

[1] The Casablanca Agency is a subsidiary and/or predecessor in interest to Publicis.  For the purpose of this order, "Publicis" includes the Casablanca Agency.  The other named Defendants in the FAC have been dismissed from this case.

[2]  Having read and considered the papers presented by the parties, the Court finds these matters appropriate for disposition without hearings.  *See* Fed. R. Civ. P. 78; Local Rule 7-15.  Accordingly, the hearings set for November 4, 2019 at 1:30 p.m. are hereby vacated and off calendar.

place of business in Paris, France, is a global advertising and public relations company that works with American film and television companies. (*Id.* ¶¶ 48–50.) Alcon is a Delaware LLC with its principal place of business in Los Angeles, California. (*Id.* ¶ 33.) It produces motion pictures and television shows distributed around the world. (*Id.* ¶ 34.) Alcon is also the assignee of Columbia TriStar Marketing Group, Inc. ("CTMG") for all claims against Defendants related to *BR 2049*. (*Id.* ¶ 35.) Finally, interested non-party Branded Entertainment Network, Inc. ("BEN") is a Delaware LLC and a Los-Angeles based marketing agency. (*Id.* ¶ 117.) Alcon, Peugeot, Publicis, and BEN were the four key players in a botched product placement deal and now allege various frauds against and amongst each other.

**B.**   ***Blade Runner 2049***

In or about 2011, Alcon acquired the rights to produce a sequel to the seminal 1982 science-fiction film, *Blade Runner*. (*Id.* ¶ 70.) Pre-production for the sequel, *BR 2049*, started sometime in 2015. (*Id.* ¶ 93a.) Alcon set October 6, 2017 as the global theatrical release date. (*Id.* ¶ 75.) To meet that date, it set the following timeline: (1) Principal Photography from July 11, 2016 through November 22, 2016, (2) "Picture Lock" (when the timing and sequence of the film have been set) by June 8, 2017, and (3) "Picture Delivery" (the actual distribution of the film to theaters) between September 25, 2017 and September 30, 2017. (*Id.* ¶ 93.)

According to Alcon, *BR 2049* "presented an exceptionally rare and highly valuable automotive product placement and co-promotional opportunity." (*Id.* ¶ 87.) A "co-promotional agreement," sometimes referred to as a "co-promotional media spend," is a more sophisticated form of product placement. In a co-promotional agreement, rather than just paying the producers to include a product in their film, a company also commits to spending a certain amount on marketing and advertising that promotes *both* the

product and the film.  (*See id.* ¶¶ 99–103.)  *BR 2049* prominently features a flying car, called a "spinner."  (*Id.* ¶¶ 88–89.)  The spinner is central to the film's aesthetic vision of the future and is a steadfast companion to the protagonist, "K," played by film star Ryan Gosling.  (*Id.* ¶¶ 88–89.)  According to Alcon, a co-promotional agreement for a carmaker to place its brand on the spinner was a "generational opportunity."  (*Id.* ¶ 90.)

## C.   Initial Negotiations

Alcon started soliciting bids for co-promotional agreements from automotive companies around January 2016.  (*Id.* ¶ 95.)  According to Alcon, this opportunity was uniquely valuable to Peugeot who was planning to reintroduce its cars in the U.S. market after a twenty-four-year hiatus.  (*Id.* ¶¶ 42–44.)  By July 2016, Peugeot emerged as the winning bidder, and its designers started collaborating with Alcon to create the spinner.  (*Id.* ¶ 162.)  The course of negotiations, however, are hotly disputed.

Peugeot employed Publicis to negotiate the *BR 2049* deal with Alcon.  (*Id.* ¶ 115; Peugeot Mot. at 3.)  Publicis, in turn, worked with BEN to broker the deal.  (Dkt. 101 [Alcon's Second Supplemental Brief on Jurisdiction Discovery, hereinafter "Sec. Supp."] at 5.)  Both Publicis and Peugeot dispute that BEN had any authority to act on their behalf.  (*See generally* Peugeot Mot.; Publicis Mot.)  Peugeot also claims that Publicis acted fraudulently in its representation and has sued Publicis in Paris Commercial Court in France.  (*See* Dkt. 68-3.)

By May 2016, Alcon had narrowed the field to Peugeot and one other carmaker.  (FAC ¶ 96.)  At this point, Peugeot had already submitted an initial bid for the *BR 2049* deal—either through BEN, Publicis, or on its own behalf—and had engaged Publicis to negotiate the deal.  (*Id.* ¶ 123.)  Later that month, the sole remaining competitor made a higher bid that included several hundred-thousand dollars in product placement fees and

"a guaranteed minimum media spend commitment of about $16 million." (*Id.* ¶ 119.) Peugeot, Publicis, and Mendez allegedly "knew or suspected that Alcon had a competing bid of at least this magnitude." (*Id.* ¶¶ 119–120.) More broadly, Defendants allegedly understood that Alcon would never accept an offer without a media spend, unless the product placement fee was at least several million dollars. (*Id.* ¶ 111.)

On May 19, 2016, BEN communicated to Alcon that Peugeot would pay a product placement fee of $750,000 and would commit to a guaranteed media spend of at least $20 million. (*Id.* ¶ 128.) BEN allegedly made this offer based on a "Media Plan Agreement" that it executed with Publicis, Peugeot's agent. (Sec. Supp. at 7; Dkt. 111-1 [Publicis' Reply in Support of Mot., hereinafter "Publicis Reply"] at 9–10.) Sometime after receiving this offer, Alcon began negotiating with Peugeot and Publicis directly, and BEN was cut out of the deal in June. (FAC ¶¶ 142–144; Publicis Reply at 11.) Publicis and Peugeot both signed confidentiality agreements to receive early access to *BR 2049* materials. (FAC ¶¶ 142, 161.) The agreement allegedly provided that "the parties relationship and communications about it would be governed by the laws of the State of California." (*Id.*)[3]

### D. The Letter of Intent

On July 12, 2016, Publicis allegedly sent Alcon an "Agreement in Principle" providing that the parties would continue to negotiate in good faith for a binding contract (the "Letter of Intent"). (*Id.* ¶ 150.) As alleged, it set out the terms for this future

---

[3] As set out in the Court's concurrently issued order, the parties' pending applications to file under seal are GRANTED IN PART and DENIED IN PART. (Dkts. 109, 117, 119, 124, 128.) The applications are DENIED to the extent that this Order relies on testimony and evidence concerning BEN's internal business practices and BEN's role in *BR 2049*. This information is pivotal to the case at hand, and its disclosure is unlikely to cause annoyance, embarrassment, oppression, or undue burden or expense. *See Phillips v. General Motors Corp.*, 307 F.3d 1206, 1213 (9th Cir. 2002). The Court therefore finds that there is not good cause to shield this information from the public. *See id.*; Fed. R. Civ. P. 26(c).

contract and specified that Peugeot would commit to both a $500,000 placement fee *and* a media spend of at least $30 million outside the United States in exchange for a satisfactory placement.  (*Id.* ¶ 153.)  The letter also attached specifications for the promised co-promotion.  (*Id.* ¶ 154.)

According to Alcon, Publicis and/or Peugeot made this offer in bad faith, and Peugeot never intended to commit to a media spend.  The FAC offers two sets of allegations. Under the first set, Peugeot explained to Publicis that they were *only* willing to commit to a product placement fee and that they *would not* commit to a co-promotional media spend.  (*Id.* ¶ 146.)  Under this set of allegations, Peugeot allegedly instructed Publicis to "walk back" the BEN bid and to an offer a 700,000-euro product placement fee with *no* guaranteed media spend, but Publicis deliberately ignored these instructions.  (*Id.* ¶¶ 146, 152.)  Under the other set of allegations, Peugeot and/or Mendez instructed Publicis to offer the $30 million co-promotional agreement but planned to renege on the promised media spend when they had more leverage.  (*Id.* ¶¶ 136, 151.)  Regardless, the Letter of Intent ended the bidding war, and Alcon moved forward with Peugeot alone.  (*Id.* ¶ 155.)

### E.    Ongoing Negotiations, Performance, and Breach

Between July and December 2016, Peugeot's designers collaborated extensively with Alcon to incorporate Peugeot's trade dress and brand on the spinner.  (*Id.* ¶¶ 160–189.)  Mendez and representatives from Publicis met with Alcon on-location in Hungary to discuss design details and affirmed their commitment to the project.  (*Id.* ¶ 163.)  Alcon allegedly incorporated Peugeot's specifications during Principal Photography and post-production based on the assumption that the parties would make good-faith efforts to finalize and consummate a contract that included a $30 million media spend.  (*Id.* ¶ 180.)  Peugeot also allegedly worked with Alcon to begin planning the co-promotion and told

Alcon that it had engaged a marketing firm, BETC, to execute the plan. (*Id.* ¶ 199.) On January 24, 2017, representatives from Alcon, Publicis, BETC, Publicis, and Peugeot, including Mendez, attended a "kickoff" meeting in Los Angeles. (*Id.* ¶ 200.) During this meeting, Peugeot Defendants allegedly communicated that they were ready and willing to launch a promotional campaign. (*Id.* 208–209.)

Meanwhile, Publicis was allegedly exchanging drafts of a long-form contract with Alcon's lawyers. (*Id.* ¶ 187.) Every one of these drafts included a California choice-of-law provision and listed a California arbitrator as the forum for dispute resolution. (Dkt. 34 [Declaration of Jeannette Hill in support of Alcon's Opposition, hereinafter "Hill Dec."] ¶ 17.) On or about January 18, 2017, Publicis signed a long-form contract as Peugeot's agent. (*Id.* ¶ 201.) Alcon asked Publicis to obtain the signature of a Peugeot executive, but Publicis initially refused. (*Id.* ¶ 202–204.) Instead, Publicis and/or Peugeot provided a "Delegation of Signature Authority" signed by Mendez, authorizing Publicis to sign for Peugeot on its behalf. (*Id.* ¶¶ 212–215.) As alleged, either Defendants were deceiving Alcon to gain leverage or Publicis was successfully hiding the agreed-upon terms from Peugeot. (*Id.*) Under the second theory, Peugeot continued to believe it had sole discretion to dictate the terms of the media spend. (*Id.*)

In April 2017, five months before the release date, the deal began to unravel. First, Publicis and Peugeot's relationship deteriorated because of an alleged fraud related to Publicis's portion of the fees. (*Id.* ¶ 220.) Then Peugeot began attempting to renegotiate the contract that Publicis had executed. It proposed various revisions to the long-form contract and tried to create "moving targets" for its promised performance. (*Id.* ¶¶ 220–233.) After allegedly making various good-faith attempts to satisfy these requests, Alcon directly confronted Peugeot about its contractual obligations. (*Id.* ¶¶ 234–246.) On May 4, 2017, Mendez allegedly denied the existence of the Letter of Intent, denied that Publicis had authority to execute a contract on Peugeot's behalf, and, most importantly,

denied that Peugeot had committed to a pre-release media spend.  (*Id.* ¶ 247.)  She proposed a new agreement that gave Peugeot full discretion to dictate the terms of any media spend.  (*Id.* ¶ 248.)  After these last-minute negotiations broke down, Alcon allegedly made a good-faith attempt to satisfy its obligations and released the film.  (*Id.* ¶¶ 249–297.)  The released film depicts the spinner with Peugeot's branding and trade dress.  (*Id.* ¶ 297.)  Peugeot never promoted the film and allegedly refuses to pay Alcon anything for the placement.  (*Id.* ¶¶ 303, 315.)  *BR 2049* won two academy awards and grossed $260 million.  (*Id.* ¶¶ 304–307.)  A real-life version of the spinner, with Peugeot's branding, was displayed at Comic-Con in San Diego, California.  (*Id.* ¶ 294.)

Based on these allegations, Alcon brought suit against Peugeot and Mendez and later amended to add Publicis.  (*Id.*)  The Court allowed Alcon to subpoena BEN to gather evidence about jurisdictional facts.  (Dkt. 73.)  Before the Court are Peugeot Defendants' and Publicis's separate motions to dismiss, several declarations from the parties' employees, and supplemental briefing and exhibits based on discovery.

## III.  PERSONAL JURISDICTION

### A.    Legal Standard

Both the Peugeot Defendants and Publicis argue the Court must dismiss this action because it lacks personal jurisdiction over them.  A party may move to dismiss an action for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2).  Federal courts may only decide cases over which they have statutory jurisdiction and where the exercise of jurisdiction comports with due process.  *Glencore Grain Rotterdam B.V. v. Shivnath Rai Harnarain Co.*, 284 F.3d 1114, 1123 (9th Cir. 2002).  When subject matter jurisdiction is based on diversity, the district court applies the law of the state in which the court sits.  *See* Fed. R. Civ. P. 4(k)(1)(A); *Yahoo! Inc. v. La Ligue Contre Le*

*Racisme Et L'Antisemitisme*, 433 F.3d 1199, 1205 (9th Cir. 2006).  Because California's long-arm statute, California Civil Procedure Code § 410.10, extends jurisdiction to the limit of federal due process, the Court need only consider due process.  *Glencore*, 284 F.3d at 1123.  Constitutional due process is satisfied when a nonresident defendant has "certain minimum contacts" with the forum state "such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice."  *Williams v. Yamaha Motor Co.*, 851 F.3d 1015, 1022 (9th Cir. 2017) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).

There are two recognized bases for exercising jurisdiction over a nonresident defendant: (1) "general jurisdiction," which arises when a defendant's activities in the forum are sufficiently "substantial" or "continuous and systematic" to justify the exercise of jurisdiction over it in all matters; and (2) "specific jurisdiction," which arises when a defendant's specific contacts with the forum give rise to the claim in question. *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414–16 (1984); *Doe v. Am. Nat'l Red Cross*, 112 F.3d 1048, 1050–51 (9th Cir. 1997).[4]

The Ninth Circuit employs a three-part test for assessing whether a defendant has sufficient contacts with the forum state to be subject to specific personal jurisdiction: (1) the nonresident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; (2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and (3) the exercise of jurisdiction must comport with fair play and substantial justice, *i.e.*, it must be reasonable. *Picot v. Weston*, 780 F.3d 1206, 1211 (9th Cir. 2015).  "The plaintiff bears the burden of satisfying the first two prongs of the test.  If the plaintiff fails to satisfy either of these prongs, personal jurisdiction is not established in the forum state."  *Schwarzenegger v.*

---

[4] Alcon concedes that the Court does not have general jurisdiction over Defendants.  (See Dkt. 74 at 13.)

*Fred Martin Motor Co.*, 374 F.3d 797, 802 (9th Cir. 2004).  If the plaintiff satisfies both of the first two prongs, "the burden shifts to the defendant to set forth a compelling case that the exercise of jurisdiction would not be reasonable."  *Picot*, 780 F.3d at 1212.

Plaintiff's burden to show personal jurisdiction "varies according to the nature of the pre-trial proceedings in which the jurisdictional question is decided."  *Forsythe v. Overmyer*, 576 F.2d 779, 781 (9th Cir. 1978).  "Where, as here, a motion to dismiss is based on written materials rather than an evidentiary hearing, the plaintiff need only make a *prima facie* showing of jurisdictional facts."  *Love v. Associated Newspapers, Ltd.*, 611 F.3d 601, 608–09 (9th Cir. 2010).  "Uncontroverted allegations in the complaint must be taken as true, and conflicts over statements contained in affidavits must be resolved in [the plaintiff's] favor."  *Id.*; *see also Pebble Beach Co. v. Caddy*, 453 F.3d 1151, 1154 (9th Cir. 2006).  "[M]ere 'bare bones' assertions of minimum contacts with the forum or legal conclusions unsupported by specific factual allegations will not satisfy a plaintiff's pleading burden."  *Swartz v. KPMG LLP*, 476 F.3d 756, 766 (9th Cir. 2007) (per curiam).[5]  The Court addresses its personal jurisdiction over Peugeot Defendants and Publicis in turn.

## B.   Personal Jurisdiction Over Peugeot Defendants

### 1.   Purposeful Availment and Purposeful Direction

Under the first prong of the Ninth Circuit's specific jurisdiction test, a plaintiff must establish that the defendant either purposefully availed itself of the privilege of

---

[5] When jurisdictional facts are in dispute, the Court has the authority, but no obligation, to conduct a preliminary hearing during which the plaintiff must prove jurisdictional facts by a preponderance of the evidence.  *Data Disc, Inc. v. Sys. Tech. Assocs., Inc.*, 557 F.2d 1280, 1284–85 (9th Cir. 1977). The Court declines to order one here.  Plaintiff will still carry the burden of proving jurisdictional facts by a preponderance of the evidence at trial.  *Id.* at 1285 n.2.

conducting activities in California, or purposefully directed its activities toward the forum state. *Schwarzenegger*, 374 F.3d at 802.  While the phrase "purposeful availment" is often used to describe both purposeful availment and purposeful direction, they are two distinct concepts.  *Id.*  "A purposeful availment analysis is most often used in suits sounding in contract," while "[a] purposeful direction analysis . . . is most often used in suits sounding in tort."  *Id.*

### i.    Purposeful Availment

The Court applies a purposeful availment analysis to all of Alcon's claims against Peugeot.  Because the alleged fraud is intertwined with the parties' duties under the contract, these claims sound in contract.  *See Sher v. Johnson*, 911 F.2d 1357, 1362 (9th Cir. 1990) (applying a purposeful availment analysis where a plaintiff's fraud claims are intertwined with contract claims).  To have purposefully availed itself of the privilege of doing business in the forum, a defendant must have "performed some type of affirmative conduct which allows or promotes the transaction of business within the forum state." *Boschetto v. Hansing*, 539 F.3d 1011, 1016 (9th Cir. 2008)

"Our evaluation of the jurisdictional significance of a defendant's contract or other business in the forum is not rigid and formalistic, but rather practical and pragmatic."  *Id.* In a contract-related dispute between a resident plaintiff and non-resident defendant, "the mere existence of a contract with a party in the forum state does not constitute sufficient minimum contacts for jurisdiction."  *Sher*, 911 F.2d at 1362.  Instead, the Court must consider "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing" to assess whether a defendant's contacts are "substantial" and not merely "random, fortuitous, or attenuated."  *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 479, (1985) (internal quotations omitted).

Alcon has made a prima facie showing that Peugeot purposefully availed itself of the privilege of doing business in California.  Peugeot's contacts go well beyond the "mere existence" of a contract with a California company.  *See Sher*, 911 F.2d at 1362.  First, it specifically sought out a contract that would promote business in California.  Although BEN initially pitched this opportunity to Publicis, Peugeot ultimately hired Publicis and gave it instructions to bid on the deal and negotiate with Alcon.  (FAC ¶ 115; Peugeot Mot. at 3.)  As alleged, Peugeot sought out the agreement to gain exposure to American consumers in anticipation of reentering American automotive markets in fifteen states, including California.  (FAC ¶¶ 42–44.)  During the January meeting in Los Angeles, Mendez specifically discussed opportunities to display a real-life, Peugeot-branded spinner in California.  (Kosove Dec. at ¶ 63.)  Taken together, Alcon has made a prima facie showing that Peugeot targeted California filmgoers.  This undercuts Peugeot's argument that it did not "promote[ ] the transaction of business" within California.  (Peugeot Mot. at 8 (quoting *Sher*, 911 F.2d at 1362).)

While the design of the spinner and Principal Photography occurred in Europe, the negotiations, course of dealing, and actual contracts revolved around California.  *See Burger King*, 471 U.S. at 479.  Publicis, Peugeot's agent, spent more than a year engaged in ongoing negotiations with Alcon producers in California.  While many of these negotiations took place over phone or email, that does not make them irrelevant to a minimum contacts analysis.  *See Northrup King Co. v. Compania Productora Semillas Algodoneras Selectas, SA*, 51 F.3d 1383, 1388 (8th Cir. 1995) (explaining that although "letters and faxes alone do not establish personal jurisdiction . . . in conjunction with other contacts they may support the exercise of personal jurisdiction").  Peugeot signed a non-disclosure agreement with a California choice-of-law provision to gain access to *BR 2049*'s story, script, and images.  (Kosove Dec. at ¶ 31.)  Access to these materials was closely guarded, and the choice-of-law provision was not "incidental," but crucial to Peugeot's ability to negotiate a deal in California.  (*See id.*)  Peugeot, through Publicis,

also executed a long-form contract providing that disputes about the agreement would be governed by California law.  (Hill Dec. ¶ 17.)  While choice-of-law provisions are not sufficient to establish personal jurisdiction on their own, they offer obvious and relevant evidence of purposeful availment.  *See Burger King*, 471 U.S. at 481–82.

Although the promised media spend would have occurred outside the United States, the *BR 2049* agreement contemplated an ongoing relationship between the parties that would have required Peugeot to work closely with Alcon's California employees. *See id.* at 473; *Sustainable Ranching Partners, Inc. v. Bering Pac. Ranches Ltd.*, 2017 WL 4805576, at *5 (N.D. Cal. Oct. 24, 2017).  Before the film's release, Peugeot would have coordinated with Alcon to plan and execute the media spend, and, after the release, the parties would have jointly marketed the spinner through toy sales and car shows. (Kosove Dec. at ¶ 73–74.)  Moreover, the contemplated and actual consequences of the agreement were felt in California.  *See Burger King*, 471 U.S. at 479.  As Peugeot allegedly hoped, *BR 2049* was screened at 368 California theaters—more than any other state—and a real-life spinner has been displayed at museums, car shows, and conventions in California.  (Kosove Dec. at ¶ 57.)

Finally, Peugeot representatives travelled to California to negotiate and/or plan the co-promotional agreement.  Peugeot Defendants argues that the meeting was insignificant and an "incidental outgrowth of the alleged agreement."  (Peugeot Mot. at 11 (quoting *Picot v. Weston*, 780 F.3d 1206 (9th Cir. 2015)).)  The Court disagrees.  The meeting included at least fifteen people from five different companies, including the CEOs of Alcon, senior executives from Sony, two Peugeot executives, two Publicis executives, and a representative from BETC.  (Kosove Dec. at ¶ 72.)  According to Alcon's CEO, "it was supposed to be the beginning of several months of intensive, cooperative work" amongst these entities.  (*Id.*)  Peugeot highlights that this was a "kickoff" meeting, but, as events unfolded, the terms of the deal were very much unsettled in January 2017—

Peugeot allegedly denied that the parties had formed a binding agreement three months

after the meeting.  (FAC ¶ 247.)  If no agreement existed, the trip to California was an

attempt to solicit a mutually beneficial partnership.  *See JGSM Entm't Corp. v. TWG*

*Mgmt., LLC,* 2018 WL 4008983, at \*4 (D. Nev. Aug. 22, 2018).  If an agreement did

exist, the trip was crucial to the alleged fraud.  Alcon ignored red flags from Publicis

because Peugeot had repeatedly expressed its commitment to the agreement, including

during this meeting.  Taken together, Peugeot's contacts with California were

"substantial" and not "random, fortuitous, or attenuated."  *Burger King*, 471 U.S. at 479.

Based on the written materials provided, Alcon has made a prima facie showing of

purposeful availment.[6]

## ii.      Purposeful Direction

Because Alcon's only claim against Mendez is for fraud, the Court applies a

purposeful direction analysis.  *See Schwarzenegger*, 374 F.3d at 802.  The Ninth Circuit

evaluates purposeful direction under the three-part "effects" test, derived from *Calder v.*

*Jones*, 465 U.S. 783 (1984).  *Id.* at 803.  The "effects" test requires that the defendant

have allegedly "(1) committed an intentional act; (2) expressly aimed at the forum state;

(3) causing harm that the defendant knows is likely to be suffered in the forum state."

*Axiom Foods, Inc. v. Acerchem Int'l, Inc.*, 874 F.3d 1064, 1069 (9th Cir. 2017).  Specific

personal jurisdiction must stem from "the defendant's 'own contacts' with the forum, not

[from] the defendant's knowledge of a plaintiff's connection to a forum."  *Id.* at 1070.

"[T]he plaintiff cannot be the only link between the defendant and the forum."  *Walden v.*

*Fiore*, 571 U.S. 277, 285 (2014).

---

[6] The Court could determine that, because the co-promotional agreement is central to this claim, the
Court's purposeful availment analysis also applies to the fraud claim against Mendez.  *See Boschetto v.*
*Hansing*, 539 F.3d 1011, 1016 (9th Cir. 2008).  Instead, the Court applies a purposeful direction analysis
to avoid any doubt about the propriety of its jurisdiction.

In its fraud claim, Alcon alleges that Mendez committed intentional acts and that this led to predictable harm in California. (*Id.* ¶¶ 148–151, 208, 303–304; *see* Kosove Dec. at ¶ 61.) Alcon has also shown that Mendez's alleged misconduct was "aimed at the forum state." *See Axiom Foods*, 874 F.3d at 1069. As alleged, Mendez repeatedly misrepresented Peugeot's commitment to its obligations under a contract that created an ongoing relationship with a California company. (FAC ¶¶ 148–151, 208.) She allegedly made these misrepresentations by phone, email, and in-person in California. (*Id.*) Mendez argues that, to satisfy its burden, Alcon must allege that she sought "to exploit the California market." (Peugot Mot. at 12 (citing *Axiom Foods*, 874 F.3d at 1070–71).) Regardless of whether the relevant test is so narrow, Alcon makes a prima facie showing of exactly that. The goal of the agreement was to place Peugeot's brand in a film that was produced in and distributed from California. Because most American film producers, like Alcon, are based in California, there is a California market for product placements. (*See* Kosove Dec. at ¶¶ 51–54.) The alleged fraud sought to exploit that market by obtaining a valuable placement without the agreed-upon payment. Moreover, Mendez allegedly committed this fraud in order to promote Peugeot cars to California consumers. (FAC ¶¶ 42–44.) The Court concludes that Alcon has established a prima facie case in support of its fraud claim that Mendez and Peugeot, "(1) committed an intentional act; (2) expressly aimed at the forum state; (3) causing harm that [she knew was] likely to be suffered in the forum state." *See Axiom Foods*, 874 F.3d at 1069.

## 2. Arising Out of Defendant's Forum Conduct

Under the second prong of the Ninth Circuit's specific jurisdiction test, a lawsuit arises out of a defendant's contacts with the forum state if there is a direct nexus between the cause of action being asserted and the defendant's activities in the forum. *See Fireman's Fund Ins. Co. v. Nat'l Bank of Coops.*, 103 F.3d 888, 894 (9th Cir. 1996). The Ninth Circuit has adopted a "but for" test when assessing whether an action arises out of

a defendant's contacts with the forum state. *See, e.g.*, *Panavision Int'l L.P. v. Toeppen*, 141 F.3d 1316, 1322 (9th Cir. 1998) ("We must determine if the plaintiff . . . would not have been injured 'but for' the defendant['s] . . . conduct directed toward [plaintiff] in California.").

This requirement is met here. Peugeot Defendants allegedly solicited and executed a contract to place its product in a film produced in Californian and shown to Californian audiences. Mendez travelled to California and, as alleged here, made false or misleading representations about her company's willingness to perform its contractual obligations. The FAC generally alleges that Peugeot Defendants engaged in a scheme to defraud and unlawfully leverage Alcon and violated the terms of a binding agreement. These claims would not exist but for Peugeot and Mendez's contacts with the forum state. *See Dole Food Co. v. Watts*, 303 F.3d 1104, 1114 (9th Cir. 2002) (claims arise out of contacts with forum that were "integral and essential parts of the alleged fraudulent scheme"). Peugeot Defendants argue that the Court may only consider statements made by Mendez while physically present in California in applying the "but for" test. The Court disagrees. As discussed above, Peugeot and Mendez "purposefully directed" conduct at California from outside of the state. *See Calder v. Jones*, 465 U.S 783 (1984). Defendants that "'reach out beyond one state and create continuing relationships and obligations with citizens of another state' are subject to regulation and sanctions in the other state for the consequences of their activities." *Burger King*, 471 U.S. at 473 (quoting *Travelers Health Ass'n v. Virginia*, 339 U.S. 643, 647 (1950)).

### 3.      Fair Play, Substantial Justice, and Reasonableness

Since Alcon has met its burden on the first two prongs, the burden shifts to the Peugeot Defendants to demonstrate that the exercise of jurisdiction would not be reasonable. *Picot*, 780 F.3d at 1212. In evaluating reasonableness, the Ninth Circuit

considers: "(1) the extent of the defendant's purposeful injection into the forum; (2) the defendant's burdens from litigating in the forum; (3) the extent of conflict with the sovereignty of the defendant's state; (4) the forum state's interest in adjudicating the dispute; (5) the most efficient judicial resolution of the controversy; (6) the importance of the forum to the plaintiff's interest in convenient and effective relief; and (7) the existence of an alternative forum." *Ziegler v. Indian River Cty.*, 64 F.3d 470, 475 (9th Cir. 1995).  Where, as here, "a defendant who purposefully has directed his activities at forum residents seeks to defeat jurisdiction, he must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Burger King*, 471 U.S. at 477.

The Peugeot Defendants have not made such a compelling case.  Peugeot allegedly entered into a co-promotional agreement to reach a California audience and, eventually, to sell its vehicles in California.  Although France may provide an alternative forum, Peugeot has not explained why its burden defending itself in California would be any greater than Alcon's burden litigating in France.  The Court recognizes the weight of national sovereignty, but because the relevant injury occurred in California, France's interest in this dispute is diminished.  *See Johnston v. Multidata Sys. Int'l Corp.*, 523 F.3d 602, 617 (5th Cir. 2008).  By contrast, California has a manifest interest in protecting its resident businesses from fraud and providing a forum for injuries by out-of-state actors. *See Burger King*, 471 U.S. at 473.  Moreover, Peugeot's agent executed a contract providing that this dispute would be governed by California law.  (*See* Hill Dec.)  This obviously heightens California's interest and suggests that California will provide a more efficient venue and more effective relief.  *See Ziegler*, 64 F.3d at 475 (factors four, five, and six).  Peugeot unpersuasively claims that there are "minimal tie[s] between California and the case's core facts."  (Peugeot Mot. at 15.)  But it does not explain what ties exist with France other than Defendants' citizenship and residence.  The possible efficiency of Alcon joining Peugeot's action against Publicis in France does not make this suit

"unreasonable." *See Burger King*, 471 U.S. at 477.  Peugeot Defendants' motion to dismiss for lack of personal jurisdiction is **DENIED.**

## C.     Personal Jurisdiction Over Publicis

Alcon asserts various contract-related claims against Publicis, as well as claims for fraud and negligent misrepresentation.  Publicis, like Peugeot Defendants, moves to dismiss these claims for lack of personal jurisdiction.  The Court applies the three-part test set out above to determine whether Alcon has made a prima facie showing of personal jurisdiction over Publicis.  *See Schwarzenegger*, 374 F.3d at 802.

### 1.     Purposeful Availment

Because Publicis's alleged fraud and misrepresentations are intertwined with the parties' duties under the contract, the Court applies a purposeful availment analysis to all of Alcon's claims against Publicis.  *See Sher*, 911 F.2d at 1362 (9th Cir. 1990).  The relevant inquiry is whether Publicis "performed some type of affirmative conduct which allows or promotes the transaction of business within the forum state."  *Boschetto v. Hansing*, 539 F.3d 1011, 1016 (9th Cir. 2008).

Under one set of alleged facts, Publicis knowingly executed a contract that Peugeot had not authorized.  (*Id.* ¶ 147.)  As alleged, Publicis carried out a two-sided fraud that lasted nearly a year: it misled Alcon about Peugeot's commitment to a $30-million media spend and misled Peugeot about Alcon's expectations.  (*Id.*)  Under California law, Publicis may be individually liable as Peugeot's agent if it executed a contract without a good-faith belief that it had authority to do so.  Cal. Civ. Code § 2343.  Because this is

the sole basis for Alcon's contract claims against Publicis, the Court focuses its
purposeful availment analysis on this set of allegations.[7]

Alcon has made a prima facie showing that Publicis purposefully availed itself of
the privilege of doing business in California.  First, Publicis worked extensively with
BEN's Los-Angeles based staff to secure the co-promotional agreement.  Although a
Paris-based BEN employee initially approached Publicis about this opportunity, their
relationship moved forward in California.  (Dkt. 101-2, Ex. 95 at 102.)  In May 2016,
BEN and Publicis executed a "Media Plan Agreement" that purported to give BEN
authority to negotiate on behalf of Publicis.  (Dkt. 101-2, Ex. 132.)  Pursuant to this
agreement, Erin Schmidt, a Los Angeles-based BEN employee, acted as a liaison
between Alcon and Publicis.  (*See* Dkt. 101-2, Exs. 130–133, 145–150.)  Schmidt
exchanged numerous emails and phone calls with Publicis discussing the substantive
terms of a possible agreement.  (*Id.*)  Schmidt also provided Publicis with early copies of
the script and early images of Alcon's spinner design.  (*Id.*, Exs. 145–146, 150, 166.)
Publicis, in turn, sent Schmidt questions and design input from Peugeot.  (*Id.*, Ex. 169.)
During this correspondence, Publicis executives offered to travel to the US to finalize
negotiations and requested "an appointment in LA [Los Angeles] between Peugeot's
artistic department and the movie's graphic designers."  (*Id.*, Exs. 147, 150.)  Because
Alcon has not alleged that Publicis exercised sufficient control over BEN's actions, the
Court cannot assume that BEN acted as Publicis's agent.  *See Michelson v. Hamada*, 29
Cal. App. 4th 1566, 1579 (1994) (explaining that control is crucial to a principal-agent
relationship).  Nevertheless, Publicis's working relationship with BEN reveals relevant
contacts with California.  *Burger King*, 471 U.S. at 479.

---

[7] Under Federal Rule of Civil Procedure 8(d)(2), Alcon may set out alternative or hypothetical
statements of its claims.  Because Alcon will eventually have the burden of proving jurisdictional facts
by a preponderance of the evidence, the court need not analyze personal jurisdiction under each set of
factual allegations.  *See Data Disc*, 557 F.2d at 1285 n.2.

Publicis also had relevant contacts with California when it dealt with Alcon
directly.  Publicis signed a non-disclosure agreement, provided by Alcon, with a
California choice-of-law provision.  (Kosove Dec. at ¶ 31.)  It also allegedly exchanged
drafts of a long-form contract with a similar provision, and ultimately signed this contract
on Peugeot's behalf.  (Hill Dec. ¶ 17.)  According to Alcon, Publicis fraudulently
withheld these long-form contracts from Peugeot to secure its own fees.  (FAC ¶¶ 212–
215.)  Finally, in January 2017, Publicis executives traveled to California during the final
stages of the negotiation, and allegedly made misstatements and omissions in support of
its fraud.  (FAC ¶¶ 200–209.)  Publicis argues that because negotiations concluded before
this "kickoff" meeting, it was not a significant contact with California.  As explained
above, this argument is undercut by the instability of the agreement after the meeting.
Publicis promoted business in California by acting as a conduit between Peugeot and
Alcon and successfully executing a contract that put Peugeot's brand in a movie
produced in and distributed from California.

Finally, as discussed above, the co-promotional agreement had a substantial impact
in California and should have created an ongoing business relationship between Alcon
and Peugeot.  Publicis argues that, because it acted as Peugeot's agent, the purpose and
consequences of the contract are not relevant here.  The Court disagrees.  Because
Publicis allegedly violated the terms of its principal-agent relationship, it may be
individually liable for breach of the *BR 2049* agreement.  According to one set of
allegations, Publicis, and not Peugeot, "reach[ed] out beyond one state and create[ed]
continuing relationships and obligations with citizens of another state."  *See Burger King*,
471 U.S. at 473 (quotations omitted).  If Publicis acted without authority, it would be
unjust to allow the company to hide behind the shield of agency law.  *See Int'l Shoe*, 326
U.S. at 316 (explaining that the fundamental principle of personal jurisdiction is "fair
play and substantial justice").  The Court finds that Publicis's contacts with California

were "substantial" and not "random, fortuitous, or attenuated." *Burger King*, 471 U.S. at 479. Alcon has made a prima facie showing of purposeful availment.

### 2. Arising Out of Defendant's Forum Conduct

Alcon has also alleged facts showing a direct nexus between its claims against Publicis and Publicis's activities in California. *See Fireman's Fund*, 103 F.3d at 894. As alleged, Alcon would not have been injured but for the relationship Publicis facilitated between Alcon and Peugeot and Publicis's fraudulent statements and omissions. *See Panavision Int'l*, 141 F.3d at 1322. Publicis created this relationship by communicating with producers and executives in California, and its representatives allegedly made fraudulent misrepresentations while physically present in California.

### 3. Fair Play, Substantial Justice, and Reasonableness

Because Alcon has satisfied the first two prongs, the burden shifts to Publicis to show that the exercise of jurisdiction would be unreasonable. *Picot*, 780 F.3d at 1212. Publicis fails to carry that burden. It argues that it would be unjust to hale an agent to California to resolve a dispute between its principal and its counterparty. This argument has already been addressed. Publicis allegedly extended its authority when it bound Peugeot to an ongoing contractual relationship with a California business. In this context, it would be unjust to adjudicate Alcon's claims against Peugeot, but not against Publicis. Similarly, Alcon's allegation of fraud suggest that Publicis purposefully injected itself into California by fraudulently misrepresenting its principal and executing a deal that it knew would collapse. *See Burger King*, 471 U.S. at 477. Accordingly, Publicis's motion to dismiss for lack of personal jurisdiction is **DENIED.**

//

1

## IV.  *FORUM NON CONVIENS*

2

3          The Peugeot Defendants also ask the Court to dismiss Alcon's claims under the

4    doctrine of *forum non conveniens*.  "The principle of *forum non conveniens* is simply that

5    a court may resist imposition upon its jurisdiction even when jurisdiction is authorized by

6    the letter of a general venue statute." *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 507 (1947).

7    This "drastic exercise of the court's inherent power" should be used sparingly and does

8    not require a plaintiff to choose the optimal forum for its adversary.  *Carijano v.*

9    *Occidental Petroleum Corp.*, 643 F.3d 1216, 1224 (9th Cir. 2011); *see Dole Food Co.,*

10   *Inc. v. Watts*, 303 F.3d 1104, 1118 (9th Cir. 2002).  "A party moving to dismiss based on

11   forum non conveniens bears the burden of showing (1) that there is an adequate

12   alternative forum, and (2) that the balance of private and public interest factors favors

13   dismissal." *Dole*, 303 F.3d at 1118.[8]

14

15          Peugeot Defendants have not shown that private interests favor dismissal.  Private

16   interests include "ease of access to sources of proof; availability of compulsory process

17   for attendance of unwilling witnesses, and cost of obtaining attendance of willing

18   witnesses; and likelihood of a fair trial." *Id.* at 1119.  The witnesses and evidence here

19   are split between France and California.  While defendants reside in France, all of

20   Alcon's employees and most of BEN's employees are in California.  (Kosove Dec. ¶ 76.)

21   Similarly, Alcon's vehicle design notes and records from negotiating and drafting the

22   long-form contract are stored in Los Angeles.  (*Id.* ¶ 77; Hill Dec. ¶ 21.)  Although

23   Peugeot Defendants may face difficulties based on the "inherent difficulty of bringing

24   hostile witnesses before the U.S. courts," *Contact Lumber Co. v. P.T. Moges Shipping*

25   *Co.*, 918 F.2d 1446, 1452 (9th Cir. 1990), they have not shown that this burden

26   outweighs the obstacles Alcon would face suing in France.  Moreover, the Court's

27

28   [8] Because Alcon concedes that France offers an adequate alternative forum, the Court only considers the
     second part of this test.

exercise of personal jurisdiction over Publicis should mitigate their concerns about hostile witnesses.

Defendants have also failed to show that public interests favor dismissal.  Public interests include "court congestion, local interest in resolving the controversy, and preference for having a forum apply a law with which it is familiar."  *Dole*, 303 F.3d at 1119.  Peugeot Defendants argue that the Central District of California is burdened with "crowded dockets," but they offer no information about the efficiency of the Paris Commercial Court.  (Peugeot Mot. at 17 (quoting *Carijano*, 643 F.3d at 1233).)  More importantly, Defendants have not addressed how a French court would effectively resolve a contract dispute allegedly bound by a California choice-of-law provision.  *Dole*, 303 F.3d at 1119.  Finally, because the primary injuries occurred in California, the Court finds that France does not have a superseding interest in resolving this dispute. Peugeot Defendants' motion to dismiss for *forum non conveniens* is **DENIED**.

## VI.  Conclusion

For the foregoing reasons, Peugeot Defendants' motion to dismiss for lack of personal jurisdiction and for *forum non conveniens* is **DENIED**, and Publicis motion to dismiss for lack of personal jurisdiction is **DENIED**.

DATED:      October 30, 2019

_____

CORMAC J. CARNEY

UNITED STATES DISTRICT JUDGE