**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

|  |  |
|---|---|
| ALCON ENTERTAINMENT, LLC, | Case No.: CV 19-00245-CJC(AFMx) |
| Plaintiff, | **ORDER DENYING DEFENDANT PUBLICIS MEDIA FRANCE SA'S MOTION TO DISMISS THE THIRD AMENDED COMPLAINT [Dkt. 173]** |
| v. | |
| AUTOMOBILES PEUGEOT SA, *et al.*, | |
| Defendants. | |

## I. INTRODUCTION

Plaintiff Alcon Entertainment, LLC ("Alcon") brings this diversity action against Defendants Automobiles Peugeot SA ("Peugeot"), Peugeot executive Isabel Salas Mendez ("Mendez"), and Publicis Media France SA ("Publicis"). (Dkt. 170 [Third

Amended Complaint, hereinafter "TAC"].)[1]  This dispute arises out of an alleged breach of a product placement and co-promotional agreement for Alcon's film *Blade Runner 2049* ("*BR 2049*").  (*Id.*)  The operative Third Amended Complaint ("TAC") asserts nine causes of action for (1) breach of contract, (2) breach of implied covenant of good faith and fair dealing, (3) promissory estoppel, (4) breach of duty to negotiate in good faith, (5) fraud, (6) reasonable value of services, (7) quantum meruit, (8) fraud, and (9) negligent misrepresentation.  (*Id.*)[2]  Before the Court is Publicis's motion to dismiss for failure to state a claim.  (Dkt. 173 [Motion]; Dkt. 173-1 [Memorandum in Support, hereinafter "Mot."].)  For the following reasons, that motion is **DENIED**.[3]

## II. BACKGROUND

The TAC alleges the following facts, which the Court accepts as true for the purposes of this motion.  Peugeot is a carmaker incorporated in France as a "société anonyme."  (TAC ¶¶ 3, 31.)  Mendez is a senior marketing executive for Peugeot responsible for sponsorships, co-promotional partnerships, and product placements.  (*Id.* ¶¶ 4, 32.)  Publicis is a French advertising and public relations firm that works with American film and television companies.  (*Id.* ¶¶ 5, 33.)  Publicis is also the successor-in-interest to The Casablanca Agency ("Casablanca"), a French media agency that no longer exists.  (*Id.* ¶ 6.)  For the purposes of this motion, the Court refers to "Publicis" and "Casablanca" interchangeably.  Alcon is an American motion picture studio, and the assignee of Columbia TriStar Marketing Group, Inc. ("Columbia") and Sony Pictures Entertainment, Inc. ("Sony") for all claims related to *BR 2049*.  (*Id.* ¶¶ 2, 30).  Former

---

[1] Alcon has voluntarily dismissed the other Defendants originally named in this action—Publicis Groupe, S.A., Herve Montron, and Mamou Sissoko.  (Dkt. 53.)

[2] Alcon's claims for reasonable value of services and quantum meruit are asserted against Peugeot only and are therefore not relevant to the instant motion.  (*See* TAC ¶¶ 275–285.)

[3] Having read and considered the papers presented by the parties, the Court finds this matter appropriate for disposition without a hearing.  *See* Fed. R. Civ. P. 78; Local Rule 7-15.  Accordingly, the hearing set for July 13, 2020 at 1:30 p.m. is hereby vacated and off calendar.

Defendants Herve Montron and Mamou Sissoko are the principals and/or managing agents of Publicis.  (*Id.* ¶¶ 34–35.)  Finally, non-party Branded Entertainment Network, Inc. ("BEN") is a Los Angeles-based marketing agency that acts an independent broker for co-promotional agreements.  (*Id.* ¶ 36.)  Alcon, Peugeot, Publicis, and BEN were the four key players in a botched product placement deal for *BR 2049*.

### A.   *Blade Runner 2049* and Product Placement Opportunities (2010 – 2016)

In 2010, Alcon acquired the rights to produce a sequel to the seminal 1982 science fiction film, *Blade Runner* and, several years later, executed a co-production agreement for *BR 2049* with Sony and Columbia.  (*Id.* ¶¶ 37–39, 70.)  Pre-production for *BR 2049* started in 2015 with the following timeline: (1) principal photography from July through November 2016, (2) picture lock (finalizing the timing and sequence of the film) by June 8, 2017, (3) picture delivery (distribution of the film to theaters) in late September 2017, and (4) a global theatrical release on October 6, 2017.  (*Id.* ¶ 56.)

*BR 2049*, like the original *Blade Runner*, prominently features a flying car or "spinner."  (*Id.* ¶¶ 43, 52.)  The spinner is central to the film's aesthetic and a steadfast companion of the protagonist, K, played by Ryan Gosling.  (*Id.*)  Starting in January 2016, Alcon solicited bids from carmakers for a product placement and co-promotional agreement that would allow them to put their branding on the spinner.  (*See id.* ¶¶ 52, 58–59.)  A "co-promotional agreement," or "co-promotional media spend," is a more sophisticated form of product placement.  In addition to paying the producers to display a product in their film, the partner commits to spending a certain amount on advertising that promotes both its product and the film.  (*See id.* ¶¶ 53–54.)  These agreements typically include a media spend that is "magnitudes larger" than the placement fee, and movie producers rely on them to develop global marketing plans.  (*Id.*)  The *BR 2049* opportunity was uniquely valuable to Peugeot because it was planning to reintroduce its

cars in the U.S. market for the first time since the 1990s.  (*Id.* ¶ 44.)  By July 2016, Peugeot emerged as the winning bidder, and its designers started collaborating with Alcon to create the spinner.  (*Id.* ¶ 115.)  The course of negotiations, however, are disputed and—one way or another—went seriously wrong.

### B.    Alternative Theories of Liability

Peugeot employed Publicis to act as its agent for the *BR 2049* deal.  (*Id.* ¶¶ 13, 33, 149.)  Publicis, in turn, initially worked with BEN to broker the deal.  (*Id.* ¶ 58.)[4]  In general, the TAC alleges that Peugeot—through Publicis—committed to a $30-million co-promotional media spend, then repudiated its commitment a few months before the film's release.  (*See id.* ¶ 13 [summary of facts and claims].)  For its part, Peugeot claims that it was defrauded by Publicis and that Publicis ignored clear instructions *not* to commit to a media spend.  (*See id.*)  Peugeot has filed suit against Publicis under this theory in Paris Commercial Court in France ("the French action").  (*See* Dkt. 68 [Paris Commercial Court Complaint, original and translation, hereinafter "Peugeot Compl."].)[5]

At this stage, Alcon does not know whether Peugeot's allegations against Publicis are well-founded.  Accordingly, the TAC offers four alternative theories of liability.

- <u>Theory 1 – Tortious Conduct by Publicis Alone</u>: As alleged in the French action, Publicis contradicted Peugeot's instructions not to commit to a media spend and misled both sides about the details of the nascent agreement.  (TAC ¶¶ 16–18.)

---

[4] According to Alcon, Publicis and Peugeot had worked with BEN on several other placements for Peugeot in American films and television shows in 2015, and Publicis had a standing assignment to identify valuable opportunities for Peugeot.  (*See* TAC ¶¶ 48–49.)

[5] The Court takes judicial notice of these public records pursuant to Federal Rule of Evidence 201.  *See Coinstar, Inc. v. Coinbank Automated Sys., Inc.*, 998 Fed. Supp. 1109, 1114 (N.D. Cal. 1998); *Eakin Ents., Inc. v. Specialty Sales LLC*, 2012 WL 2445154, at *4 (E.D. Cal. June 26, 2012).

- <u>Theory 2 –Tortious Conduct by All Defendants</u>: The Peugeot Defendants and Publicis conspired and carried out a coordinated scheme to manipulate Alcon.  (*Id.* ¶¶ 19–22.)

- <u>Theory 3 – Tortious Conduct by Peugeot Defendants Alone</u>: The Peugeot Defendants executed this scheme alone, using Publicis as an innocent actor.  (*Id.* ¶¶ 23–25.)

- <u>Theory 4 – Innocent Breach</u>: Defendants executed the contract in good faith, but the Peugeot Defendants became unable or unwilling to perform after the agreement became binding.  (*Id.* ¶¶ 26–29.)

The TAC alleges certain facts—including contradictory facts—in support of these alternative theories.  At this stage, the relevant inquiry is whether Alcon adequately states a claim against Publicis under *any* set of allegations in the TAC.  *See* Fed. R. Civ. P. 8(e)(2); *Molsbergen v. United States*, 757 F.2d 1016, 1019 (9th Cir. 1985). Accordingly, the Court's analysis focuses on Theory 1.

## C.    Initial Negotiations Through BEN (January – July 2016)

From January through March 2016—before Alcon had any direct contact with Defendants—BEN executives discussed the *BR 2049* placement with Publicis.  (TAC ¶ 58.)  At this point, Alcon had reached out to several brokers to gauge the market and multiple brands—including BMW, Audi, Porsche, and Subaru—expressed interest.  (*Id.* ¶ 59.)  Publicis informed BEN that Peugeot was interested in a possible integration and had the budget to commit to a multimillion-dollar media spend.  (*Id.* ¶¶ 58, 62–66.)  This information eventually reached Josh Ravetch, Alcon's product placement executive.  (*Id.* ¶ 66.) By April 2016, at least one other serious bidder had emerged for the *BR 2049* deal—an automotive company that the parties refer to as "Brand Z."  (*Id.* ¶¶ 68–70.)

Publicis therefore conspired to "set the market"—bidding high to eliminate Brand Z.  (*Id.* ¶ 70; *see id.* ¶¶ 71–75.)

In May and June 2016, Publicis provided BEN with several letters of intent ("LOIs") to establish that Peugeot "had good faith interest in bidding, [] knowing that bids would require a significant placement fee and a co-promotion commitment."  (*Id.* ¶¶ 76–78.)  Although they went through BEN, Publicis intended the letters to reach Alcon.  Indeed, Publicis received confidential information about *BR 2049*—including early access to the script—in exchange for its bids.  (*Id.* ¶¶ 77–78, 85–91.)  In a June 6, 2016 LOI, Publicis suggested a placement fee of $750,000 and a media spend commitment of "up to $20,000,000.00."  (*Id.*)  According to Alcon, the June 6, 2016 LOI constituted an offer to negotiate in good faith a deal with those terms in exchange for more confidential information about *BR 2049*.  (*Id.* ¶ 94.)  In response, Alcon shared confidential images of the spinner with BEN, Publicis, and Peugeot.  (*Id.* ¶¶ 92–94, 96–99.)  Alcon contends that this creating a "binding contract to negotiate in good faith."  (*Id.* ¶ 95.)  However, on June 29, 2016, BEN informed Ravetch that Peugeot could not commit to the terms in its most recent LOI, and negotiations broke down.  (*Id.* ¶ 102.)  At this point, BEN was cut out of the deal, and Alcon dealt directly with Defendants.  (*See id.* ¶ 104.)

### D.    The July 12, 2016 Letter of Intent

After this breakdown, Columbia executives contacted Defendants to determine whether to continue negotiations.  (*Id.*)  Mendez, Montron, and Sissoko reaffirmed Peugeot's interest in the deal, blamed BEN for any miscommunication, and agreed to resume negotiations based on the terms in the LOIs.  (*Id.*)  On July 12, 2016, Montron emailed Columbia executive Ziad Toubassy a two-page document entitled "Blade Runner II – Agreement in Principle" (the "July 12, 2016 LOI").  (*Id.* ¶ 107.)  It provided that

Peugeot, through Publicis, would negotiate in good faith to reach a binding placement and co-promotion deal that would include at least a $500,000 placement fee and a minimum $30 million co-promotion if Alcon agreed to negotiate exclusively with Peugeot moving forward.  (*Id.*)  Alcon accepted this offer and proceeded to negotiate exclusively with Peugeot and Publicis.  (*Id.* ¶ 110.)

### E.   Ongoing Negotiations and Performance (July 2016 – January 2017)

For the next six months, Peugeot's designers collaborated with Alcon to incorporate Peugeot's trade dress and brand on the spinner, while Publicis and the producers continued to negotiate the details of the deal.  (*Id.* ¶¶ 115.)  In July 2016, Mendez, Peugeot design executive Yang Cai, and Sissoko met with Alcon on location in Hungary to discuss design details.  (*Id.* ¶¶ 115–117.)  After some back and forth, Alcon incorporated Cai's designs during principal photography and post-production.  (*Id.* ¶¶ 117–122, 136–138.)

By August 16, 2016, Publicis and Alcon had agreed on the basic terms of the placement: ten seconds of visibility that would include branding on the spinner ("on-vehicle badging") and background advertisements ("wall ads").  (*Id.* ¶¶ 124, 130.)  Peugeot would have a right to approve the implementation, but its review was to be prompt, reasonable, and "within the creative and artistic parameters of the film, which were in the control of Alcon."  (*Id.* ¶ 125.)  With this structure in place, Publicis and the producers proceeded to exchange drafts of a written memorialization.  (*Id.* ¶¶ 130–135 [drafts exchanged from September 2016 through January 2017].)  In November 2016, Defendants informed Alcon that Peugeot had hired a media agency, BETC, to execute the co-promotion and media spend, and Alcon shared confidential script information with BETC executives.  (*Id.* ¶ 139.)  The parties scheduled a "kickoff" meeting for January 24, 2017, at Alcon's Los Angeles office.  (*Id.* ¶ 142.)

### F.     January 2017 Written Agreement and Kickoff Meeting

On January 10, 2017, Columbia executives emailed a long-form documentation of the agreement to Publicis.  (*Id.* ¶ 143.)  On January 18, 2017, Montron signed this agreement, and Sissoko emailed it back to Columbia, stating that it was the "final" version (the "January 2017 Writing").  (*Id.*)  Under the terms of that document, Alcon committed to providing ten seconds of visibility, including "about six (6) seconds of visibility footage in two spinner sequences and about (4) seconds to at least one outdoor/wall ad sequence," subject to Peugeot's prompt, commercially reasonable, and good faith review and approval.  (*Id.* ¶ 151.)  Upon satisfactory placement footage, Peugeot would pay a $500,000 fee and execute a $30-million co-promotional media spend.  (*Id.*)  In the agreement, Peugeot acknowledged that it had reviewed and approved visual depictions of the placement items and committed to negotiate in good faith any dissatisfaction with the placement.  (*Id.*)

Sissoko did not copy any Peugeot executives on the acceptance email, so Alcon and Columbia asked that Publicis expressly confirm Peugeot's approval.  (*Id.* ¶ 144.)  In response, Publicis sent Columbia a "Delegation of Signature Authority" signed by Mendez on behalf of Peugeot.  (*Id.* ¶ 149.)  On January 24, 2017, representatives from Alcon, Publicis, BETC, Publicis, and Peugeot, attended the "kickoff" meeting in Los Angeles.  (*Id.* ¶ 145.)  During this meeting, Defendants communicated that they were ready and willing to launch a promotional campaign and that Publicis was Peugeot's authorized agent.  (*Id.* ¶¶ 145–148.)

### G.     Renegotiations and Repudiation (February – August 2017)

After a successful kickoff meeting, the deal began to unravel.  First, an in-house lawyer for Publicis contacted Alcon, and explained that its legal team had not reviewed

the January 2017 Writing and wanted the opportunity to "make some limited comments." (*Id.* ¶ 154.)  Without waiving rights, Alcon and Columbia agreed to receive comments and continued to plan the co-promotion with Peugeot.  (*Id.* ¶ 155.)  In April 2017, Publicis's lawyer sent Alcon and Columbia a revised draft of the agreement.  (*Id.* ¶ 156.)  The draft left most of the material terms in place, but attempted to create "moving targets" for Peugeot's approval of the placement.  (*Id.* ¶¶ 157–158.)  Alcon and Columbia rejected the changes and asked Peugeot to confirm its commitment to the January 2017 Writing.  (*Id.* ¶ 159.)  This never happened.

In April 2017, a Columbia executive contacted Mendez to ask why Peugeot had not provided a detailed co-promotion plan.  (*Id.* ¶ 161.)  Mendez denied having committed to any media spend and claimed that Publicis had no deal-making authority for Peugeot.  (*Id.* ¶¶ 161–164.)  She proposed a new agreement that would give Peugeot full discretion to dictate the terms of any media spend *after* the film's theatrical release.  (*Id.* ¶¶ 165, 176.)  In June 2017, Columbia and Peugeot executives met in Paris and attempted to salvage the deal.  (*Id.* ¶¶ 181–188.)  These negotiations broke down after Mendez expressed that Peugeot would not commit to the co-promotion, regardless of whether it was satisfied with the placement.  (*Id.* ¶ 191.)

Around the same time, Peugeot executives delayed their review of the placement footage, then claimed that it was unsatisfactory based on unfounded and unreasonable objections.  (*Id.* ¶¶ 189–190.)  For example, Peugeot objected to elements that its own designer had produced.  (*Id.* ¶ 190.)  Peugeot ultimately refused to work with the producers to resolve its objections.  (*See id.* ¶¶ 189–194.)  On June 14, 2017, Columbia communicated that it believed Peugeot's denial of satisfaction was in bad faith and it was time to "turn it over to lawyers."  (*Id.* ¶ 194.)  A few days later, Alcon and Columbia executives sent a fully executed copy of the January 2017 Writing to Mendez.  (*Id.*)

Despite Defendants' repudiation, Alcon made a good-faith attempt to satisfy the terms of the agreement.  (*Id.* ¶¶ 197–203.)  The released film depicts Peugeot's branding and trade dress for at least twelve seconds.  (*Id.* ¶ 203.)  Peugeot never promoted the film and never paid Alcon a placement fee.  (*Id.* ¶¶ 207, 218.)  *BR 2049* won two academy awards and grossed $260 million.  (*Id.* ¶¶ 208–209.)  Peugeot's branding is clearly visible in posters for the film, which show Gosling standing next to the spinner.  (*Id.* ¶¶ 206, 277.)  Based on these allegations, Alcon brought suit against Peugeot and Mendez and later amended to add Publicis.  (*See id.*)

## III.  LEGAL STANDARD

A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of the claims asserted in the complaint.  The issue on a motion to dismiss for failure to state a claim is not whether the claimant will ultimately prevail, but whether the claimant is entitled to offer evidence to support the claims asserted.  *Gilligan v. Jamco Dev. Corp.*, 108 F.3d 246, 249 (9th Cir. 1997).  Rule 12(b)(6) is read in conjunction with Rule 8(a), which requires only a short and plain statement of the claim showing that the pleader is entitled to relief.  Fed. R. Civ. P. 8(a)(2).  When evaluating a Rule 12(b)(6) motion, the district court must accept all material allegations in the complaint as true and construe them in the light most favorable to the nonmoving party.  *Moyo v. Gomez*, 32 F.3d 1382, 1384 (9th Cir. 1994).

However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (stating that while a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, courts "are not bound to accept as true a legal conclusion couched as a factual allegation" (citations and quotes omitted)).  Dismissal of a complaint for failure to state a

claim is not proper where a plaintiff has alleged "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. In keeping with this liberal pleading standard, the district court should grant the plaintiff leave to amend if the complaint can possibly be cured by additional factual allegations. *Doe v. United States*, 58 F.3d 494, 497 (9th Cir. 1995).

## IV. DISCUSSION

The Court first addresses the evidentiary scope of the instant motion. In 2019, Defendants filed two separate motions to dismiss for lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2). (Dkt. 22, 55.) After allowing the parties to conduct jurisdictional discovery and submit evidence, (*see* Dkt. 73), the Court denied both motions, (Dkt. 133). Publicis's motion relies heavily on evidence introduced during this phase. (*See e.g.*, Mot. at 3 [citing Dkt. 111-5, 128-4].) But a motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, and the Court declines to convert the instant motion into one for summary judgment.

It is true that a district court may consider documents "whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading," *see Branch v. Tunnell*, 14 F.3d 449, 454 (9th Cir. 1994), if those documents are "central to the plaintiff's claim," *see United States v. Corinthian Colleges*, 655 F.3d 984, 999 (9th Cir. 2011). And, as Publicis points out, the TAC refers to much of the evidence at issue. (*See, e.g.*, TAC ¶ 106 [citing "jurisdiction Exhibit 23"].) However, at this stage, the Court's authority to "consider" such documents does not allow the Court to "draw inferences or take notice of facts that might reasonably be disputed." *Corinthian Colleges*, 655 F.3d at 999. Because the meaning and significance of the evidence cited by Publicis is disputed, the Court's analysis focuses on the

allegations in the TAC.  *See id.*  If Publicis believes the evidence in the record is sufficient to defeat Alcon's claims, it can move for summary judgment.

**A.      Breach of Contract**

Publicis first argues that Alcon fails to state a claim for breach of contract because it fails to allege the requisite elements under California law.  Alternatively, it argues that, as an agent for a disclosed principal, it cannot be liable for Peugeot's breach and that this claim is precluded by California's statute of frauds.  The Court first addresses the substantive elements of Alcon's claim, then Publicis's remaining arguments.

1.      <u>Existence of a Contract</u>

To state a claim for breach of contract in California, a plaintiff must allege: (1) existence of a contract, (2) plaintiff's performance or excuse for non-performance, (3) defendant's breach, and (4) resulting damage.  *See Oasis West Realty, LLC v. Goldman*, 51 Cal. 4th 811, 821 (2011).  Publicis first challenges the existence of a *BR 2049* co-promotion contract.  A contract exists only if the parties are capable of contracting, they manifest objective consent, the contract has a lawful object, and there is sufficient consideration.  Cal. Civ. Code § 1550.  Publicis asserts that Alcon has not properly alleged mutual objective consent.  (Mot. at 12–13.)  The Court disagrees.

Publicis argues that the parties never agreed on specific terms and therefore never achieved mutual objective consent.  (*Id.*)  Under California law, in order for a contact to be formed, "the contract terms must be clear enough that the parties can understand what each is required to do."  *Hynix Semiconductor Inc. v. Rambus Inc.*, 441 F. Supp. 2d 1066, 1073 (N.D. Cal. 2006) (citing Cal. Jury Instructions Civil No. 302; Rest. 2d Contracts § 33(1)); *see Ladas v. Cal. State Automobile Assn.*, 19 Cal. App. 4th 761, 770 n.2

(holding that an amorphous promise cannot rise to the level of a contractual duty).  The allegations in the TAC plainly meet this threshold.  The TAC details the terms of an agreement finalized by the January 2017 Writing.  (TAC ¶ 151.)  Columbia proposed this "final" agreement to Publicis, and Publicis signed it on behalf of Peugeot.  (*Id.* ¶ 143.)

Publicis objects to Alcon's allegation that the parties executed a "partially written, partially oral contract . . . evidenced in part by the January 18, 2017 Writing and the October 16, 2016 Writing."  (*See* TAC ¶ 216.)  According to Publicis, the TAC impermissibly "cherry-picks" terms from different drafts of the parties' agreements, which shows a lack of mutual consent.  (Mot. at 13.)  At this stage, the Court is not convinced.  The substantive terms of each side's performance are essentially identical in the agreement described in the TAC and the January 2017 Writing.  (*Compare* TAC ¶ 151 *to* Dkt. 144-3 [January 2017 Writing, hereinafter "2017 PLA"] §§ 8.III.a, 9.)[6]  In other words, the TAC alleges that the parties agreed on clear terms setting out what both sides were required to do.  *See Hynix Semiconductor*, 441 F. Supp. 2d at 1073.  The TAC's reference to terms outside the four corners of the January 2017 Writing does not show a lack of mutual consent.

## 2.      Performance or Excuse for Non-Performance

Publicis next argues that Alcon failed to deliver a satisfactory placement under the terms of the alleged agreement and therefore has not alleged its own performance or excuse for non-performance.  *See Oasis West Realty*, 51 Cal. 4th at 821 (second element).  According to Publicis, "a stopwatch shows indisputably that the Gosling Product Placement is on screen less than 10 seconds," and "Alcon does not allege otherwise."

---

[6] Alcon acknowledges the authenticity of the January 2017 Writing proffered by Publicis, (*see* Dkt. 181 [Opposition] at 19), and the Court takes notice of its contents as a document "whose contents are alleged in a complaint . . . but which [is] not physically attached to the pleading," *see Branch*, 14 F.3d at 454.

(Mot. at 15.)  The second statement is false.  In fact, Alcon alleges that the released film delivered at least twelve seconds of visibility.  (TAC ¶ 203.)  And, at this stage, the Court declines to test this allegation with a stopwatch.  The Court may not "draw inferences or take notice of facts that might reasonably be disputed" on a motion to dismiss.  *See Corinthian Colleges*, 655 F.3d at 999.  Determining—millisecond by millisecond—which shots satisfy the visibility criteria would obviously be subject to reasonable dispute and is inappropriate at this stage.  *See id.*

### 3.   Statute of Frauds

Publicis next contends that the "partially written, partially oral" contract alleged in the TAC violates California's statute of frauds.  (*See* Mot. at 13–14.)  Although the statute of frauds is an affirmative defense, it can be raised in a motion to dismiss if apparent on pleadings.  *See McCalden v. Cal. Library Ass'n*, 955 F.2d 1214, 1219 (9th Cir. 1990).  This is an exacting standard.  "A court should dismiss a breach of contract claim based on the statute of frauds only if it is clear from the face of the complaint or the documents attached thereto that the statute of frauds presents an insurmountable bar to plaintiff's cause of action."  *Jun-En Enter. v. Lin*, 2012 WL 12886499, at *2 (C.D. Cal. Oct. 17, 2012) (internal quotations omitted).  Publicis has not shown such a bar.

Under California's statute of frauds, "[a]n agreement that by its terms is not to be performed within a year from the making thereof" is invalid unless it "or some note or memorandum thereof" is "in writing and subscribed by the party to be charged or by the party's agent."  Cal. Civ. Code § 1624(a)(1).  Publicis apparently concedes that the January 2017 Writing could satisfy this requirement.  (*See* Mot. at 14.)  However, it argues that Alcon "cobbled together" an alleged agreement from several *different* writings and fails to identify a "definitive" writing that satisfies the statute of frauds.  (*See id.*)  Specifically, it argues that "there are conflicting price provisions" in various

documents exchanged during negotiations.  (*See id.*)  This argument falls flat.  In the TAC, Alcon identifies the January 2017 Writing as the definitive version of the parties' agreement.  (*See* TAC ¶¶ 143–151.)  Publicis's "conflicting price provisions" theory is pure obfuscation.  Alcon is not attempting to enforce the price provisions from earlier versions of the agreement—it is attempting to enforce the price provisions in the January 2017 Writing.  (*Compare id.* ¶¶ 151(n)–151(q) *with* 2017 PLA §§ 8–9.)  The TAC satisfies the statute of frauds because it alleges a writing that "identifies the subject of the parties' agreement, shows that they made a contract, and states the essential contract terms with reasonable certainty."  *See Sterling v. Taylor*, 40 Cal. 4th 757, 766 (2007).

### 4.   Agency Liability

Finally, Publicis argues that even if the parties executed an enforceable contract, it cannot be liable for Peugeot's breach as a disclosed agent.  California Civil Code § 2343 provides that an agent is generally not liable for breach of contract by its principal.  However, "[o]ne who assumes to act as an agent is responsible to third persons as a principal for his acts in the course of his agency . . . [w]hen he enters into a written contract in the name of his principal, without believing, in good faith, that he has authority to do so."  Cal. Civ. Code § 2343(2).  It is well-settled that, under § 23243(2), an agent can be liable on the contract as the principal.  *See Borton v. Barnes*, 48 Cal. App. 589, 591 (Cal. Ct. App. 1920).  Publicis argues that this exception cannot apply because Alcon fails to specify what "written contract" Publicis entered.  (*See* Mot. at 10.)

Once again, Publicis objects to the "partially written, partial oral" contract alleged by Alcon.  (*See* TAC ¶ 216.)  According to Publicis, a "written contract" subject to § 2343(2) "cannot have an 'oral' part."  (Mot. at 11.)  In other words, Publicis argues that § 2343(2) only applies if one writing "contains all the terms of the contract."  (*See id.*)  This argument has no support in California law.  Neither of the cases Publicis cites for

this proposition address § 2343—indeed, neither involve the liability of agents.  *See E.O.C. Ord, Inc. v. Kovakovich*, 200 Cal. App. 3d 1194, 1199–200 (Ct. App. 1988); *Benard v. Walkup*, 272 Cal. App. 595 (1969).  Nor do these cases involve analogous legal questions.  Instead, they stand for the uncontroversial principle that "the receipt and acceptance by one party of a writing signed by the other party, and purporting to embody all the terms of a contract between the two, binds the acceptor as well as the signer, to the terms of the writing."  *See id.*

Publicis's implicit argument—here and elsewhere—is that a "written agreement" cannot be supplemented or interpreted through external evidence.  This is not the law. *See* Cal. Civ. Proc. Code § 1856 ("The terms set forth in a [written contract] may be explained or supplemented by evidence of consistent additional terms unless the writing is intended also as a complete and exclusive statement of the terms of the agreement."); *Schwartz v. Shapiro*, 229 Cal. App. 2d 238, 248 (1964) ("The formal written contract is not the agreement of the parties, but only evidence of that agreement.")  Nothing in the language of § 2343(2) suggests that it only applies to fully integrated contracts, and the Court declines to invent such a rule.  *See* Cal. Civ. Code § 2343(2).

Alternatively, Publicis argues that even if the parties had a written agreement, Publicis was fully authorized to bind Peugeot pursuant to Mendez's Delegation of Signature Authority.  (*See* Mot. at 11–12.)  This misses the point.  Under Theory 1, Alcon alleges that Publicis exceeded its delegated authority because of the *terms* of the agreement.  Specifically, Publicis allegedly executed an agreement for a $30-million media spend without a good faith belief that it had authority to commit Peugeot to *any* media spend.  (*See* TAC ¶ 150.)  This allegation satisfies § 2343(2).  *See Borton v. Barnes*, 48 Cal. App. 589, 590 (Cal. Ct. App. 1920) (concluding that defendant exceeded the scope of his authority as an agent by executing a contract that was not authorized by

principal and therefore could be liable for ensuing breach).  Accordingly, Alcon has stated a valid breach of contract claim against Publicis.[7]

## B.    Promissory Estoppel

Publicis next argues that Alcon fails to state a claim for promissory estoppel because it does not allege that Publicis made any promises "for its own performance on which Alcon relied."  (Mot. at 16.)  Under California law, the elements of a claim for promissory estoppel are: (1) a promise clear and unambiguous in its terms; (2) reliance by the party to whom the promise is made (3) that is both reasonable and foreseeable; and (4) the party asserting the estoppel must be injured by his reliance.  *See U.S. Ecology, Inc. v. California*, 129 Cal. App. 4th 887, 901–02 (2005).  "A cause of action for promissory estoppel is a claim in equity that substitutes reliance on a promise for consideration."  *Fleet v. Bank of Am. N.A.*, 229 Cal. App. 4th 1403, 1412–13 (Ct. App. 2014) (citing *Youngman v. Nevada Irrigation Dist.*, 70 Cal. 2d 240, 249 (1969)).  Although promissory estoppel is a "contract principle," *see Cooper v. State Farm Mut. Auto. Ins. Co.*, 177 Cal. App. 4th 876, 892 (2009), one set of facts cannot give rise to liability for both breach of contract *and* promissory estoppel, *see Money Store Inv. Corp. v. S. California Bank*, 98 Cal. App. 4th 722, 732 (2002).  Nevertheless, a plaintiff can plead both claims in the alternative.  *See Fleet*, 229 Cal. App. 4th at 1412–13.

Publicis first argues that § 2343(2) cannot create liability for promissory estoppel against the agent of a disclosed principal.  (Mot. at 16.)  This appears to be an issue of first impression, and the Court agrees that it is an awkward fit.  As discussed above, § 2342(2) provides that an agent can be responsible to third persons as a principal

---

[7] Publicis challenges Alcon's claim for breach of the implied covenant of good faith and fair dealing on the same grounds, arguing that it cannot be liable under § 2343(2) because there is no comprehensive written agreement.  (*See* Mot. at 15–16.)  This argument fails for the reasons set out above.

"[w]hen he enters into a written contract in the name of his principal, without believing, in good faith, that he has authority to do so."  Cal. Civ. Code § 2343(2).  The purpose of promissory estoppel is to allow courts to enforce *non-contractual* promises.  *See U.S. Ecology*, 129 Cal. App. 4th at 902 (explaining that the doctrine "allow[s] enforcement of a promise that would otherwise be unenforceable").  Accordingly, a claim for promissory estoppel seems inherently incompatible with § 2343(2), which requires an enforceable written agreement.

However, in the TAC, Alcon also alleges that Publicis can be liable for promissory estoppel under § 2343(3).  This subsection provides that "an agent is responsible to third persons as a principal for his acts in the course of his agency . . . [w]hen his acts are wrongful in their nature."  Cal. Civ. Code § 2343(3).  Under California law, acts are wrongful in their nature if they would constitute a tort or fraud.  *See Millsap v. Nat'l Funding Corp. of Cal.*, 135 P.2d 407 (1943) (stating that an agent is liable where payment turned over to principal is induced by agent's fraud); *Montaquila v. Countrywide Home Loans, Inc.*, 2008 WL 11342693, at *4 (C.D. Cal. May 7, 2008) (same).  Under Theory 1, the TAC alleges that Publicis defrauded Peugeot and Alcon during negotiations.  (*See* TAC ¶¶ 16–18.)  Specifically, Publicis—on behalf of Peugeot—allegedly promised to negotiate in good faith toward a deal that included a $30-million media spend, despite its knowledge that Peugeot had no budget for a promotion and could not make such a commitment.  (*See id.*)  To the extent Alcon states a valid claim for fraud based on this theory, it also states a plausible claim for promissory estoppel.  As alleged, the fraudulent promise was "clear and unambiguous" in its terms and caused reasonably foreseeable reliance and injury.  *See U.S. Ecology*, 129 Cal. App. 4th at 901–02.

Finally, Publicis argues that because Alcon verified Peugeot's promises directly with Peugeot, Publicis cannot be liable for promissory estoppel.  This ignores the

allegation that for more than a year—from January 2016 through April 2017—Alcon
negotiated directly with Publicis and relied on Publicis's ostensible authority to execute a
binding agreement.  Peugeot's alleged misconduct is relevant to the proper equitable
remedy, but does not negate Alcon's claim against Publicis.  *See Racine & Laramie, Ltd.
v. Dep't of Parks & Recreation*, 11 Cal. App. 4th 1026, 1035 (1992), *as modified* (1993).
("[I]n the course of negotiations it is possible for a party to so mislead another by
promises or representations, upon which the second party detrimentally relies, as to bring
into play the concept of promissory estoppel.")  At this stage, the Court is not persuaded
that Plaintiff's breach of contract or promissory estoppel claims fail based on Publicis's
status as an agent.

### C.    Duty to Negotiate in Good Faith

Publicis mounts a similar challenge to Alcon's claim for breach of the duty to
negotiate in good faith.  (*See* Mot. at 16–17; TAC ¶¶ 248–258.)  Publicis argues that
Alcon fails to allege a binding contract to negotiate in good faith.  Alternatively, it argues
that the LOIs only bound Peugeot and cannot support Publicis's liability.  The Court
finds both arguments unavailing.

Under California law, "[t]he fact that parties commence negotiations looking to a
contract, or to the amendment of an existing contract, does not by itself impose any duty
on either party not to be unreasonable or not to break off negotiations, for any reason or
for no reason." *Racine & Laramie, Ltd. v. Dep't of Parks & Recreation*, 11 Cal. App. 4th
1026, 1034–35 (1992), *as modified* (1993).  However, "[d]uring the course of
negotiations things may be done which do then impose a duty of continued bargaining
only in good faith." *Id.*  For example, "in anticipation of an agreement the parties may,
by letter of intent or otherwise, agree that they will bargain in good faith for the purpose
of reaching an agreement." *Id.* at 1035.  Here, Alcon properly alleges that the LOIs

executed in May, June, and July 2016 created such an obligation by expressly confirming the parties' commitment to negotiate a co-promotional agreement in good faith.  (*See* TAC ¶¶ 76–83, 93–95, 107–113.)

Publicis argues that a disclaimer in the LOIs precludes Alcon's claims.  The LOIs included the following language: "WARNING: This agreement is not a contract.  It only intends to establish a tangible partnership between Peugeot and the Blade Runner II movie."  (*Id.* ¶ 108.)  At this stage, the Court finds that Alcon states a valid claim despite this disclaimer.  The stated intent of the LOI was "to establish a tangible partnership." (*Id.*)  To that end, it outlined a commitment to negotiate in good faith.  (*See id.*)  Alcon allegedly accepted this promise both expressly and by its conduct—terminating negotiations with other automotive companies and incorporating Peugeot's design during production.  (*See id.* ¶¶ 108, 114–129.)  At this stage, the Court cannot resolve the parties' competing interpretations of the evidence in the record and must accept the facts alleged in the TAC.  *See Corinthian Colleges*, 655 F.3d at 999.  Accordingly, on the instant motion, the Court credits Alcon's interpretation—the disclaimer clarified that the substantive terms of the co-promotion set out in the LOI were not final, and the LOI nevertheless created a binding commitment to negotiate in good faith.  (*See* TAC ¶ 108.)

Alcon also properly alleges a breach of this duty.  To state a claim for a breach of the duty to negotiate in good faith, a plaintiff must allege a deliberate act that "unfairly frustrates the agreed common purposes and disappoints the reasonable expectations of the other party," *see Careau & Co. v. Sec. Pac. Bus. Credit, Inc.*, 222 Cal. App. 3d 1371, 1395 (1990), and "that the defendant acted in bad faith to frustrate the contract's benefits," *see Celador Int'l Ltd. v. Walt Disney Co.,* 347 F. Supp. 2d 846, 852 (C.D. Cal. 2004).  Alcon does just that.  Under Theory 1, the TAC alleges that Publicis executed the LOIs in bad faith and with the knowledge that Peugeot would never agree to a co-promotional media spend.  (*See* TAC ¶¶ 16–18.)  Because Alcon alleges deliberate,

tortious conduct committed in bad faith, it properly states a claim attributable to Publicis
under § 2343(3).

### D.    Fraud

Finally, Publicis argues that Alcon's fraud claim does not satisfy Federal Rule of
Civil Procedure 9(b)'s particularity requirement.  (Mot. at 17–24.)  The Court disagrees.[8]
Under California law, the elements of a fraudulent deceit claim are "(1) misrepresentation
(false representation, concealment or known disclosure); (2) knowledge of falsity
(scienter); (3) intent to induce reliance; (4) justifiable reliance; and (5) resulting damage."
*Beijing Tong Ren Tang (USA) Corp. v. TRT USA Corp.*, 2010 WL 890048, at *2 (N.D.
Cal. Mar. 8, 2010) (quoting *Zinn v. Ex-Cell-O Corp.*, 148 Cal. App. 2d 56, 68 (1957));
*see* Cal. Civ. Code §§ 1709–1710.  "Making a promise without any intention of
performing it constitutes deceit and satisfies the misrepresentation and scienter
requirements."  *Beijing Tong Ren Tang*, 2010 WL 890048, at *2.

Like all claims sounding in fraud, claims for fraudulent deceit must satisfy the
heightened pleading requirements of Rule 9(b).  *Id.*  Under that rule, a plaintiff alleging
fraud must "state with particularity the circumstances constituting fraud or mistake."
Fed. R. Civ. P. 9(b); *see Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1145 (9th Cir. 2009).
This means "[t]he plaintiff must set forth what is false or misleading about a statement,
and why it is false."  *In re GlenFed, Inc. Sec. Litig.*, 42 F.3d 1541, 1548 (9th Cir. 1994).
In other words, a plaintiff must plead the "who, what, when, where, and how" of the
alleged misconduct.  *See Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir.
2003); *Cooper v. Pickett*, 137 F.3d 616, 627 (9th Cir. 1997).  When an artificial entity is

---

[8] Because the Court finds that Alcon properly states a claim for fraud against Publicis directly, it need
not address the allegation that Publicis aided and abetted Mendez's fraudulent misconduct.  (*See* TAC
¶ 272 [fifth claim for relief].)

the alleged perpetrator of the fraud, the plaintiff must "allege the names of the persons who made the allegedly fraudulent representations, their authority to speak, to whom they spoke, what they said or wrote, and when it was said or written." *UMG Recordings, Inc. v. Glob. Eagle Entm't, Inc.*, 117 F. Supp. 3d 1092, 1107 (C.D. Cal. 2015).

In the TAC, Alcon enumerates thirty-four false statements and identifies twenty-eight statements as relevant to its fraud claim against Publicis. (*See* TAC ¶ 288.) As Publicis points out, many of the alleged statements fail to satisfy Rule 9(b). For example, the TAC sometimes refers to the "thrust" of communications. (*See, e.g.*, *id.* ¶ 77 ["This May 2, 2016 communication and its thrust is 'False Statement No. 5.'"].) Other statements were made by third parties, not Defendants. For example, False Statement 7 is a phone call between Reiko Porter (a BEN executive) and Ravetch (an Alcon executive), during which Porter communicated that Peugeot had made a bid with certain terms. (*See id.* ¶ 79.) According to the TAC, Publicis "caused the making of Porter's statements to Alcon related to Peugeot's intentions, ability to perform, and the authority of Casablanca, via the Sissoko and/or Montron to Morizet, and then through on to Porter, then to Ravetch, chain." (*Id.*) To be sure, actionable fraud can include misrepresentations made to a third party with intent that they be "repeated and acted upon by the plaintiff." *See Geernaert v. Mitchell*, 31 Cal. App. 4th 601, 605 (1995). However, a plaintiff must still allege with sufficient specificity the statements made by the defendant to the third party—not just the relayed version of that message. *See Vess*, 317 F.3d at 1106.

Nevertheless, the Court finds that Alcon states a sufficiently particularized claim for fraudulent deceit against Publicis based on at least False Statements 17, 18, and 23.[9]

---

[9] Publicis offers an identical challenge to Alcon's claim for negligent misrepresentation, arguing that it fails to satisfy Rule 9(b)'s specificity requirement. (*See* Mot. at 24–25.) The Court rejects this argument for the reasons set out above.

False Statement 17 identifies specific emails Montron sent to Ziad Toubassy, a Columbia executive, between July 5 and July 11, 2016, which allegedly expressed Peugeot's commitment to negotiate a deal that included a $30-million media spend.  (*Id.* ¶ 106.) False Statement 18 is the two-page LOI that Montron allegedly emailed to Toubassy on July 12, 2016, reaffirming the same and setting out the tentative terms of the parties' agreement.  (*Id.* ¶ 107.)  Finally, False Statement 23 is the email Sissoko sent to Columbia on January 18, 2017, with an attached copy of the signed long-form agreement, which Sissoko referred to as "final."  (*Id.* ¶ 143.)  As summarized here, Alcon properly alleges the "who, what, when, where, and how" of these statements.  *See Vess*, 317 F.3d at 1106.  It also alleges why these statements were false: they communicated a promise to negotiate in good faith and to perform a $30-million media spend "without any intention of performing" and omitted the material fact that Peugeot had no budget for a co-promotion.  *See Beijing Tong Ren Tang*, 2010 WL 890048, at *2.


Finally, Alcon properly alleges facts supporting Publicis's knowledge of falsity and intent to induce reliance.  *See Oestreicher v. Alienware Corp.,* 544 F. Supp. 2d 964, 968 (N.D. Cal. 2008), *aff'd* 322 F. App'x 489 (9th Cir. 2009) (explaining that a claim for fraud must "set forth facts from which an inference of scienter could be drawn") (quoting *Twombly,* 550 U.S. at 569)); *In re GlenFed*, 42 F.3d at 1548 (explaining that a plaintiff must allege "circumstances indicating falseness").  A party may not transform a contract claim into a fraud claim "by simply pleading, without more, that [the other party] never intended to perform on the contracts; something more than nonperformance is required to establish" a fraud claim.  *See Tanedo v. E. Baton Rouge Par. Sch. Bd.*, 2012 WL 5447959, at *8 (C.D. Cal. Oct. 4, 2012).  Here, under Theory 1, Alcon alleges that Publicis offered a $30-million media spend "without authority from Peugeot" or "in direct contravention of Peugeot's instructions" in order to push out other bidders.  (*See* TAC ¶¶ 85, 100, 104, 134); *cf. Tanedo*, 2012 WL 5447959, at *8 (dismissing fraud claim where the party had "not pleaded any facts to make plausible the claim that, at the time

[the other party] entered into the recruiting contracts, they had no intention of honoring them"). It also alleges that Montron and Sissoko had a pattern and practice of negotiating product placements on Peugeot's behalf, then refusing to perform as promised. (*See* TAC ¶¶ 48–50). Taken together, these allegations plausibly establish Publicis's scienter and intent to induce reliance. *Cf. MatVan, Inc. v. Sheldon Good & Co. Auctions, LLC,* 2007 WL 2206946, *6 (C.D. Cal. July 27, 2007) (dismissing claim where "plaintiffs' factual allegations fail[ed] to demonstrate that defendants did not have an intention to keep promises at the time they w[ere] made").

## V. CONCLUSION

For the foregoing reasons, Publicis's motion to dismiss the TAC for failure to state a claim is **DENIED**.

After reviewing the January 2017 Writing, the Court must express its concern about the parties' litigious conduct. The agreement includes an arbitration clause pursuant to which "[a]ll actions or proceedings arising in connection with, touching upon or relating to this agreement, the breach thereof and/or the scope of the provisions of this section [] shall be submitted to JAMS [] for final and binding arbitration." (2017 PLA § 37(a).) The Court can only speculate as to why none of the parties have invoked this clause. It is concerned, however, that one side may choose to do so at an opportune moment—after wasting the time and resources of the Court and the parties.

The Court also notes that the January 2017 Writing appears to strictly limit the damages available in this proceeding. According to its liability provision, "[n]either party will be liable for consequential, incidental, special or punitive damages or other damages other than actual damages arising between the parties to this agreement from the relationship or the conduct of business contemplated herein." (*Id.* § 32.) The Court is

therefore skeptical that Alcon could recover the $30 million in general damages specified in its Prayer for Relief. (*See* TAC at 115–118.) In all likelihood, the amount at issue is significantly less.

The Court therefore strongly believes this case should settle or, at the very least, proceed to arbitration. Given the costs of protracted litigation, it may well be in the parties' best interests to resolve this dispute informally. The Court reminds counsel of their ethical obligation to dedicate themselves to their clients' interests and encourages them to use their best efforts to facilitate a reasonable settlement.

DATED:     July 7, 2020

_____

CORMAC J. CARNEY

UNITED STATES DISTRICT JUDGE